No. 13-3350

# THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

AARON MCCOY,
*Plaintiff*

v.

GAMESA WIND US, LLC,
*Defendant-Appellee*

and

IBERDROLA RENEWABLES, INC. and GAMESA TECHNOLOGY CORPORATION, INC.
*Defendant-Third Party Plaintiffs-Appellees*,

and

OUTLAND RENEWABLE ENERGY LLC n/k/a RENOVO RENEWABLE ENERGY, LLC
and OUTLAND ENERGY SERVICES, LLC, n/k/a NORTHWIND HOLDINGS, LLC, f/k/a/
OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC,
*Third Party Defendants-Appellants.*

_____

Appeal from the United States District Court for the Northern District of Illinois, Eastern
Division
No. 1:11-cv-00592
Hon. Charles P. Kocoras
_____

**APPELLANT'S CIRCUIT RULE 30(b) APPENDIX**
_____

# CIRCUIT RULE 30(B) APPENDIX

## TABLE OF CONTENTS

Page

1. DOCKET ENTRY 53—CROSS-CLAIM FILED BY THE GAMESA PARTIES AGAINST
   OUTLAND WITHOUT EXHIBITS…………………………………………....…..…… A49

2. DOCKET ENTRY 112—ORIGINAL COUNTERCLAIM FILED BY OUTLAND AGAINST
   THE GAMESA PARTIES……………………………………………………….……… A56

3. DOCKET ENTRY 290—ORDER RE GOOD FAITH FINDING…………………..……… A108

4. DOCKET ENTRY 291—ORDER RE GOOD FAITH FINDING…………………..……… A112

5. DOCKET ENTRY 297—MOTION FOR LEAVE TO AMEND ORIGINAL
   COUNTERCLAIM……………….....................................................…… A116

6. DOCKET ENTRY 297, ATT. 1—PROPOSED AMENDED COUNTERCLAIM……..…… A129

7. DOCKET ENTRY 354—RULE 59 MOTION………………………………………… A159

8. DOCKET ENTRY 358—TRANSCRIPT, AUGUST 8, 2013, OF PROCEEDINGS ON
   RULE 54 MOTION…………………………………………………………………… A186

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY,<br><br>          Plaintiff<br><br>v.<br><br>GAMESA TECHNOLOGY CORPORATION, INC.,<br>and IBERDROLA RENEWABLES, INC.,<br><br>          Defendants. | : : : : : : : : : : : : : : | District Judge<br>The Honorable Charles P. Kocoras<br><br>Magistrate Judge:<br>The Honorable Arlander Keys<br><br>Case No. 11-CV-00592<br><br>JURY DEMAND |
| IBERDROLA RENEWABLES, INC. and<br>GAMESA TECHNOLOGY CORPORATION, INC.,<br><br>          Third-Party Plaintiffs,<br><br>v.<br><br><br>OUTLAND RENEWABLE ENERGY, LLC.<br>OUTLAND ENERGY SERVICES, LLC<br>OUTLAND RENEWABLE ENERGY FIELD<br>SERVICES, LLC,<br><br>          Third-Party Defendants. | : : : : : : : : : : : : | |
| IBERDROLA RENEWABLES, INC.<br><br><br>          Third-Party Plaintiffs,<br><br>v.<br><br><br>GAMESA WIND US, LLC<br><br>          Third-Party Defendants. | : : : : : : : : : : : | |

## GAMESA TECHNOLOGY CORPORATION, INC'S CROSS-CLAIM AGAINST OUTLAND ENERGY SERVICES, LLC, INDIVIDUALLY, AND AS SUCCESSOR TO, AND ASSIGNEE OF, OUTLAND RENEWABLE ENERGY, LLC

NOW COMES Defendant/Third-Party Plaintiff, Gamesa Technology Corporation, Inc.

("Gamesa"), by and through its attorney, Julie Negovan, Esq., of Kutak Rock LLP, as and for its

Cross-claim against Third-Party Defendant Outland Energy Services, LLC, Individually, and as

Successor to, and Assignee of, Outland Renewable Energy, LLC ("OES"), states as follows:

### INTRODUCTION

1.      On December 7, 2010, Plaintiff Aaron McCoy filed a two count Complaint at

Law ("Plaintiff's Complaint at Law") against Defendant/Third-Party Plaintiff Gamesa

Technology Corporation, Inc. and Defendant/Third-Party Plaintiff Iberdrola Renewables, Inc.

("Iberdrola").  Plaintiff alleged, *inter alia*, that on or about October 20, 2010, he was an

electrician employed by Outland Renewable Energy, LLC ("ORE," sometimes hereinafter

referred to collectively with OES, "Outland") and that he was installing a turbine at a wind farm

near Cayuga Ridge South, Livingston County, Illinois when, during the course of said

employment, the power source for the wind turbine at issue was turned on or otherwise activated,

causing Plaintiff to suffer significant injuries.  Plaintiff seeks damages from Defendant/Third-

Party Plaintiffs Gamesa and Iberdrola based upon alleged negligent and careless acts or

omissions in, among other things more fully set forth in the Plaintiff's Complaint at Law, turning

on the power source to the turbine at issue.  A copy of Plaintiff's Complaint at Law is attached

hereto and made a part hereof as Exhibit "A" and is incorporated herein by reference as if set

forth at length.

**A51**

2.      Upon information and belief, it is averred that Outland Energy Services, LLC is the successor in interest and assignee of the duties, obligations, and responsibilities of Outland Renewable Energy, LLC.

3.      Iberdrola subsequently filed Third-Party Complaints against various parties, including, among others, OES.

4.      Defendant/Third-Party Plaintiff Gamesa has filed an Answer and Affirmative Defenses to Plaintiff's Complaint at Law, denying all material allegations set forth therein. Furthermore, Defendant/Third-Party Plaintiff Gamesa continues to deny said allegations, and nothing contained herein is intended as a waiver or withdrawal of said denials. A copy of Defendant/Third-Party Plaintiff Gamesa's Answer and Affirmative Defenses is attached hereto and made a part hereof as Exhibit "B" and is incorporated by reference herein as if set forth at length. Without making any admissions to the contrary, and pleading strictly in the alternative, Defendant/Third-Party Plaintiff Gamesa asserts this Cross-claim against OES.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to hear and determine this Cross-claim pursuant to Rule 14 of the Federal Rules of Civil Procedure and the ancillary jurisdiction of this Court.

6.      Venue is proper in this District pursuant to Rule 14 of the Federal Rules of Civil Procedure.

## COUNT I — CONTRIBUTION

7.      Defendant/Third-Party Plaintiff Gamesa incorporates paragraphs 1-6 above by reference as if set forth at length herein.

8.      At all times relevant hereto, including on October 20, 2010, the date of the occurrence alleged in Plaintiff's Complaint at Law, Third-Party Defendant ORE was Plaintiff's employer and, as such, had a duty, among other things, to exercise ordinary and reasonable care

**A52**

for Plaintiff's safety, to provide Plaintiff with a safe working environment, and to ensure that Plaintiff had the appropriate skills, training, supervision, and safety equipment necessary to perform Plaintiff's job in a safe and proper manner.

9.    At all times relevant hereto, including on October 22, 2010, the date of the occurrence alleged in Plaintiff's Complaint at Law, Third-Party Defendant OES was the successor in interest and assignee to ORE, who was Plaintiff's employer, and as such had a duty, among other things, to exercise ordinary and reasonable care for Plaintiff's safety, to provide Plaintiff with a safe working environment, and to ensure that Plaintiff had the appropriate skills, training, supervision, and safety equipment necessary to perform Plaintiff's job in a safe and proper manner.

10.    If Plaintiff proves that the power source for the wind turbine at issue was negligently, carelessly, and without warning turned on or otherwise activated, thus causing the injuries allegedly suffered by Plaintiff, then Third-Party Defendant OES, individually and as successor in interest and/or assignee to ORE, in breach of its and their duties alleged above, was then and there guilty of one or more of the following negligent acts or omissions:

(a)    failing to provide a reasonably safe work environment;

(b)    failing to properly train Plaintiff;

(c)    failing to properly supervise Plaintiff;

(d)    failing to provide Plaintiff with proper safety equipment;

(e)    failing to properly instruct Plaintiff regarding the use of safety equipment;

(f)    being otherwise careless and negligent.

11.    If Plaintiff is entitled to any recovery from Defendant/Third-Party Plaintiff Gamesa, which Gamesa has expressly denied and continues to deny, such injuries or damages

4852-7834-8041.1

4

**A53**

were not proximately caused by any act or omission of Defendant/Third-Party Plaintiff Gamesa, but rather, were the direct and proximate result of the aforementioned negligent acts and/or omissions of Third-Party Defendant OES, individually and as successor in interest and/or assignee of ORE and/or other parties, including co-defendants.

12.    During all times relevant hereto, including all times alleged in Plaintiff's Complaint at Law, there was in effect a statute entitled "Joint Tortfeasors Contribution Act," 740 ILCS 100/0.01 *et seq.*, which applies to actions for contribution arising after March 1, 1978, and Defendant/Third-Party Plaintiff Gamesa brings this action for contribution pursuant to said Act.

13.    Accordingly, to the extent that the negligence of OES, individually and as successor in interest to ORE, was the direct and/or proximate cause, or a proximate cause, of the damages for which recovery is sought from Defendant/Third-Party Plaintiff Gamesa, and in the event that Defendant/Third-Party Plaintiff Gamesa is found liable to Plaintiff for the injuries and other damages allegedly sustained by Plaintiff, Defendant/Third-Party Plaintiff Gamesa is entitled to contribution from and against OES in accordance with the Joint Tortfeasors Contribution Act, 740 ILCS 100/0.01 *et seq.*

WHEREFORE, Defendant/Third-Party Plaintiff, Gamesa Technology Corporation, Inc., respectfully requests that, in the event that Gamesa Technology Corporation, Inc. is found liable to Plaintiff, judgment should be entered in favor of Gamesa Technology Corporation, Inc. and against Third-Party Defendant, Outland Energy Services, LLC, individually and as successor in interest and/or assignee to Outland Renewable Energy, LLC to the fullest extent provided by law for its proportionate share of fault in causing such liability, in an amount to be determined at trial, and for such other and further relief this Court deems just and proper.

4852-7834-8041.1

**A54**

## COUNT II – INDEMNIFICATION

14.    Defendant/Third-Party Plaintiff Gamesa incorporates paragraphs 1-13 above by reference as if set forth at length herein.

15.    At all times relevant hereto, including on and before the date of the occurrence alleged in Plaintiff's Complaint at Law, October 20, 2010, there existed a certain Framework Services Agreement Contract ("the Outland/Gamesa Contract") entered into between ORE and Gamesa Wind US, LLC ("Gamesa Wind"). A copy of the Outland/Gamesa Contract is attached hereto and is made a part hereof as Exhibit "C" and is incorporated herein by reference as if set forth at length.

16.    Gamesa Wind is an affiliate of Gamesa Technology Corporation, Inc.

17.    Section 7.4 of the Outland/Gamesa Contract states:

> "Each Party (each, and "Indemnifying Party") shall defend, indemnify, and hold harmless the other Party, its partners and its parent corporations, subsidiaries, affiliates, members, agents, officers, directors and employees (each, an "Indemnified Party") from and against any and all suits, actions, proceedings, judgments, losses, damages, claims, fines, penalties, litigation, court costs, and reasonable attorneys' fees, for bodily injury (including death) or property damage to the other Party of any third party to the extent arising out of the Indemnifying Party's negligence, gross negligence, strict liability or intentional conduct, or that of its subcontractors, agents or employees in connection with the Indemnifying Party's performance under this Agreement."

18.    Gamesa is an "Indemnified Party," as defined in the Outland/Gamesa Contract.

19.    Thus, ORE agreed to defend, indemnify and hold harmless Gamesa Wind and Gamesa for any damages caused by the negligence, gross negligence, strict liability or intentional conduct of ORE or ORE's subcontractors, agents or employees.

20.    Gamesa denies that it was negligent or that its acts or omissions in any way contributed to Plaintiff's injuries as alleged in the Plaintiff's Complaint at Law. To the contrary,

**A55**

Gamesa alleges and hereby avers that the negligent acts and omissions of ORE and of OES, individually and as successor and/or assignee of ORE, as set forth in paragraph 10 above, which is incorporated by reference herein as if set forth at length, were a proximate cause of Plaintiff's injuries as alleged in Plaintiff's Complaint at Law.

21.     OES therefore has the duty to defend, indemnify and hold harmless Gamesa from all damages sustained by Gamesa in connection with Plaintiff's Complaint at Law as defined by the Agreement, including any adverse judgment, all expense of litigation, court costs, and attorneys' fees.

WHEREFORE, Defendant/Third-Party Plaintiff, Gamesa Technology Corporation, Inc., respectfully requests that, in the event that Gamesa Technology Corporation, Inc. is found liable to Plaintiff, judgment should be entered in favor of Gamesa Technology Corporation, Inc. and against Third-Party Defendant, Outland Energy Services, LLC, individually and as successor and/or assignee of Outland Renewable Energy, LLC,  in an amount equal to any judgment entered against Gamesa Technology Corporation, Inc., any attorneys' fees incurred, and all costs of litigation and such other and further relief this Court deems just and proper.

Dated:  July 13, 2011

**KUTAK ROCK LLP**

_____*/s/ Julie B. Negovan*_____
Julie Negovan, Esq.
Michael T. McDonnell, III., Esq.
Suite 2050
One South Wacker Avenue
Chicago, IL 60606-4614
(312) 602-4100
(312) 602-4101
*Julie.Negovan@kutakrock.com*

*Attorneys for Defendants*
*Gamesa Technology Corporation, Inc.*
*and Third-Party Defendant*
*Gamesa Wind US, LLC*

**A56**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |

**COUNTERCLAIMS OF OUTLAND AGAINST GAMESA TECHNOLOGY
CORPORATION, INC. AND GAMESA WIND US LLC**

**OVERVIEW OF COUNTERCLAIMS**

Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland

Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC and Outland

Energy Services, LLC f/k/a Outland Energy Field Services, LLC, ("Outland"), by their attorney Randolph C. Winton states the following in support of their counterclaims against Gamesa Wind U.S., LLC and Gamesa Technology Corp., Inc. ("Gamesa").

*Introduction of the Parties*

1.      Founded by five Minnesota farmers in 2005, Outland provides wind farm operation, maintenance and repair services ("O&M Services") to the wind energy industry throughout the United States and abroad.  It currently employs approximately 144 employees, down from 175 employees it employed before Gamesa, Gamesa Corporación Tecnológica, S.A. ("Gamesa Spain") and Iberdrola's damaging actions. Outland is headquartered in Canby, Minnesota, with additional offices in Mendota Heights, Minnesota and Guymon, Oklahoma.

2.      Outland has been providing O&M Services to Gamesa since 2006.

3.      The counter-claims and claims that Outland has set forth below are related to and/or arise out of the third-party claims brought by Iberdrola and Gamesa against Outland, and relate to and/or arise out of an interrelated set of facts, and common parties. These counterclaims and cross claims seek to remedy substantial and ongoing harm sustained by Outland at the hands of Gamesa and Gamesa Spain, and to a different degree, Iberdrola.  These claims relate to the accident involving Plaintiff Aaron McCoy in three ways.  They relate to Iberdrola's and Gamesa's desire to evade responsibility for the accident, Iberdrola's and Gamesa's desire to use the occurrence of the accident as a subterfuge for a more sinister agenda to damage Outland, and Gamesa's improper attempts to use the accident to terminate existing agreements with Outland.

4.      Gamesa and Iberdrola are owned and controlled by Spanish companies.  Gamesa is owned and controlled by Gamesa Spain. Upon information and belief, Iberdrola owns at least 14% of Gamesa.  Upon information and belief, until 2009, Iberdrola owned approximately 25%

A58

of Gamesa. Upon information and belief, Gamesa Spain has conspired with Gamesa and acted in concert with respect to all the actions that have been harmful to Outland. Gamesa Spain owns property in the United States subject to this Court's jurisdiction, which includes 100% of the shares of Gamesa Technology Corporation, Inc., a Delaware corporation.

*Gamesa's Business Model and Its Change Targeted at Outland*

5.     Gamesa is a manufacturer of wind turbines.  Gamesa's standard practice was, and is, to sell its wind turbines to various asset owners, such as Iberdrola.  As part of the sale of the wind turbines, Gamesa (similar to most other wind turbine manufacturers) would require that the purchaser also contract with Gamesa for O&M Services for those wind turbines for a specified period of time.

6.     Gamesa did not have its own internal O&M Service group.  Rather, its business model was to be the general contractor for the O&M Service with the wind turbine owner, and then provide those O&M Services using the services of a limited number of subcontractors, such as Outland. In the general/sub approach, Gamesa would manage the process but the majority of the O&M Service work was completed by independent service providers, such as Outland.

7.     That business model worked during the boom years of 2007 through 2010 but the global markets started to turn leaving wind turbine manufacturers' traditional pipeline (turbine sales) uncertain and vulnerable. Complicating matters for Gamesa was their shrinking market share in the United States.

8.     Upon information and belief, at one point, Gamesa controlled more than 10% of the United States market for wind turbine sales.  Upon information and belief, that market share is shrinking.  That shrinking market share coupled with global uncertainty over turbine sales has left Gamesa in an extremely vulnerable economic position.

**A59**

9.    Therefore, Gamesa decided to change its strategy and target longer warranties and the related revenue from service contracts as one of several keys to their survival.  The challenge for Gamesa was that they entered into service agreements with Outland and others prior to the market turn and without fully realizing their market share was evaporating.

10.    In order for the Gamesa strategy to work, however, it would need to eliminate Outland as a competitor, which resulted in Gamesa devising the plan laid out in these claims.

*The Outland-Gamesa Relationship*

11.    Since 2006, Outland has made substantial investments in personnel and equipment to build the business based upon the request from Gamesa, Gamesa's representations and assurances that it did not intend to self-perform (i.e., create its own O&M Service group to compete with Outland), and the promises to Outland that Gamesa would continue to provide a certain minimum level of work that would allow Outland the ability to fairly recover the investments it had made.

12.    Outland delivered, and continues to deliver, superior performance to Gamesa, became Gamesa's number one provider of services, achieved unprecedented recognition for its quality, occupational health and safety, and environmental management programs, and experienced steady growth.

13.    Outland's investment in, and focus upon, safety, quality, performance and productivity has resulted in Outland achieving certifications for its quality (ISO 9001:2008), environmental (ISO 14001:2004) and occupational health and safety (OHSAS 18001:2007) management programs.  No other independent wind O&M Service provider in North America has attained these certifications.

14.    From August 2006 to October 2008, the work to be performed at a particular site

**A60**

on Gamesa's behalf was governed by a purchase order (a "Purchase Order"). Work under a Purchase Order would be for a specific task, or set of tasks, at a wind farm that would require Outland personnel to perform work for anywhere from a few days to several months.

15.     The annual revenue received by Outland from Gamesa from Purchase Orders grew from approximately $225,000 in 2006 to approximately $6.1 million in 2010.

16.     On October 3, 2008, Outland and Gamesa entered into their first contract that specified the use of Outland personnel at certain Iberdrola-operated wind farms for a longer-term period of time. That contract was entitled the Framework Services Agreement (the "FSA") and provided separate terms and conditions related to work at those wind farms over a longer period of time, generally approximately two years.

17.     After Outland and Gamesa entered into the FSA, Gamesa continued to issue separate Purchase Orders for the shorter duration assignments.

18.     On November 19, 2009, Outland and Gamesa entered into new framework agreement entitled the Maintenance Services Agreement (the "MSA"), which placed additional Iberdrola-operated wind farms under a long-term agreement (including the Cayuga Ridge site which was the site of Plaintiff's accident).

19.     The MSA revised many of the provisions that were in the FSA governing the relationship between Outland and Gamesa.

20.     Specifically, the MSA revised the terms of a noncompetition clause (a clause which in the FSA was unenforceable under Minnesota law), the governing law clause, the dispute resolution clause, and the provision dealing with the solicitation of the other party's employees.

21.     Under the MSA, Outland is required to satisfy the needs of Gamesa's customer,

**A61**

Iberdrola. Specifically, Outland is required to provide all O&M Services, including preventative maintenance, corrective maintenance, design modifications, technical support and weekend, holiday, emergency and on-call work coverage. (MSA, § 2.2.)

22.    Pursuant to the MSA, Outland must train all its personnel on health and safety, and on industry technical standards, in order to allow its employees to effectively perform O&M Services. (MSA, § 4.4.)

23.    Outland performs O&M Services pursuant to technical documentation, manuals and quality procedures supplied by Gamesa; safety rules, regulations and manuals supplied by Gamesa and Iberdrola; and applicable federal, state or local health and safety laws and regulations. (MSA, § § 4.2 and 4.3.)

24.    Further, if Iberdrola establishes site-specific rules and/or safety procedures, Outland must comply with Iberdrola's mandates. (MSA, § 4.4.)

25.    On a regular basis, Outland supplies Gamesa with a regular O&M Services report for each project site, including descriptions of services completed; delays experienced in performing services; significant issues experienced in losses of turbine availability, causes and remedies; actualized inventory of warehouse items; and health and safety reports and inspection reports performed during the month. (MSA, § 2.6.)

26.    Gamesa and Outland expressly agreed that only certain limited events would be considered an event of default by Outland (an "Event of Default") under the MSA. If an Event of Default existed, and if Gamesa in good faith gave immediate written notice to Outland, and if Outland could demonstrate that the existence of such event arose for reasons not attributable to Outland, then such event would not be considered an Event of Default. (MSA, § 6.1.)

27.    If an Event of Default existed, and if Gamesa in good faith gave immediate

6

written notice to Outland, and if Outland could not demonstrate that the event arose for reasons not attributable to Outland, then Outland would be entitled to five (5) working days to initiate a cure. If Outland could not cure within five (5) working days after initiating such a cure, then Gamesa would be entitled to remedies. (MSA, § 6.2.)

28.    A valid Event of Default has never existed under the MSA.

29.    Also in 2009, Iberdrola and Gamesa entered into a strategic accord on wind-farm development that allowed for joint development and operation of wind farms.

30.    Since Outland has been performing services for Gamesa, Outland has met and exceeded all safety and performance benchmarks. On information and belief, Outland's performance for Gamesa was far superior then what Gamesa received from any other subcontractor.   For example, in 2010 when Gamesa was facing the potential payment of approximately $15 million in liquidated warranty damages for failure to maintain a specified wind turbine availability percentage, Gamesa replaced the subcontractor that had been working on the site, with Outland.  Outland was able to improve the availability at the site in a very short period of time saving Gamesa approximately $15 million in warranty payments.

31.    Outland has achieved similar results under similar circumstances at other wind farms. In each case, Outland replaced an existing O&M Service subcontractor and immediately was able to improve production while maintaining the highest levels of safety.

32.    Through providing these services for Gamesa on wind farms throughout the United States, Outland's personnel developed a particular expertise in troubleshooting Gamesa-made turbines. When Outland's business for Gamesa was at its peak in the first quarter of 2011, Outland had approximately 100 technicians working on Gamesa turbines, and provision of services to Gamesa accounted for the vast majority of Outland's revenue.

**A63**

*The Tying of Wind Turbine Sales and O&M Services*

33.     At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for wind turbines existed in the United States.

34.     At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for Gamesa wind turbines existed in the United States.

35.     At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for parts for Gamesa wind turbines existed in the United States.

36.      At the time that Gamesa sold the wind turbines to various owners, a market for the O&M Service of Gamesa wind turbines existed in the United States.

37.     At the time Gamesa sold the wind turbines to various owners, Gamesa controlled 100% of the O&M Service market for Gamesa wind turbines.

38.     Gamesa has market power over the O&M Services market for Gamesa wind turbines.

39.     Gamesa has market power over the market for parts for Gamesa wind turbines.

40.     Gamesa had at the time relevant market power over the market for wind turbines in the United States.

41.     At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

42.     At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to

**A64**

the O&M Service for their wind turbines.

43.     By tying the sale of Gamesa wind turbines to the provision by Gamesa of O&M

Services for those wind turbines, Gamesa was able to establish and continue its control of 100%

of the O&M Service market for Gamesa wind turbines. That is, even though Gamesa brought in

Outland to perform the actual services on the Gamesa wind turbines that Gamesa had sold to

customers, Outland was a subcontractor—Gamesa was the contractor and maintained the actual

customer relationship with the turbine owner.

*The Events Leading to the McCoy Accident*

44.     On September 23, 2010, the following Outland personnel were assigned to the

Cayuga Ridge wind farm in order to perform a waffle block design modification procedure (the

"Modification Procedure") specified by Gamesa: Alex Rice (Project Manager), Mike Piper (Lead

Technician), Matt Davis, Kyle Nieman, Adam Hengesteg, Nathan Black, Cory Hart, Alex

Anderson, Andrew Ehrhardt, and Aaron McCoy.

45.     Cayuga Ridge was one of the sites covered in the MSA.

46.     In order to perform the Modification Procedure the turbine needs to be de-

energized.

47.     When dealing with potentially hazardous electrical energy, technicians use a lock-

out tag-out ("LOTO") procedure to ensure their safety.  The procedure is so named because it

consists of using a lock—to lock the electrical equipment in the "off" position—and a tag—to

inform other employees of who locked the equipment, and when they did so.

48.     Outland trained all of its personnel to use a standard LOTO procedure. Under that

standard LOTO procedure, when a technician wants to perform services on a turbine, that turbine

must be "turned off" by switching the equivalent of a large circuit breaker to the "off" position.

**A65**

The technician then applies a lock to the switch in such a way that the switch cannot be turned back on as long as that lock is in place. Each technician applies his own lock and maintains control of the key that opens the lock, so that no other person is able to remove the lock and then re-energize the turbine as long as the technician is working on the equipment and exposed to electrical hazards. The technician then applies a tag on which he writes pertinent information about the service being performed (e.g. his name, the date, the time), so that anyone else coming along will understand the reason for the lock on the switch. The tag states that it is only to be removed by the person who placed the tag.

49.     Once the technician has applied the lock, established control of the key and then applied the tag, the technician would climb up to the top of the turbine tower, perform the service, and then descend back to the bottom of the tower to unlock the lock, and thereby allow the re-energization of the turbine.

50.     Again, the approach described above is the standard LOTO procedure. That standard LOTO procedure is the only LOTO procedure approved by Outland health and safety management and protocols.

51.     All Outland technicians are trained and instructed to use only that standard LOTO procedure.

52.     Like all other Outland technicians, Plaintiff McCoy was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

53.     Alex Rice was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

54.     The standard Outland LOTO procedure follows the standard (aka individual) LOTO procedures set forth in 29 C.F.R. 1910.147 (general industry) and 29 C.F.R. 1910.269

**A66**

(electric power generation, transmission, and distribution).

55.    Other LOTO procedures may be permissible. For example, 29 C.F.R. 1910.147(f)(3) describes a group LOTO procedure.

56.    On or about September 23, 2010, at a meeting of Gamesa, Iberdrola and Outland on-site personnel at the Cayuga Ridge site, Iberdrola and Gamesa instructed Outland's personnel in that meeting that a modified LOTO procedure would be used for the Modification Procedure.

57.    In attendance at that meeting were the following individuals: (a) from Iberdrola: Curtis Radke (site supervisor), Evan Bonnel, Dale Thomas, Andrew Morrissey, and Chris Tolian; (b) from Gamesa: Ross Williamson (site manager); (c) from Outland: Alex Rice, Mike Piper.

58.    Under that modified LOTO procedure, each Outland technician performing the design modification was to leave his key at the base of the wind turbine tower, near the lock, and then climb uptower to perform services. Under this approach, when a given team of two Outland technicians had completed their work and needed the turbine re-energized so that they could check the effectiveness of that work, the Outland team was to remain uptower and call to an Iberdrola technician via radio.

59.    That Iberdrola technician would be stationed down on the ground and would be available to re-energize any of the turbines in which Outland's technicians were working uptower. Upon receiving a call to re-energize a given turbine, the Iberdrola technician would proceed to the given turbine, radio again to Outland's technicians uptower to confirm that they were in a so-called "safe zone," i.e., away from the electrical equipment, take one of the keys left downtower by Outland's technicians, unlock the lock, and then re-energize the equipment.

60.    The benefit to Iberdrola and Gamesa of this modified LOTO procedure was that it

11

**A67**

would reduce a) the amount of time it would take to perform the design modification, thereby reducing turbine downtime and increasing production of electricity; and b) the number of climbs and re-energizations, thereby reducing wear and tear on the turbine and its components.

61.     At no time did anyone who participated in that meeting notify anyone from Outland's off-site management—not Outland's health and safety management, not Outland's operations management, not Outland's technical training management, not Outland's human resources management, and not Outland's legal management—that Outland's on-site personnel would be using that modified LOTO procedure.

62.     This modified LOTO approach appears to have been inconsistent with some Gamesa guidance, but consistent with other Gamesa guidance. Although Gamesa's general instruction for "Locking and Signaling Procedure for Electrical Equipment" states that "[i]t is absolutely forbidden for the employees to remove whatever personal warning labels or padlocks which are not theirs," the procedure that Gamesa issued for performance of the transformer design modification (the work that Outland's technicians were performing at the time of the accident) refers to the separate roles of "operator" and "technician" indicating the use of a system operator LOTO procedure with the "operator" controlling the lock at the base of the tower and the "technician" working uptower. That is, both the instructions of Iberdrola and Gamesa's on-site managers and the documentation that Gamesa provided Outland in accordance with which Outland was to perform the procedure called for Outland technicians to surrender control of their LOTO keys to another party, specifically, Iberdrola.

63.     On October 20, 2010, the accident at Cayuga Ridge occurred involving Plaintiff Aaron McCoy.

**A68**

64.     On that day, multiple teams of Outland technicians were working uptower in different turbines. When one such team called to the downtower Iberdrola technician to re-energize their turbine, that Iberdrola technician went to another tower and re-energized that other tower.

65.     In that tower, McCoy and his work partner were not expecting re-energization but rather were working near the transformer. Upon re-energization, an arc flash (electrical explosion) emerged out of the electrical equipment uptower in front of which Aaron McCoy was working, thereby burning McCoy.

66.     In taking these actions, the Iberdrola technician purposefully and knowingly removed a lock that was not his lock, using a key that was not his key. The Iberdrola technician was reckless and negligent in his decision to energize a turbine without first confirming that Outland's technicians uptower were in a safe position.

67.     The period from September 27, 2010, to October 20, 2010, was between the regular monthly site visit from Outland health and safety management during which site EHS audits would have been completed.

68.     At the time of the accident, McCoy was performing the Modification Procedure that Outland was performing at the direction of Gamesa while using the modified LOTO procedure that Outland was using at the direction of Iberdrola and Gamesa.

69.     As a result of the accident, an investigation was undertaken by the United States Occupational Health and Safety Administration ("OSHA").

70.     Outland's personnel cooperated fully with the OSHA investigation, and answered all questions truthfully, even when those answers hurt Outland's interests.

71.     In contrast, on information and belief, Gamesa's personnel did not participate in

A69

all of the interviews that OSHA requested.

72.     Both before and after the October 20, 2010, Cayuga Ridge incident, Outland's industry-leading O&M Services teams have performed at all sites and projects under the MSA – including Cayuga Ridge – in a safe, efficient, effective and high quality manner.

73.     Specifically, Outland has met or exceeded all defined service standards, including for ensuring the availability of the turbines, completing all administrative duties in a timely manner, and completing all maintenances within the contractually-defined schedule.

> *Gamesa's Secret Plan to Put Outland Out of Business so Gamesa Could Acquire Outland Technicians, Gamesa's Intentional Interference with the Acquisition of Outland, and Gamesa's Actions to Improperly and Unlawfully Monopolize and Attempt to Monopolize the O&M Service Market in Gamesa Wind Turbines*

74.     In summer 2010, Outland and Gamesa began discussing the possibility of working together to provide O&M Services to Gamesa wind project owners when the Gamesa wind turbines enter their post-warranty period. Joe Thorpe the existing head of service at Gamesa told Outland President Steve Scott that Gamesa knew that the relationship with both Duke Energy and Horizon Wind LLC (both owners of Gamesa wind turbines) was so bad that Gamesa was not going to sell any more turbines to either party and they knew they had no chance to secure any contract with either party to perform post warranty work.

75.     As a result, Gamesa encouraged Outland to try to secure that work outside of whatever joint arrangement Outland and Gamesa might create for bidding on post-warranty work for other Gamesa wind turbine owners.

76.     In August 2010, Joe Thorpe was transitioning to another position within Gamesa. A new person, Rick Hammill was brought in to lead the services area of Gamesa, and he brought in another new person, Gary Stansbury to replace Thorpe.

**A70**

77.     On information and belief, Hammill and/or his superior(s) decided that the existing Gamesa O&M Service business model, where Gamesa would always subcontract the provision of O&M Services, was going to change.

78.     On information and belief, Hammill and/or his superior(s) decided that Gamesa would establish its own O&M Service group with technicians that can self-perform to reduce the amount of work (and revenue) given to independent service providers like Outland.

79.     That complete shift in its business model was contrary to all the prior representations and assurances provided to Outland.

80.     In order to achieve Gamesa's new goal to have its internal O&M Service group, Gamesa—at first secretly, and then openly—started to recruit Outland technicians to join Gamesa.

81.     Personnel within Gamesa admitted to Outland that they were coming after Outland's technicians and that Gamesa wanted to hire more than 40 technicians by the end of 2010 and that most of those hires would come from Outland.

82.     Around this time period, Gamesa accounted for approximately 90% of Outland's business, and virtually all Outland technicians were certified for work on Gamesa wind turbines, which contributed to Gamesa's strategy.

83.     Despite the full assault by Gamesa on Outland technicians, few Outland technicians moved to Gamesa.

84.     As a result, Gamesa needed to devise a new strategy to secure Outland technicians.

85.     Outland reasonably expected based upon Gamesa's promises and statements the prior year's level of business with Gamesa to be maintained and an increase in business from

**A71**

Gamesa in 2011 due to Gamesa's ongoing assurance that it was not going to compete with Outland,  Gamesa's request that Outland purchase certain flame-retardant clothing, and Gamesa's request that Outland pay for certain training provided by Gamesa as their preferred partner and in preparation for the expected growth in business with Outland.

86.    After the failure of its malicious attempt to hire a substantial part of Outland workforce, in early January 2011, Gary Stansbury of Gamesa stated to Steve Scott that Gamesa was interested in acquiring Outland.

87.    Steve Scott thanked Gary for Gamesa's interest but indicated that Outland intended to remain independent from any one particular manufacturer because otherwise Outland might be prevented from acquiring work for turbines manufactured by others.

88.    Sometime between the end of 2010 and January 2011, however, Gamesa secretly and with malicious intent, devised a strategy to destabilize Outland if Outland rejected Gamesa's acquisition overture.  Gamesa's plan would be to put Outland out of business so that Outland technicians would be available for Gamesa to hire in large numbers, which would allow Gamesa to acquire all or a substantial portion of Outland's business and personnel at no cost and allow Gamesa to achieve its goal of creating its own large O&M Service group, while at the same time eliminating Outland as a competitor of Gamesa's new O&M Service group.

89.    The plan devised by Gamesa provided for Gamesa to keep telling Outland that Outland was going to keep getting more business from Gamesa.

90.    That approach would mean that Outland would continue to train and hire new technicians.

91.    That approach would mean that Outland would continue to acquire assets and protective equipment for its technicians as directed by Gamesa.  One such example, is the

**A72**

approximately $250,000 of flame-retardant clothing that Gamesa's policy required Outland to acquire at Outland's own expense in 2010 and 2011.

92.    The basic approach was to keep Outland believing it would continue to receive more work from Gamesa and then, at the right moment, to pull the rug out from under Outland and watch the business fall, thus allowing Gamesa to pick up the pieces for its own hoped-for O&M Service business.

93.    In January and February 2011, Gamesa continued to implement its secret plan. Unknown to Outland and contrary to the representations made by Gary Stansbury, Gamesa had secretly decided to cease all Purchase Order business with Outland as a first step, and started to look for ways to terminate the MSA as a second step.

94.    On February 17, 2011, Outland and Duke Energy ("Duke") entered into a letter of intent pursuant to which Duke was to purchase a 25% interest in Outland.

95.    On February 24, 2011, Outland informed Gary Stansbury of Gamesa that Outland and Duke Energy had entered into an agreement for Duke to acquire a substantial minority stake in Outland, with the possibility that Duke could eventually acquire all of Outland.

96.    Upon learning that information Gamesa realized that it might need to accelerate its plan or adjust its approach.

97.    Gamesa quickly realized that if Duke acquired a stake in Outland, that Outland might be able to withstand any attempt by Gamesa to destabilize Outland. If that occurred, Gamesa's plan to build its own business at the expense of Outland would fail.

98.    Gamesa reacted quickly.  On February 26, 2011, Gary Stansbury of Gamesa called Steve Scott of Outland and gave the concept a thumbs down for the stated reason that Gamesa believed Iberdrola would force Outland off their sites because Iberdrola and Duke

17

compete on the development front.

99.      In keeping with the façade, however, on that same February 26, 2011 call, Gary Stansbury stated to Steve Scott that Gamesa was very happy with the quality of service that Outland continued to deliver, and reiterated that Outland was Gamesa's key vendor. In that connection, Stansbury stated that they were seeking up to 24 additional technicians because Gamesa was getting ready to potentially replace a competing service provider at some sites.

100.     Stansbury, however, set the stage for possibly using the McCoy accident as part of its secret plan to destabilize Outland.  Stansbury told Steve Scott that Gamesa had been getting "beat up badly" by Iberdrola over the McCoy accident and the McCoy lawsuit. Stansbury stated that there was much concern over what might be coming from OSHA and the litigation with Plaintiff McCoy.

101.     Nevertheless, in continuing the façade in order to preserve the element of surprise needed to execute the plan, as late as March 2011, Gamesa was still telling Outland that Gamesa had a long list of projects they wanted Outland to commission under Purchase Orders in 2011.

102.     In response to Gamesa's statements of February 26, Steve Scott contacted Iberdrola directly.  After several missed attempts at direct contact, on March 27, 2011, Kevin Devlin, Vice President of Commercial Operations for Iberdrola stated that he endorsed the concept of Duke acquiring an interest in Outland.  Devlin stated that the competition issue between Duke and Iberdrola was not a concern.

103.     As a result of Iberdrola's direct statements to Outland, Gamesa needed to escalate its approach.  On April 14, 2011, Gamesa called Duke directly to attempt to scuttle the Duke/Outland transaction.  Not only did Gamesa inform Duke that Gamesa's position was that the deal should not happen, Gamesa took affirmative economic steps to try to induce Duke not to

**A74**

do the transaction with Outland.  Specifically, Gamesa discussed a turbine supply offer that tied in a five-year extension of the O&M Services on Duke's North Allegheny project.  The Duke North Allegheny project was the first Duke project with Gamesa turbines that was scheduled to enter the post-warranty period starting in September 2011.

104.    Duke rejected Gamesa's interference, and attempt at bribing Duke, to terminate Duke's transaction with Outland. Gamesa left that conversation knowing they were not going to be selling any more turbines to Duke and would be losing the maintenance contract at North Allegheny.

*With No Place to Turn, Gamesa Looks to the OSHA Citations and the McCoy Accident*

105.    On April 8, 2011, OSHA issued six citations to Outland related to the LOTO procedure that was in use at the Cayuga Ridge wind farm at the time of the accident that occurred involving Plaintiff Aaron McCoy.

106.    After Gamesa learned of the citations, Gamesa's Gary Stansbury stated to Steve Scott of Outland that, "To be honest, we're shocked we weren't cited as well."

107.    Neither Gamesa nor Iberdrola were issued citations by OSHA.

108.    Upon information and belief, neither Gamesa nor Iberdrola were issued citations because it was an Outland employee that was injured, and no injury occurred to either a Gamesa employee or an Iberdrola employee.

109.    Also on information and belief, Iberdrola was told informally by OSHA at the 2011 American Wind Energy Association conference in Anaheim, California, on or about May 23, 2011, that if another accident occurred at an Iberdrola site that OSHA would seek criminal sanctions against Iberdrola.

**A75**

110.    After the rebuke that Gamesa received from Duke on April 14, 2011, Gamesa was desperate and needed to find a way to destabilize Outland quickly.

111.    On May 11, 2011, the Duke agreement of February 17, 2011, was replaced with an agreement among Outland, Duke and an institutional investor for the sale of 100% of the interests in Outland.

*Gamesa Realizes It is Out of Time and Implements its Plan to Topple Outland and Implicates Iberdrola*

112.    In order to interfere with the Outland acquisition contract and Outland's existing and potential economic relations, on May 12, 2011, the day after the agreement for the sale of Outland was signed, Gamesa implemented its plan to scuttle the transaction and destabilize Outland.

113.    Gamesa sent a letter to Outland raising frivolous issues and declared Outland in default under the MSA.

114.    In that same letter, Gamesa implicated Iberdrola in its scheme by stating that Gamesa's customer, Iberdrola, had demanded that Gamesa remove Outland from all of its wind farms.

115.    The May 12 Letter stated that "Outland has failed to perform O&M Services in accordance with the health, safety and environmental requirements of the [MSA] and applicable law. This failure has been noted by OSHA . . ."

116.    At the same time, Gamesa implemented the other part of its plan which called for the cessation of any new Purchase Orders for transactional business with Outland.

117.    Gamesa had implemented its three-prong approach—terminate all Purchaser Orders (leaving 40% of Outland's technicians without work), scuttle the acquisition of Outland (so that it would not be able to financially withstand the Gamesa attack), and move to terminate

**A76**

the remaining contractual work represented by the MSA (which would leave another 40% of Outland's technicians without work).

118.     The impact was immediately felt on Outland.  Within days of Gamesa's letter, both Duke and the institutional investor refused to proceed with the transaction under the originally agreed terms, and reduced the amount they were willing to pay for Outland by approximately $15 million. Because of Gamesa's continued frivolous attempts to terminate the Outland-Gamesa agreements, and Gamesa's false statements to others, the acquisition did not proceed even under the reduced terms.

119.     In addition, with the full and immediate cessation of Purchase Orders, approximately 40% of Outland's technicians were without work.  In addition, the 18 technicians that were still in training would have no work once their training was complete.

120.     With respect to Gamesa's attack under the MSA, Outland notified Gamesa that it rejected Gamesa's frivolous attempt to declare a default under the MSA.

121.     Gamesa responded by letter dated May 27, 2011, in which Gamesa reiterated that Outland was in default under the MSA stating "Outland was cited by OSHA for failing to comply with various provisions of 29 C.F.R. §1926 et seq."

122.     Outland again notified Gamesa that it rejected Gamesa's frivolous attempt to declare a default under the MSA.

123.     Finally realizing that its assertions in its letters of May 12 and May 27 were unjustified, and wholly without basis, under the MSA, Gamesa took a different tack to try to finish the job it started on May 12.

124.     On July 21, 2011, Gamesa sent two new letters to Outland frivolously asserting a completely new basis for default under the MSA, and for the first time, asserting a breach of the

**A77**

dormant FSA.

125.    Outland notified Gamesa that it rejected Gamesa's frivolous attempts to declare a default under the MSA and to declare a breach of the FSA in its efforts to destabilize Outland.

126.    Then on August 31, 2011, Gamesa's outside legal counsel sent letters to Outland re-asserting the frivolous position of Gamesa's July 21 letters.

127.    In the August 31, 2011, letters it became clear that Gamesa intended to continue to push its plan to destabilize Outland by attempting to frivolously terminate the MSA. Gamesa knew that such a continued push also served the additional goal of keeping away potential investors or acquirers of Outland.

128.    More alarming, however, was the statement in those August 31 letters that made it clear that Gamesa had engaged in new interference with Outland's ongoing prospective economic relations by referencing specific third parties that Gamesa had contacted in an attempt to interfere with Outland's attempts to obtain work from those entities.

129.    Because Outland had not yet toppled, those August 31 letters confirmed that Gamesa had opened up a new front against Outland, even though it had already substantially reduced the Outland workforce.

130.    The August 31 letters confirmed that Gamesa was continuing its active campaign to interfere with Outland's prospective business and to put Outland in a false light with Outland's potential customers.

131.    Most recently, on September 16, 2011, Outland was notified by one of its partners, Hansen Transmissions International NV ("Hansen"), who is a manufacturer of gearboxes in Gamesa wind turbines, that Gamesa Spain informed Hansen that Gamesa would "no longer allow access to Gamesa wind turbines for the HOGUT (Hansen Outland Gear Unit

**A78**

Team)." As a result, Hansen suspended its partnership with Outland with respect to Hansen gearbox maintenance and repair services for Gamesa wind turbines.

132.    Gamesa's unlawful and tortious actions with respect to Outland's partnership with Hansen, and Hansen's immediate suspension of the Outland partnership, *prima facie* establishes Gamesa's market power over the Gamesa parts market.

133.    Gamesa is attempting to prohibit Outland from providing O&M Services for Gamesa wind turbines in various states, including, without limitation, Texas, Illinois, California, West Virginia and Pennsylvania.

134.    Gamesa's and Gamesa Spain's actions – in concert, combination or conspiracy with each other and/or with Iberdrola – have systematically inflicted immediate, immeasurable and irreparable harm upon Outland through a sustained course of improper and illegal actions over recent months.

## CLAIMS FOR RELIEF

### COUNT I
### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS (OUTLAND'S EXISTENCE)

135.    Outland restates and realleges the foregoing paragraphs.

136.    Outland has contractual relations, and prospective contractual relations, with third parties.

137.    Gamesa, Gamesa Spain and Iberdrola were and are aware of those contractual relations and prospective contractual relations.

138.    Gamesa, Gamesa Spain and Iberdrola intentionally interfered with Outland's contractual relations and prospective contractual relations by, among other things, engaging in unfair competition against Outland, by committing commercial disparagement, making false

**A79**

statements, misrepresentations of fact, improper inducement of employees, breaches of contract and breaches of good faith and fair dealing, knowingly and purposely and secretly taking actions and conspiring to take actions designed to destabilize Outland and eliminate it as a competitor, interfering with Outland's acquisition agreements, interfering with Outland's agreements with others, such as Hansen, falsely informing prospective customers that Outland was contractually prevented by Gamesa from servicing their turbines, instructing Outland personnel to follow a LOTO procedure that was not the standard Outland LOTO procedure, conspiring to remove Outland from Iberdrola sites, engaging in unfair trade practices, engaging in unlawful restraints on trade, and violating Federal and state anti-trust laws.

139.    Gamesa, Gamesa Spain and Iberdrola, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing its contractual relations and prospective contractual relations.

140.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**COUNT II**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC RELATIONS (GAMESA'S INTERFERENCE WITH**
**OUTLAND'S PROSPECTIVE CONTRACTS WITH OTHERS)**

141.    Outland restates and realleges the foregoing paragraphs.

142.    Outland has contractual relations, and prospective contractual relations, with third parties. Outland has and had prospective contractual relations with Gamesa.

143.    Those prospective contractual relations include and included ongoing and future work for O&M Services for owners of wind turbines that were manufactured by Gamesa and

A80

others manufacturers.

144.    Gamesa and Gamesa Spain were and are aware of those contractual relations and prospective contractual relations.

145.    Gamesa and Gamesa Spain intentionally and improperly interfered, and continue to interfere, with those prospective contractual relations.

146.    Gamesa's and Gamesa Spain's intentional and improper interference induced or otherwise caused those other parties not to enter into or continue the prospective relations.

147.    Gamesa's and Gamesa Spain's intentional and improper interference prevented Outland from acquiring or continuing the prospective relations.

148.    Gamesa and Gamesa Spain have employed wrongful means.

149.    Gamesa's and Gamesa Spain's actions are an attempt to create or continue an unlawful restraint on trade.

150.    Defendants Gamesa and Gamesa Spain and Defendant Iberdrola intentionally interfered with Outland's contractual relations and prospective contractual relations by, among other things, engaging in unfair competition against Outland, by committing commercial disparagement, misrepresentations of fact, making false statements, making statements to put Outland in a false light, improper inducement of employees, breaches of contract and breaches of good faith and fair dealing, knowingly and purposely and secretly taking actions and conspiring to take actions designed to destabilize Outland and eliminate it as a competitor, interfering with Outland's acquisition agreements, interfering with Outland's agreements with others, such as Hansen, falsely informing prospective customers that Outland was contractually prevented by Gamesa from servicing their turbines, engaging in unfair trade practices, engaging in unlawful restraints on trade, and violating Federal and state anti-trust laws.

**A81**

151.    Gamesa and Gamesa Spain, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing its contractual relations and prospective contractual relations.

152.    As a direct and proximate result of Gamesa's and Gamesa Spain's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**COUNT III**
**TORTIOUS INTERFERENCE WITH**
**CONTRACTUAL RELATIONS (OUTLAND'S ACQUISITION)**

153.    Outland restates and realleges the foregoing paragraphs.

154.    Outland has contractual relations, and prospective contractual relations, with third parties, specifically, parties interested in an investment in, or acquisition of, Outland.

155.    Gamesa, Gamesa Spain and Iberdrola were and are aware of those contractual relations and prospective contractual relations.

156.    Gamesa, Gamesa Spain and Iberdrola intentionally interfered with Outland's contractual relations and prospective contractual relations by, among other things, engaging in unfair competition against Outland by committing by engaging in unfair competition against Outland, by committing commercial disparagement, misrepresentations of fact, making false statements, making statements to put Outland in a false light, improper inducement of employees, breaches of contract and breaches of good faith and fair dealing, knowingly and purposely and secretly taking actions and conspiring to take actions designed to destabilize Outland and eliminate it as a competitor, interfering with Outland's acquisition agreements, interfering with Outland's agreements with others, such as Hansen, falsely informing prospective customers that Outland was contractually prevented by Gamesa from servicing their turbines,

**A82**

engaging in unfair trade practices, engaging in unlawful restraints on trade, and violating Federal and state anti-trust laws.

157.    Gamesa, Gamesa Spain and Iberdrola, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing its contractual relations and prospective contractual relations with respect to the acquisition of Outland or an interest in Outland.

158.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

### COUNT IV
### INTENTIONAL INTERFERENCE WITH
### OUTLAND'S DIRECTIVES, TRAINING AND SAFETY PROTOCOLS

159.    Outland restates and realleges the foregoing paragraphs.

160.    Gamesa and Iberdrola knowingly and purposefully interfered with Outland's directives, training and safety protocols by directing Outland's on-site technicians to use a group LOTO procedure.

161.     As a direct and proximate result of Gamesa's and Iberdrola's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

### COUNT V
### BREACH OF CONTRACT (TRANSACTIONAL WORK)

162.    Outland restates and realleges the foregoing paragraphs of its Complaint.

163.    Outland and Gamesa have agreements for transactional work. Transactional work is the recurring work that Gamesa provided for shorter duration assignment through Purchase

**A83**

Orders.

164.    Outland made investments in its business based upon Gamesa's representations of a continued amount of transactional business.

165.    Gamesa's actions described herein represent a clear repudiation and breach by Gamesa of the agreements for transactional work with Outland.

166.    Outland has justifiably and reasonably relied on Gamesa's continued issuance of Purchase Orders for ongoing future work.

167.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**COUNT VI**
**INDEMNIFICATION UNDER MSA**

168.    Outland restates and realleges the foregoing paragraphs.

169.    Section 7.4 of the MSA  states that Gamesa will indemnify Outland for losses, fines, damages, claims, penalties or liability for bodily injury or property damage to the other Party or any third party to the extent arising out of Gamesa's negligence, gross negligence or intentional misconduct.

170.    Outland has suffered and continues to suffer damage, losses, fines as the result of Gamesa's negligence, gross negligence or intentional misconduct, including, without limitation (i) payments paid or payable to OSHA as a result of the McCoy accident, (ii) damage to its reputation, (iii) damage from the failure of the purchase of all the assets of Outland by Duke and the institutional investor, (iv) lost profits, (v) other damages in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial, all of which Gamesa is obligated to indemnify Outland for under Section 7.4 of the MSA.

**A84**

## COUNT VII
## <u>BREACH OF DUTY TO DEAL FAIRLY</u>

171.    Outland restates and realleges the foregoing paragraphs.

172.    Gamesa has a duty to deal with Outland fairly and in good faith, including a duty to provide Outland with information about risks of physical harm or pecuniary loss that the Gamesa knows, has reason to know, or should know are present in the Outland's work but unknown to Outland.

173.    Gamesa's failure to disclose each and every step of its secret plan to hire Outland technicians, destabilize Outland, interfere with Outland's contracts, interfere with Outland's prospective economic relations is, individually and collectively, a breach of that duty.

174.    As a result of Gamesa's breach of that duty, Outland has been and continues to suffer damage.

175.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT VIII
## <u>SECTION 2 OF THE SHERMAN ACT AND</u>
## <u>CLAYTON ACT, SECTION 3 (TREBLE DAMAGES)</u>

176.    Outland restates and realleges the foregoing paragraphs.

177.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of Section 2 of the Sherman Act.

**A85**

178.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

179.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

180.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

181.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

182.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

183.    Outland demands an award of treble damages in accordance with law.

**COUNT IX**
**SECTION 1 OF THE SHERMAN ACT AND**
**CLAYTON ACT, SECTION 3 (TREBLE DAMAGES)**

184.    Outland restates and realleges the foregoing paragraphs.

185.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated Section 1 of the Sherman Act and Section 3 of the Clayton Act.

186.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

187.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of the Sherman Act and Clayton Act.

**A86**

188.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

189.    Gamesa has market power over the market for parts for Gamesa wind turbines.

190.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

191.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

192.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

193.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

194.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

195.    As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

196.    Outland demands an award of treble damages in accordance with law.

**COUNT X**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

197.    Outland restates and realleges the foregoing paragraphs.

31

**A87**

198.    Gamesa owes Outland a duty of good faith and fair dealing in the conduct and transaction concerning the Agreement.

199.    Gamesa's conduct, as set forth herein in this Complaint, constitutes breaches of its duty of good faith and fair dealing it owes to Outland.

200.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

201.    Outland has been, and will continue to be, irreparably harmed and damaged by Gamesa's breaches of this duty of good faith and fair dealing, and is without a complete and adequate remedy at law.

202.    Gamesa must be enjoined from continued breaches of its duty of good faith and fair dealing.

203.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial, relative to these breaches of their duties of good faith and fair dealing, along with attorneys' fees and costs incurred, to be proven with specificity at trial.

## COUNT XI
## COMMERCIAL DISPARAGEMENT

204.    Outland restates and realleges the foregoing paragraphs.

205.    Gamesa has published false and disparaging statements about Outland concerning its performance under the Agreement, with the intent the publication would cause pecuniary loss and harm or reasonably recognized that the publication would result in pecuniary loss and harm.

206.    Outland has been, and will continue to be, irreparably harmed and damaged by Gamesa's false and disparaging statements.

207.    Gamesa knew the statements were false, or acted with reckless disregard of its truth or falsity.

208.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

**A88**

209. As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue with those new investments, the loss of opportunities to acquire new contracts, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

210. Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial, along with attorneys' fees and costs incurred, to be proven with specificity at trial.

### COUNT XII
### INJURIOUS FALSEHOOD

211. Outland restates and realleges the foregoing paragraphs.

212. Gamesa has published false statements harmful to Outland.

213. Gamesa intended for the publication of those statements to result in harm to Outland, or recognized or should have recognized that it was likely to do so.

214. Gamesa knows that the statements were false, acted in reckless disregard of its truth or falsity, or acted negligently regarding the truth or falsity of the statements.

215. Gamesa made those statements with motive of ill will toward Outland.

216. Gamesa made those statements with an intent to interfere in an unprivileged manner with Outland's interests.

217. Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

218. As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue

with those new investments, the loss of opportunities to acquire new contracts, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

219.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial along with attorneys' fees and costs incurred, to be proven with specificity at trial.

## COUNT XII
## DISPARAGEMENT OF PROPERTY

220.    Outland restates and realleges the foregoing paragraphs.

221.    Gamesa has published false statements harmful to Outland's business reputation, quality of service, quality of safety.

222.    Gamesa intended for the publication of those statements to result in harm to Outland, or recognized or should have recognized that it was likely to do so.

223.    Gamesa intended the statements to cast doubt, and the recipient's understanding of it as casting doubt was reasonable.

224.    Gamesa knows that the statements were false, acted in reckless disregard of its truth or falsity, or acted negligently regarding the truth or falsity of the statements.

225.    Gamesa made those statements with motive of ill will toward Outland.

226.    Gamesa made those statements with an intent to interfere in an unprivileged manner with Outland's interests.

227.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

228.    As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue

with those new investments, the loss of opportunities to acquire new contracts, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

229.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial along with attorneys' fees and costs incurred, to be proven with specificity at trial.

## COUNT XIII
## DEFAMATION

230.    Outland restates and realleges the foregoing paragraphs.

231.    Gamesa has published false statements harmful to Outland.

232.    Gamesa intended for the publication of those statements to result in harm to Outland, or recognized or should have recognized that it was likely to do so.

233.    Gamesa knows that the statements were false, acted in reckless disregard of its truth or falsity, or acted negligently regarding the truth or falsity of the statements.

234.    Gamesa made those statements with motive of ill will toward Outland.

235.    Gamesa made those statements with an intent to interfere in an unprivileged manner with Outland's interests.

236.    The statements tend to prejudice Outland in the conduct of its business or deters others from dealing with it.

237.    The recipients of the statements correctly, or mistakenly but reasonably, understood that the statements referred to Outland.

238.    Such statements ascribed to Outland conduct, characteristics or a condition that would adversely affect its fitness for the proper conduct of its lawful business.

239.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

240.    As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue with those new investments, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

241.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial along with attorneys' fees and costs incurred, to be proven with specificity at trial.

**COUNT XIV**
**ACCOUNTING FOR BONUSES**

242.    Outland restates and realleges the foregoing paragraphs.

243.    Under the FSA and the MSA, Outland was entitled to receive certain bonuses. Outland has not received and bonuses and Gamesa has not provided an accounting of bonuses due to Outland under the FSA or the MSA.

244.    In addition, under Section 3.3 of the MSA, Gamesa was under an obligation to attempt to negotiate in good faith an availability bonus payable to Outland.

245.    Gamesa breached its obligation.

246.    Outland seeks an accounting for all bonuses that are due and payable under the FSA and MSA, a determination of the availability bonuses that reasonably should have been negotiated for Outland's benefit and payment of such bonuses.

**COUNT XV**
**MINNESOTA ANTITRUST ACT OF 1971 (TREBLE DAMAGES)**

247.    Outland restates and realleges the foregoing paragraphs.

**A92**

248.    The Minnesota Antitrust Act of 1971, Minn. Stat. §325D.52 (the "Minnesota Antitrust Act") states: "The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful".

249.    Under Minn. Stat. §325D.57 the injured party is entitled to an award of treble damages.

250.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of the Minnesota Antitrust Act.

251.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

252.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

253.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

254.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

255.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

256.    Outland demands an award of treble damages in accordance with law.

A93

## COUNT XVI
## MINNESOTA ANTITRUST ACT OF 1971 (TREBLE DAMAGES)

257.    Outland restates and realleges the foregoing paragraphs.

258.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated the Minnesota Antitrust Act.

259.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

260.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of the Minnesota Antitrust Act.

261.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

262.    Gamesa has market power over the market for parts for Gamesa wind turbines.

263.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

264.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

265.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

266.    Not an insubstantial dollar volume of commerce in the O&M Service market for

**A94**

Gamesa wind turbines is affected.

267.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

268.    As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

269.    Outland demands an award of treble damages in accordance with law.

## COUNT XVII
## TEXAS FREE ENTERPRISE AND ANITTRUST ACT
## TEXAS BUSINESS AND COMMERCE CODE SECTION 15.05(a)

270.    Outland restates and realleges the foregoing paragraphs.

271.    The Texas Free Enterprise and Antitrust Act, the Texas Business and Commerce Code, Section 15.05(a) ("Section 15.05(a)") provides:   "(a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."

272.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of Section 15.05(a).

273.    Gamesa's actions are designed to, among other things, prohibit or restrict Outland from bidding on O&M Service work in Texas.

274.    Gamesa's actions have been willful and flagrant.

275.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

276.    Gamesa has market power over the O&M Services market for Gamesa wind

**A95**

turbines.

277.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

278.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

279.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

280.    Outland demands an award of treble damages in accordance with law.

**COUNT XVIII**
**TEXAS FREE ENTERPRISE AND ANITTRUST ACT**
**TEXAS BUSINESS AND COMMERCE CODE SECTION 15.05(b)**

281.    Outland restates and realleges the foregoing paragraphs.

282.    The Texas Free Enterprise and Antitrust Act, the Texas Business and Commerce Code, Section 15.05(b) ("Section 15.05(b)") provides:   "(b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."

283.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of Section 15.05(b).

284.    Gamesa's actions are designed to, among other things, prohibit or restrict Outland from bidding on O&M Service work in Texas.

285.    Gamesa's actions have been willful and flagrant.

286.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa

in those efforts.

287.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

288.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

289.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

290.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

291.    Outland demands an award of treble damages in accordance with law.

**COUNT XIX**
**TEXAS FREE ENTERPRISE AND ANITTRUST ACT**
**TEXAS BUSINESS AND COMMERCE CODE SECTION 15.05(c)**

292.    Outland restates and realleges the foregoing paragraphs.

293.    The Texas Free Enterprise and Antitrust Act, the Texas Business and Commerce Code, Section 15.05(c) ("Section 15.05(c)") provides:  "(c) It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods, whether patented or unpatented, for use, consumption, or resale or to fix a price for such use, consumption, or resale or to discount from or rebate upon such price, on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce."

294.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland

**A97**

as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated the Section 15.05(c), Section 15.05(b) and Section 15.05(a).

295.    Gamesa's actions have been willful and flagrant.

296.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

297.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of Section 15.05(c), Section 15.05(b) and Section 15.05(a).

298.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

299.    Gamesa has market power over the market for parts for Gamesa wind turbines.

300.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

301.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

302.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

303.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

304.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

305.    As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

306.    Outland demands an award of treble damages in accordance with law.

**COUNT XX**
**ILLINOIS ANTITRUST ACT 740 ILCS 10/3(2) AND 10/3(3)**

307.    Outland restates and realleges the foregoing paragraphs.

308.    The Illinois Antitrust Act, 740 ILCS 10/3(3) (the "IAA Section 3") states that it is a violation of the Illinois Antitrust Act to: "(3) [e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce".

309.    The Illinois Antitrust Act, 740 ILCS 10/3(2) (the "IAA Section 2") states that it is a violation of the Illinois Antitrust Act to: "(2) [b]y contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce."

310.    Gamesa's actions are designed to, among other things, prohibit or restrict Outland from bidding on O&M Service work in Illinois.

311.    Gamesa's actions in violation of IIA Section 2 and IIA Section 3 have been willful.

312.    Under 740 ILCS 10/7(2) the injured party is entitled to an award of treble damages.

313.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland

**A99**

as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of the IIA Section 2 and IIA Section 3.

314.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

315.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

316.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

317.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

318.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

319.    Outland demands an award of treble damages in accordance with law.

## COUNT XXI
## ILLINOIS ANTITRUST ACT 740 ILCS 10/3(4)

320.    Outland restates and realleges the foregoing paragraphs.

321.    The Illinois Antitrust Act, 740 ILCS 10/3(4) (the "IAA Section 4") states that it is a violation of the Illinois Antitrust Act to:: "(4) [l]ease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services (including master antenna television service), whether patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price charged thereof, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or

**A100**

deal in the goods, wares, merchandise, machinery, supplies, or other commodity or service (including cable television service or cable television relay service), of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for such sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

322.    Under 740 ILCS 10/7(2) the injured party is entitled to an award of treble damages.

323.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated the IIA Section 2, IIA Section 3 and IAA Section 4.

324.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

325.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of IAA Section 2, IAA Section 3 and IAA Section 4.

326.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

327.    Gamesa has market power over the market for parts for Gamesa wind turbines.

328.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

329.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

**A101**

330.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

331.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

332.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

333.    As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

334.    Outland demands an award of treble damages in accordance with law.

## COUNT XXII
## DECLARATORY JUDGMENT (28 U.S.C. § 2201) AND INJUNCTIVE RELIEF

335.    Outland restates and realleges the foregoing paragraphs.

336.    An actual case or controversy exists between Outland and Gamesa with respect to the FSA; a declaratory action would settle the case and controversy.

337.    Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, et. seq., Outland is entitled to a declaratory judgment declaring and adjudicating: (a) that the restrictions on competition in the FSA are invalid and unenforceable or have been superseded by the restrictions on competition in the MSA; and (b) that the restrictions on competition in the MSA are invalid and unenforceable.

338.    Outland seeks an order enjoining (i) Gamesa and Iberdrola from taking any

further actions interfering with Outland's contractual relations or prospective contractual relations, and making false or disparaging statements with respect to Outland, (ii) Gamesa from offering O&M Service in connection with any sale of Gamesa wind turbines in the United States, and (iii) Gamesa from offering any O&M Service in connection with any Gamesa wind turbine.

**WHEREFORE**, Plaintiff Outland prays that this Court enter judgment in its favor and against Defendant Gamesa as follows:

1.      Enjoining Gamesa from further (i) engaging in unfair trade practices, (ii) engaging in actions and practices that violate Federal or state anti-trust laws, (iii) violating, breaching or otherwise interfering with the terms, conditions and provisions of any agreements to which Outland is or may be a party, and (iv) engaging in any conduct that interferes with Outland's economic relations or prospective economic relations.

2.      Enjoining Gamesa from (i) tying O&M Service in connection with any future sale of Gamesa wind turbines in the United States, and (ii) offering any O&M Service in connection with any Gamesa wind turbine already sold in the United States.

3.      Awarding Outland its damages, including all exemplary and treble damages, where available at law.

4.      Requiring Gamesa to disgorge all amounts improperly gained by their improper action at Outland's expense.

5.      Granting the relief requested in each Count in these claims against Gamesa.

6.      Awarding Outland its attorneys' fees incurred as a result of Defendants' actions, where available at law.

7.      Awarding Outland its costs, disbursements and additional attorneys' fees incurred on tortious interference with contract and/or prospective business advantage, or as otherwise may

**A103**

be available at law.

       8.      Awarding Outland pre- and post-judgment interest.

       9.      Awarding Outland all other relief that the Court deems just, proper and equitable,

including where applicable equitable relief, such as disgorgement.

                            OUTLAND ENERGY SERVICES, LLC

                            /s/  Randolph C. Winton
                            Randolph C. Winton

Randolph C. Winton
Vice President & General Counsel
Outland Energy Services, LLC
302 1st Street East
Canby, MN 56220
612-655-6178
MN Bar #: 0387118
Pro hac vice for N.D. Ill. granted Sept. 19, 2011

**A104**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## NOTICE OF FILING

TO:    SEE ATTACHED SERVICE LIST

PLEASE TAKE NOTICE that on September 22, 2011 we filed a Counterclaim with the

United States District Court Northern District of Illinois Eastern Division, a copy of which is

attached hereto and hereby served upon you.

**A105**

OUTLAND ENERGY SERVICES, LLC

/s/  Randolph C. Winton
Randolph C. Winton

Randolph C. Winton
Vice President & General Counsel
Outland Energy Services, LLC
302 1st Street East
Canby, MN 56220
612-655-6178
MN Bar #: 0387118
Pro hac vice for N.D. Ill. granted Sept. 19, 2011

**A106**

## SERVICE LIST

   I hereby certify that on September 22, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Alexander Nicholas Hattimer
Dominic R. Fichera
Fichera & Miller, P.C.
415 N. LaSalle St., Suite 301
Chicago, IL 60654
312-673-2222
Fax:  312-673-4545
alex.hattimer@ficheramiller.com
domfichera@aol.com

***Attorney for Plaintiff***

Jennifer Jerit Johnson
Andrew Scott Paine
Tressler LLP
233 S. Wacker Drive, 22nd Floor
Chicago, IL 60606-6308
312-627-4000
Fax:  312-627-1717
jjohnson@tresslerllp.com
apaine@tresslerllp.com

***Attorneys for Iberdrola Renewables, Inc. and Streator-Cayuga Ridge Wind Power LLC***

Julie Beth Negovan
Paul Sullivan Gerding, Jr.
Kutak Rock LLP
One S. Wacker Dr., Suite 2050
Chicago, IL 60606
312-602-4100
julie.negovan@kutakrock.com
paul.gerding@kutakrock.com

***Attorneys for Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC***

**A107**

Todd Edward Carlson
Grant & Fanning
10 South Riverside Dr., Suite 1770
Chicago, IL 60606
312-775-9743
Fax:  312-775-9777
todd.carlson@zurichna.com

*Attorneys for Gamesa Technology Corporation, Inc.*

Michael T. McDonnell, III
Kutak  Rock LLP
50 S. 16th Street
Two Liberty Tower, Suite 2700
Philadelphia, PA 19102
215-299-4384
michael.mcdonnell@kutakrock.com

*Attorneys for Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC*

Michael A. Strom
Law Offices of David A. Izzo& Associates
333 S. Wabash Ave., 25th Floor
Chicago, IL 60604
312-822-3350
michael.strom@cna.com

*Attorney for Outland Renewable Energy, LLC, Outlaw Energy Services, LLC, and Outland
Renewable Energy Field Services, LLC*

Joseph G. Skryd
Mulherin, Rehfeldt & Varchetto, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
630-653-9300
jskryd@mrvlaw.com

*Attorney for Outland Renewable Energy, LLC, Outlaw Energy Services, LLC, and Outland
Renewable Energy Field Services, LLC*

**A108**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 11-CV-00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants/Cross-Defendants. | ) | |

**<u>ORDER</u>**

The matter coming before the Court on the Motion for Good Faith Finding of the

Third-Party Defendants/Cross-Defendants, OUTLAND RENEWABLE ENERGY, LLC

n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY

FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND

ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES,

LLC, due notice having been given and the Court being fully advised on the premises, IT IS HEREBY ORDERED:

1.      The settlement reached between the Plaintiff, AARON MCCOY, and Third-Party Defendants/Cross-Defendants, OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, is an arms-length resolution of a disputed matter and has been made in good faith pursuant to the Illinois Joint Tortfeasors Contribution Act, 740 ILCS 100/.01, *et seq.*;

2.      Any and all Counterclaims, Cross-Claims, and/or Third-Party Complaints for contribution, indemnity, contractual indemnity, indemnification, indemnification pursuant to the Maintenance Service Agreement dated November 19, 2009, all indemnification and contractual indemnification counts that were voluntarily dismissed, and all other causes of action arising out of and related to AARON MCCOY's claims in this action filed by and/or on behalf of the Defendants, GAMESA TECHNOLOGY CORPORATION, INC., GAMESA WIND US, LLC, IBERDROLA RENEWABLES, INCORPORATED, and/or STREATOR-CAYUGA RIDGE WIND POWER, LLC, against OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, OUTLAND RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC, INDIVIDUALLY, AND AS SUCCESSOR TO AND ASSIGNEE OF OUTLAND RENEWABLE ENERGY, LLC (hereinafter referred to collectively as "OUTLAND"), are hereby dismissed with prejudice, and any and all future claims for contribution, indemnity, contractual indemnity, indemnification, indemnification pursuant to the Maintenance Service Agreement dated November 19, 2009, or other causes of action arising out of or relating to AARON MCCOY's claims in this action against OUTLAND, including Counterclaims,

**A110**

Cross-Claims, or Third-Party Complaints, if any, by any person or entity, are hereby barred; and

3.      Any and all claims for contribution arising out of or relating to AARON MCCOY's claims in this action filed by and/or on behalf of the Third-Party Defendants/Cross-Defendants, OUTLAND, against the Defendants, GAMESA TECHNOLOGY CORPORATION, INC., GAMESA WIND US, LLC, IBERDROLA RENEWABLES, INCORPORATED, and STREATOR-CAYUGA RIDGE WIND POWER, LLC, are hereby dismissed with prejudice.

4.      Nothing in this Order shall limit, impinge, pertain to or effect the claims and causes of action arising out of or relating to the allegations set forth in the Counterclaims of OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, entitled "Counterclaims of Outland Against Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC" filed on or about September 22, 2011, Document No. 112 in this litigation, and nothing in this Order shall limit, impinge, pertain to, or effect the claims or causes of action arising out of or relating to the allegations asserted by GAMESA TECHNOLOGY CORPORATION, INC. and GAMESA WIND US, LLC, against OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC in the pleading entitled "Gamesa Technology Corporation, Inc.'s and Gamesa Wind US, LLC's Answer, Affirmative and Additional Defenses, and Counterclaim to Outland's Counterclaim" filed on or about February 9, 2012, Document No. 215 in this litigation.

5.    The Court finds that there is no just reason to delay enforcement of, or appeal from, this Order pursuant to Federal Rule of Civil Procedure 54(b).

ENTERED BY:

_____
Judge

_____
February 5, 2013
Date

Prepared by:
**Mulherin, Rehfeldt & Varchetto, P.C.**
211 South Wheaton Avenue, Suite 200
Wheaton, IL 60187
(630) 653-9300

**A112**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY,<br><br>Plaintiff<br><br>v.<br><br>GAMESA TECHNOLOGY CORPORATION, INC., and<br>IBERDROLA RENEWABLES, INC.,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | District Judge<br>The Honorable Charles P. Kocoras<br><br>Magistrate Judge:<br>The Honorable Arlander Keys<br><br>Case No. 11-CV-00592<br><br>JURY DEMAND |
| IBERDROLA RENEWABLES, INC. and<br>GAMESA TECHNOLOGY CORPORATION, INC.,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br><br>OUTLAND RENEWABLE ENERGY, LLC.<br>OUTLAND ENERGY SERVICES, LLC<br>OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC,<br><br>Third-Party Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| IBERDROLA RENEWABLES, INC.<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>GAMESA WIND US, LLC<br><br>Third-Party Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| GAMESA TECHNOLOGY CORPORATION, INC.,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>STREATOR - CAYUGA RIDGE WIND POWER, LLC<br><br>Third-Party Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |

**A113**

**ORDER**

The matter coming before the Court on the Motion for Finding of Good Faith Settlement by Defendants Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC, due notice having been given and the Court being fully advised on the premises, IT IS HEREBY ORDERED:

1.     The settlement reached between the Plaintiff AARON MCCOY and Defendants Gamesa Wind US, LLC and Gamesa Technology Corporation, Inc. is an arms-length resolution of a disputed matter and has been made in good faith pursuant to the Illinois Joint Tortfeasors Contribution Act, 740 ILCS 100/.01, *et seq*.;

2.     All contract, contribution or indemnification claims based upon the Joint Tortfeasors Contribution Act, the Turbine Supply and Delivery Agreement between Streator-Cayuga Ridge Wind Power, LLC and Gamesa Wind US, LLC, or the Maintenance Service Agreement dated November 19, 2009 between Gaemsa Wind US, LLC and Outland Energy Services, LLC, whether presented by Counterclaims, Cross-Claims, and/or Third-Party Complaints, and whether or not previously voluntarily dismissed, arising out of and related to the allegations in Plaintiff's Complaint at Law against Gamesa Wind and Gamesa Technology, excluding those claims and causes of action arising out of and relating to the allegations in the pleadings set forth in Paragraph 4 of this Order, be and hereby are DISMISSED WITH PREJUDICE and the parties hereto are barred from filing any and all future claims for contribution, indemnity, contractual indemnity, indemnification, indemnification pursuant to the Turbine Supply and Delivery Agreement, or indemnification pursuant to the Maintenance Service Agreement dated November 19, 2009, or other causes of action against Gamesa Wind and Gamesa Technology arising out of or relating to the allegations in Plaintiff's Complaint at

Law, excluding those claims and causes of action arising out of and relating to the allegations in the pleadings set forth in Paragraph 4 of this Order.

3.    Any and all claims for contribution and indemnification filed by and/or on behalf of Gamesa Wind and Gamesa Technology, against Iberdrola Renewables, Inc., Streator-Cayuga Ridge Wind Power, LLC, Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC, and Outland Energy Services, LLC f/k/a Outland Renewable Energy Field Services, LLC arising out of or relating to the allegations set forth in Plaintiff's Complaint at Law be and hereby are DISMISSED WITH PREJUDICE.

4.    Nothing in this Order shall limit, impinge, pertain to or effect the claims and causes of action arising out of or relating to the allegations asserted by Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC, and Outland Energy Services, LLC f/k/a Outland Renewable Energy Field Services, LLC against Gamesa Wind US, LLC and Gamesa Technology Corporation, Inc. in the pleading entitled "COUNTERCLAIM" filed on or about September 22, 2011 (Docket No. 112) and dismissed by the Court on September 27, 2012 (Docket No. 275) and nothing in this Order shall limit, impinge or effect the claims or causes of action arising out of or related to the allegations asserted by Gamesa Wind US, LLC and Gamesa Technology Corporation, Inc. against Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC, and Outland Energy Services, LLC f/k/a Outland Renewable Energy Field Services, LLC in the pleading entitled "ANSWER TO COUNTERCLAIM and COUNTERCLAIM" filed on or about February 9, 2012 (Docket No. 215); and

5.      There is no just reason to delay enforcement of, or appeal from, all dismissal

orders referenced above pursuant to Federal Rule of Civil Procedure 54(b).


ENTERED BY:



_____
                    Judge


_____ .
      February 5, 2013
                    Date




Prepared by:
**Kutak Rock, LLP**
Julie B. Negovan, Esq.
Matthew M. Enenbach, Esq., NE#22891
Suite 2050
One South Wacker Avenue
Chicago, IL 60606-4614
(312) 602-4100

4813-7612-2642.1

**A116**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., GAMESA WIND US, LLC, IBERDROLA | ) | |
| RENEWABLES, INCORPORATED, and | ) | |
| STREATOR-CAYUGA RIDGE WIND | ) | |
| POWER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ————————————————— | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| ————————————————— | ) | |

## <u>MOTION FOR LEAVE TO FILE FIRST AMENDED COUNTERCLAIMS OF OUTLAND AGAINST GAMESA TECHNOLOGY CORPORATION, INC. AND GAMESA WIND US LLC</u>

Now comes Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC,

Outland Energy Services, LLC n/k/a Northwind Holdings LLC ("Outland"), by its attorney

Thomas Melone, and moves this court pursuant to Fed. R. Civ. P. 15(a)(2), for leave to amend its

<u>A117</u>

counterclaims against Gamesa Technology Corporation, Inc., and Gamesa Wind US LLC ("Gamesa"),  On September 22, 2011, Outland filed a 23-count counterclaim against Gamesa. On September 26, 2012, the Court granted Gamesa's motion for judgment on the pleadings for all counts except Count VI relating to Outlands' indemnification claims.

Outland's amended counterclaim against Gamesa has remedied the deficiencies in the original counterclaim.

<u>Legal Standard</u>

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts have wide discretion in deciding whether to grant leave to amend. *Johnson v. Cypress Hill*, 641 F.3d 867, 871-72 (7th Cir. 2011). The court may deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendant, or where the amendment would be futile. *Id*. Delay, alone, is generally insufficient reason to deny a motion to amend, but the longer the delay, the greater the presumption against granting leave to amend. *Id*.

As the Court is aware, Outland and Gamesa have settled the claims of Plaintiff McCoy, which now allows the parties to focus on the various business claims between them. Here there is no prejudice to the defendant from filing the amended claims against Gamesa.  In addition, there has not been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies. The parties focused on resolving the claims of Plaintiff McCoy and a settlement has been achieved.

The amendment would not be futile. As discussed herein, the amended allegations support the amended claims against Gamesa.

The amended complaint omits the business defamation related claims, most of the anti-trust claims, and certain other claims.  Set forth below is a discussion of the amended claims that

2

<u>**A118**</u>

have been retained.

**THE OUTLAND PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE**

In dismissing the tortious interference claims with respect to the acquisition by Duke Energy ("Duke"), the Court focused on the fact that there was no allegation in the counterclaim that Gamesa had knowledge of the May 11, 20111, agreement (the "Restated Acquisition Agreement") when Gamesa issued its letter of May 12, 2011.  The amended counterclaim addresses that fact.  More importantly, however, whether or not Gamesa had actual knowledge of the Restated Acquisition Agreement is not determinative.  Gamesa had actual knowledge that Outland and Duke had entered into an agreement in February 2011 (the "Original Acquisition Agreement") for Duke to acquire a significant stake in Outland, and that Duke might acquire all of Outland.  In addition, by April 15, 2011, various parties (including Gamesa) in the wind turbine services market believed that Duke was in fact purchasing 100% of Outland.  The Restated Acquisition Agreement was merely an amendment to the written agreement that Gamesa already existed.

In addition, Gamesa had knowledge that Duke had also agreed with Outland that Outland would be receiving all of the operations and maintenance contracts for the Duke Energy fleet of wind farms (the "Duke Fleet Services Agreement").

In dismissing Outland's claims, the Court noted that Duke rejected Gamesa's attempts to scuttle Duke's plans to acquire a stake in Outland, and that Outland "cannot plausibly claim that it was harmed by Gamesa's efforts to stifle the acquisition where Gamesa's attempts were rebuffed."[2] The amended claims clarify that Gamesa's unsuccessful attempt to scuttle Duke's

---

[1] *See, McCoy v. Gamesa Technology Corporation, Inc.*, 2012 U.S. Dist. LEXIS 138417, *13 (N.D. Ill. 2012) (stating "[t]hat the letter was sent one day after the acquisition agreement was signed is not enough to infer Gamesa's knowledge of the agreement.")

[2] *See, McCoy v. Gamesa Technology Corporation, Inc.*, 2012 U.S. Dist. LEXIS 138417, *12 (N.D. Ill. 2012).

**A119**

plans in April 2011 was not the basis of Outlands' claim for damages. Rather, that incident (i) confirmed Gamesa's knowledge of the agreement for Duke's acquisition, (ii) confirmed Gamesa's knowledge that Outland would be receiving the services business for Duke's fleet of wind farms, and (iii) confirmed that the Gamesa Defendants were intent on taking all necessary steps to interfere with the acquisition and the economic relations that the Outland plaintiffs would realize therefrom. The April 2011 direct contact with Duke was just one aspect that revealed Gamesa's true intention.

Neither Duke nor Sterling Partners proceeded to close an acquisition of all or any part of the member interests of Outland. In addition, Duke did not enter into a services agreement with Outland to provide services for its fleet of wind farms. On November 1, 2012, however, Duke acquired substantially all the business assets and employees of Outland. As the direct result of the Gamesa Defendant's tortious actions, the final acquisition price was reduced by approximately $15 million.

Outlands' tortious interference claims are divided as follows:

1. Tortious interference with contract.

    a. Against Gamesa for causing Duke and Sterling Partners to fail to proceed to close the acquisition of all the member interests of Outland at the price set forth in the Restated Acquisition Agreement;

    b. In the alternative, against Gamesa for causing Duke to fail to proceed to close the acquisition of a portion of the member interests of Outland at the price set forth in the Original Acquisition Agreement;

    c. Against Gamesa for causing Duke to breach its commitment to enter into the Duke Fleet Services Agreement with Outland for Duke's fleet of wind farms; and

**A120**

2.  <u>Tortious interference with prospective economic relations.</u>

    a.  Against Gamesa for causing Duke and Sterling Partners to fail to proceed to close the acquisition of all the member interests of Outland at the price set forth in the Restated Acquisition Agreement;

    b.  In the alternative, against Gamesa for causing Duke to fail to proceed to close the acquisition of a portion of the member interests of Outland at the price set forth in the Original Acquisition Agreement;

    c.  Against Gamesa for causing Duke to breach its commitment to enter into the Duke Fleet Services Agreement with Outland for Duke's fleet of wind farms; and

Illinois state courts generally follow the choice of law principles of the *Restatement (Second) of Conflict of Laws*.  *See*, *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 686 (2001). The general rule for torts, such as the tortious interference claims, is that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." *See, Restatement (Second) of Conflict of Laws* § 145.  Here, Outland is based in Minnesota.  On the other hand, Gamesa is based in Pennsylvania, and the MSA governing law is Pennsylvania. Both jurisdictions, however, follow the Restatement (Second) of Torts with respect to tortious interference with contract and with prospective economic relations.  *See,  Thompson Coal Co. v. Pike Coal Co*., 488 Pa. 198, 412 A.2d 466 (1979); *Gieseke v. IDCA, Inc*,, 2013 Minn. App. LEXIS 2, *12  (Minn. App. 2013)

A cause of action for tortious interference with a contractual relationship requires five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."  *Kjesbo v.*

**A121**

*Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

One of the elements of a claim for tortious interference is that the defendant had knowledge of the contract.  It is not necessary to show actual knowledge.  It is enough to show that he "had knowledge of facts which if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties."  *Kallok v. Medtronic, Inc.*, 573 N.W. 2d 356, 362 (Minn. 1998).  "[T]he law will impute bad faith when the wrongdoer has knowledge that the contract existed." *Id.* at 365.  When a defendant knows of a contract between the plaintiff and a third party, the defendant "is on notice as to the terms of the agreement and has a duty to learn whether his actions will cause the [third party] to breach his agreement.'" *JIT Concepts, Inc. v. Shelby County Healthcare Corp.*, 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005) (quoting *Wells Fund I v. The Shoe Show of Rocky Mount, Inc.*, 863 S.W.2d 731, 733 (Tenn. Ct. App. 1993)).  "[T]he alleged inducer may not close its eyes and ears and thereafter claim a lack of knowledge when the [contract] could have been easily obtained." *Id.* (internal quotations omitted).  *See also Rain Bird Corp. v. Nat'l Pump Co.*, No. 2:02CV018, 2003 U.S. Dist. LEXIS 26792, at *49 (N.D. Miss. 2003) ("A finding of willful ignorance is sufficient to infer knowledge of the contract."); *Major Computer, Inc. v. Academy Life Ins. Co.*, 929 F.2d 1249, 1252 (8th Cir. 1991) ("'It is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties.'" (quoting *Swaney v. Crawley*, 154 Minn. 263, 191 N.W. 583, 584 (Minn. 1923)).

Here, Gamesa had actual knowledge of the Original Acquisition Agreement because Outland informed Gamesa of the Agreement. Gamesa also had actual knowledge that Duke agreed to enter into the Duke Fleet Services Agreement for Duke's fleet of wind farms.

**A122**

Moreover, Gamesa's attempt to scuttle the transaction with Outland by directly engaging Duke, and by its attempts to destabilize Outland provides direct evidence of Gamesa's bad faith.

In addition, by April 2011, upon information and belief, the Gamesa Defendants believed that Duke was acquiring all of Outland.  Timing as to when the Gamesa Defendants had knowledge of the amendments to the Original Acquisition Agreement that were embodied in the Restated Acquisition Agreement is a factual question that cannot be resolved at the pleading stage, and is not determinative.  Quite simply, Gamesa knew that Duke and Outland entered into an agreement, and Gamesa intentionally took actions that it hoped would, and did, interfere with it.

Gamesa had knowledge of the Original Acquisition Agreement and the Duke Fleet Services Agreement.  Gamesa therefore had knowledge or had reason to be aware of the Restated Acquisition Agreement. At the very least, Gamesa had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of Outland.  Gamesa cannot avoid liability for interference with the Restated Acquisition Agreement simply because they may not have known the precise amendments to the Original Acquisition Agreement embodied therein.

The Amended Counterclaim alleges Gamesa's involvement in procuring the breaches of the Acquisition Agreements and the Duke Fleet Services Agreement.  Gamesa took its actions for the specific purpose of inducing Duke and Sterling Partners to fail to proceed with the terms of the Acquisition Agreements, and Duke to not enter into the Duke Fleet Services Agreement for its fleet of wind farms.  Moreover, Gamesa, without justification or privilege, engaged in these improper actions by employing wrongful means in breaching its fiduciary duty to Outland that existed under the principal-agent relationship.  Furthermore, while Gamesa has attempted to

**A123**

cloak some of their actions under the guise of maintaining safety at their wind farms, it is a factual question as to whether that assertion was made in good faith or whether it was just a subterfuge for Gamesa's overarching plan to prevent Outland from consummating either the Acquisition Agreement or the Duke Fleet Services Agreement, and causing harm to Outland.

### THE OUTLAND PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS.

Under Pennsylvania and Minnesota law, a plaintiff may recover from one who intentionally or improperly interferes with the plaintiff's prospective contractual relationships by inducing or causing a third person not to enter into or continue the prospective relationship or by preventing the plaintiff from acquiring or continuing the prospective relationship. *S.N.T. Industries, Inc. v. Geanopulos*, 525 A.2d 736, 739 (Pa. Super. 1987); *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1982) (citing *Restatement (Second) of Torts* § 766B. The interference with another's prospective contractual relation "is intentional if the actor desires to bring it about or if he know that the interference is certain or substantially certain to occur as a result of his action." *Restatement (Second) of Torts* § 766B, comment d. The interference must also be improper. *Restatement (Second) of Torts § 766B*, comment d.

Here there are three additional torts that Gamesa committed that provide the basis to conclude that their interference was improper: the tortious interference with contract (*Restatement (Second) of Torts, §766*), the breach of fiduciary duties of Gamesa as a principal in the principal-agent relationship that existed between Gamesa and Outland (*Restatement (Second) of Torts*, §874), and liability for intended consequences, which is sometimes referred to a prima facie tort (*Restatement (Second) of Torts*, §870) .

Whether the interference was improper and the certainty of the desired result are factual questions that cannot be resolved at the pleading stage.

The amended claims specify Gamesa's involvement in attempting to and then successfully scuttling the consummation of the Acquisition Agreements and the Duke Fleet Services Agreement. Those actions of Gamesa caused Duke and Sterling not to enter into or continue the prospective relationship or prevented Outland from acquiring or continuing the prospective relationships.

**THE OUTLAND PLAINTIFFS' CLAIM FOR PRIMA FACIE TORT**

The amended counterclaim has added the claim of prima facie tort as defined by the *Restatement (Second) of Torts*, §870.

In 1889 Lord Bowen wrote the famous dictum which has become the classic statement of the prima facie tort doctrine:

> "Now intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that person's property or trade, is actionable if done without just cause or excuse."[3]

Lord Bowen's rule now finds itself in the *Restatement (Second) of Torts* § 870, which states:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

The United States Supreme Court has more recently, citing the *Restatement (Second) of Torts*, Sec. 870, recognized that "[g]eneral [p]rinciple" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." *See, Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008).

---

[3] *See, Mogul Steamship Co. v. McGregor, Gow & Co.*, 23 Q.B.D. 598, 613 (1889), *aff'd* [1892] A.C. 25.

**A125**

Neither the Pennsylvania nor the Minnesota Supreme Courts has ruled on whether those states would recognize the cause of action of prima facie tort.  However, since the United States Supreme Court's statement in *Bridge*, the Federal Courts in Pennsylvania have allowed the cause of action of prima facie tort to proceed. *See, Devon IT, Inc. v. IBM Corp*. 805 F. Supp. 2d 110 (E.D.Pa. 2011).[4]

## ANTITRUST CLAIMS

In dismissing Outland's antitrust claims the Court stated that Outland failed to make a threshold showing that Gamesa participated in an unlawful conspiracy or that it possessed monopoly power[5].  The Court stated that Outland's statement that Gamesa possessed at its height approximately 10% of the wind turbine market in the United States was far below what is necessary for the Court to infer that it possessed monopoly power, and that Outland's attempt to save its claim by alleging that demand for wind turbines so far outpaced supply was "at odds with Gamesa's supposed motivation for starting an internal O&M services division".[6]

The amended claims make it clear that the anti-trust claim relates to the turbine sales period between 2007 and October 2008 (the onset of the economic recession) during which demand for wind turbines far outpaced supply by multiples resulting in sufficient market power for Gamesa to illegally tie its sale of wind turbines to the provision of services.  Wind turbines ordered during that time would have been placed in service during the periods from 2008 through 2010. The improper tying arrangement precluded Outland from seeking and/or acquiring that service business during the years 2008 through 2010 and resulted in wind turbine purchasers paying higher service costs, which were ultimately passed on to consumers.

---

[4] There is no reported case in Minnesota post the 2009 statement by the United States Supreme Court.  An earlier reported case, *Keckhafer v. Prudential Ins. Co. of Am*., 2002 U.S. Dist. LEXIS 19320 (D. Minn. Oct. 1, 2002), did not allow the cause of action for prima facie tort to proceed.
[5] *See, McCoy v. Gamesa Technology Corporation, Inc*., 2012 U.S. Dist. LEXIS 138417, *13 (N.D. Ill. 2012).
[6] *Id*. at  15.

**A126**

The situation here is contrary to the facts of the *Sheridan v. Marathon Petroleum Co*., 530 F.3d 590, 594 (7th Cir. 2008), because here, at all times relevant, there was a scarcity of available wind turbines for purchase.  Demand so exceeded supply that even those manufacturers that had less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market. Gamesa's competitors did not "have the productive capacity to be able to replace its reduction in output with an increase in their own output at no higher cost." *Sheridan*, 530 F.3d at 594.  Here an increase in output by a competitor was simply not physically possible during the relevant time periods.

## PROMISSORY ESTOPPEL

The amended claims include a claim based on promissory estoppel Outland was an existing subcontractor for Gamesa.  Gamesa told Outland that Outland was its primary subcontractor and that Gamesa would be providing a continuously increasing stream of business to Outland.  In particular, in late 2010 continuing into 2011 Gamesa told Outland that it needed to be ready for the work that Gamesa would be providing to it.  Outland incurred extra costs for equipment, and hiring and training employees on the basis of Gamesa's verbal unambiguous promises of future work that it would not have but for Gamesa's promises.

The elements of promissory estoppel are (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by  defendants, and (4) plaintiff relied on the promise to its detriment. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 565 N.E.2d 990, 152 Ill. Dec. 308, 309-310 (1990). *See also, Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co*., 90 Ill. App. 3d 768, 770 (1980) (stating "[p]romissory estoppel is a doctrine under which the plaintiff

**A127**

may recover without the presence of a contract."); *Newton Tractor Sales, Inc. v. Kubota Tractor Corporation*, 233 Ill. 2d 46; 906 N.E.2d 520; 329 Ill. Dec. 322 (2009) (stating "promissory estoppel is an affirmative cause of action in Illinois.")

Here, Gamesa made unambiguous promises to Outland that it would provide significant amount of future work to Outland. Outland relied on those promises when it incurred additional expenses for equipment, and hiring and training additional employees. Particularly in light of the existing general/subcontractor relationship, Outland's reliance was expected and forseeable by Gamesa. Indeed the reason why Gamesa promised the additional work to Outland was so that Outland could ramp-up to be prepared for the additional work. Outland relied on the promises to its detriment by incurring the additional costs for equipment and additional employees, in each case that it would not have incurred but for Gamesa's promises.

**BREACH OF FIDUCIARY DUTY OF GAMESA AS PRINCIPAL**

The amended counterclaim adds claims based upon Gamesa's breach of its fiduciary duty to Outland. Gamesa and Outland were parties to the FSA, the MSA, various purchase orders and to Gamesa's promise to provide future work to Outland. In each of those arrangements, the relationship between Gamesa and Outland was that of contractor-subcontractor, or principal and agent.

"A principal and an agent are in a fiduciary relationship. . . . Because of the fiduciary relationship, the principal owes the agent a duty of good faith and fair dealing in the incidents of their relationship." *Shen v. Leo A. Daly Co*., 222 F.3d 472 (8th Cir.2000). Moreover, "correlative with the duties of the agent to serve loyally and obediently are the principal's duties of compensation, indemnity, and protection." *Id.* (internal citations omitted)). In the existence of a fiduciary relationship, each party has a duty to refrain from "actively utilizing some power,

**A128**

control, or opportunity to destroy, injure, or gain preferential advantage over [the] party with whom it has a mutual interest." *Cottingham v. Gen. Motors Corp*., 119 F.3d 373, 380 (5th Cir. 1997) (internal citations omitted).

Here, Gamesa intentionally and without privilege tried to harm Outland by doing everything it could to interfere with Outland's Acquisition Agreements, the Duke Fleet Services Agreement, and Outland's very existence.  Those actions breached Gamesa's duty to refrain from actively utilizing power, control, or opportunity to destroy or injure Outland.

### Gamesa's obligation to Indemnify Outland

Count VI (which was not dismissed) has been expanded to include common law duties of indemnification.  In addition to the indemnification provision contained in the agreements between Gamesa and Outland, Gamesa has a separate duty to indemnify Outland. *See, Restatement (Third) of Agency*, § 8.14 (stating "a principal has a duty to indemnify an agent (1) in accordance with the terms of any contract between them; and (2) unless otherwise agreed . . . when the agent suffers a loss that fairly should be borne by the principal in light of their relationship.") Here Outland suffered (1) the losses suffered from Duke not proceeding with the terms of the Restated Acquisition Agreement and not engaging Outland as services provider for its fleet of wind farms, (2) the costs that it incurred for additional equipment and employees to ramp-up for the promised additional work, and (3) the fines paid to OSHA and the legal fees incurred by Outland related to the OSHA proceeding.   These are all losses that fairly should be borne by Gamesa in light of their relationship.

Dated: March 4, 2013                    */s/Thomas Melone*
                                        Thomas Melone, Esq.
                                        222 S 9th St, Suite 1600
                                        Minneapolis, MN 55402
                                         (212) 681-1120

**A129**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| ——————————————— | ) | |

**FIRST AMENDED COUNTERCLAIMS OF OUTLAND AGAINST AND GAMESA
TECHNOLOGY CORPORATION, INC. AND GAMESA WIND US LLC.**

## <u>OVERVIEW OF COUNTERCLAIMS</u>

Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Energy Services, LLC n/k/a Northwind Holdings LLC ("Outland"), by their attorney Thomas Melone states the following in support of their counterclaims against Gamesa Wind U.S., LLC and Gamesa Technology Corp., Inc. ("Gamesa").

*Introduction of the Parties*

1.      Founded by five Minnesota farmers in 2005, Outland at all relevant times provided wind farm operation, maintenance and repair services ("O&M Services") to the wind energy industry throughout the United States and abroad.  At the commencement of this case, it employed approximately 144 employees, down from 175 employees it employed before Gamesa's damaging actions.  Outland now has no employees.

2.      Outland provided O&M Services to Gamesa between 2006 and 2012.

3.      The counter-claims that Outland has set forth below are related to and/or arise out of the third-party claims brought by Gamesa against Outland, and arise out of an interrelated set of facts, and common parties involved in this litigation. These counterclaims seek to remedy substantial harm sustained by Outland at the hands of Gamesa.

4.      Gamesa is owned and controlled by Gamesa Corporación Tecnológica, S.A. ("Gamesa Spain").

*The Outland-Gamesa Relationship*

5.      Gamesa is a manufacturer of wind turbines.  Gamesa's standard practice was to sell its wind turbines to various asset owners, such as Iberdrola Renewables Inc. ("Iberdrola").

<u>**A131**</u>

As part of the sale of the wind turbines, Gamesa (similar to most other wind turbine manufacturers) would require that the purchaser also contract with Gamesa for O&M Services for those wind turbines for a specified period of time.

6.    Gamesa did not have its own internal O&M Service group. Rather, its business model was to be the general contractor for the O&M Service with the wind turbine owner, and then provide those O&M Services using the services of a limited number of subcontractors, such as Outland. In the general/subcontractor approach, Gamesa would manage the process but the majority of the O&M Service work was completed by independent service providers, such as Outland.

7.    Since 2006, Outland has made substantial investments in personnel and equipment to build the business based upon the request from Gamesa, Gamesa's representations and assurances that it did not intend to self-perform (i.e., create its own O&M Service group to compete with Outland), and the promises to Outland that Gamesa would continue to provide a certain minimum level of work that would allow Outland the ability to fairly recover the investments it had made.

8.    Outland delivered superior performance to Gamesa, became Gamesa's number one provider of services, achieved unprecedented recognition for its quality, occupational health and safety, and environmental management programs, and experienced steady growth.

9.    Outland's investment in, and focus upon, safety, quality, performance and productivity had resulted in Outland achieving certifications for its quality (ISO 9001:2008), environmental (ISO 14001:2004) and occupational health and safety (OHSAS 18001:2007) management programs. No other independent wind O&M Service provider in North America had attained these certifications.

**A132**

10.     From August 2006 to October 2008, the work to be performed at a particular site on Gamesa's behalf was governed by a purchase order (a "Purchase Order"). Work under a Purchase Order would be for a specific task, or set of tasks, at a wind farm that would require Outland personnel to perform work for anywhere from a few days to several months.

11.     The annual revenue received by Outland from Gamesa from Purchase Orders grew from approximately $225,000 in 2006 to approximately $6.1 million in 2010.

12.     On October 3, 2008, Outland and Gamesa entered into their first contract that specified the use of Outland personnel at certain Iberdrola-operated wind farms for a longer-term period of time. That contract was entitled the Framework Services Agreement (the "FSA") and provided separate terms and conditions related to work at those wind farms over a longer period of time, generally approximately two years.

13.     After Outland and Gamesa entered into the FSA, Gamesa continued to issue separate Purchase Orders for the shorter duration assignments.

14.     On November 19, 2009, Outland and Gamesa entered into new framework agreement entitled the Maintenance Services Agreement (the "MSA"), which placed additional Iberdrola-operated wind farms under a long-term agreement (including the Cayuga Ridge site which was the site of Plaintiff's accident).

15.     The MSA revised many of the provisions that were in the FSA governing the relationship between Outland and Gamesa.

16.     Specifically, the MSA revised the terms of a noncompetition clause (a clause which in the FSA was unenforceable under Minnesota law), the governing law clause, the dispute resolution clause, and the provision dealing with the solicitation of the other party's employees.

17.    Under the MSA, Outland was required to satisfy the needs of Gamesa's customer, Iberdrola. Specifically, Outland was required to provide all O&M Services, including preventative maintenance, corrective maintenance, design modifications, technical support and weekend, holiday, emergency and on-call work coverage. (MSA, § 2.2.)

18.    Pursuant to the MSA, Outland was required to train all its personnel on health and safety, and on industry technical standards, in order to allow its employees to effectively perform O&M Services. (MSA, § 4.4.)

19.    Outland performed O&M Services pursuant to technical documentation, manuals and quality procedures supplied by Gamesa; safety rules, regulations and manuals supplied by Gamesa and Iberdrola; and applicable federal, state or local health and safety laws and regulations. (MSA, § § 4.2 and 4.3.)

20.    Further, if Iberdrola established site-specific rules and/or safety procedures, Outland was required to comply with Iberdrola's mandates. (MSA, § 4.4.)

21.    On a regular basis, Outland supplied Gamesa with a regular O&M Services report for each project site, including descriptions of services completed; delays experienced in performing services; significant issues experienced in losses of turbine availability, causes and remedies; actualized inventory of warehouse items; and health and safety reports and inspection reports performed during the month. (MSA, § 2.6.)

22.    Since Outland had been performing services for Gamesa, Outland had met and exceeded all safety and performance benchmarks. On information and belief, Outland's performance for Gamesa was far superior then what Gamesa received from any other subcontractor. For example, in 2010 when Gamesa was facing the potential payment of approximately $15 million in liquidated warranty damages for failure to maintain a specified

**A134**

wind turbine availability percentage, Gamesa replaced the subcontractor that had been working on the site, with Outland.  Outland was able to improve the availability at the site in a very short period of time saving Gamesa approximately $15 million in warranty payments.

23.     Outland had achieved similar results under similar circumstances at other wind farms. In each case, Outland replaced an existing O&M Service subcontractor and immediately was able to improve production while maintaining the highest levels of safety.

24.     Through providing these services for Gamesa on wind farms throughout the United States, Outland's personnel developed a particular expertise in troubleshooting Gamesa-made turbines. When Outland's business for Gamesa was at its peak in the first quarter of 2011, Outland had approximately 100 technicians working on Gamesa turbines, and provision of services to Gamesa accounted for the vast majority of Outland's revenue.

*The Tying of Wind Turbine Sales and O&M Services*

25.     At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for wind turbines existed in the United States.

26.     At the time that Gamesa sold the wind turbines to various owners, a market for the O&M Service of Gamesa wind turbines existed in the United States.

27.     In 2007 and 2008 (through August 2008), there was a shortage of available wind turbines in the United States.  Wind turbine manufacturers could sell whatever they could manufacture.  While at that time manufacturers were planning to increase their manufacturing capacity, any such increase would be years away.  The demand for wind turbines in the United States exceeded the available supply by multiples.

**A135**

28.     If a purchaser did not want to agree to the tying of an O&M Service agreement to the sale of wind turbines, other manufacturers did not have the manufacturing capacity to replace the sale.

29.     Upon information and belief, at one point, Gamesa controlled more than 10% of the overall United States market for wind turbine sales.  However, during 2007 and 2008, there was a scarcity of available wind turbines for purchase.  Demand so exceeded supply that even those manufacturers that had less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

30.     Gamesa's competitors did not have the productive capacity to be able to replace its reduction in output with an increase in their own output at no higher cost.  Here an increase in output by a competitor was simply not physically possible during the relevant time periods

31.     As a result, the shortage of wind turbines resulted in sufficient market power for Gamesa to illegally tie its sale of wind turbines to the provision of O&M Services.

32.     Because there is generally a lag time of approximately one-two years between execution of a contract for the sale of wind turbines and the commencement of O&M Services, contracts executed by Gamesa in 2007 and 2008 would prevent wind turbine owners from entering into contracts for O&M Services in 2008 through 2010.

33.     At the time Gamesa sold the wind turbines to various owners, Gamesa controlled 100% of the O&M Service market for Gamesa wind turbines.

34.     By tying the sale of Gamesa wind turbines to the provision by Gamesa of O&M Services for those wind turbines, Gamesa was able to establish and continue its control of 100% of the O&M Service market for Gamesa wind turbines. That is, even though Gamesa brought in

**A136**

Outland to perform the actual services on the Gamesa wind turbines that Gamesa had sold to customers, Outland was a subcontractor—Gamesa was the contractor and maintained the actual customer relationship with the turbine owner.

35.     The improper tying arrangement precluded Outland from seeking and/or acquiring that service business in 2008 and 2010 and resulted in wind turbine purchasers paying higher service costs, which were ultimately passed on to consumers.

*The Events Leading to the McCoy Accident*

36.     On September 23, 2010, the following Outland personnel were assigned to the Cayuga Ridge wind farm in order to perform a waffle block design modification procedure (the "Modification Procedure") specified by Gamesa: Alex Rice (Project Manager), Mike Piper (Lead Technician), Matt Davis, Kyle Nieman, Adam Hengesteg, Nathan Black, Cory Hart, Alex Anderson, Andrew Ehrhardt, and Aaron McCoy.

37.     Cayuga Ridge was one of the sites covered in the MSA.

38.     In order to perform the Modification Procedure the turbine needs to be de-energized.

39.     When dealing with potentially hazardous electrical energy, technicians use a lock-out tag-out ("LOTO") procedure to ensure their safety.  The procedure is so named because it consists of using a lock—to lock the electrical equipment in the "off" position—and a tag—to inform other employees of who locked the equipment, and when they did so.

40.     Outland trained all of its personnel to use a standard LOTO procedure. Under that standard LOTO procedure, when a technician wants to perform services on a turbine, that turbine must be "turned off" by switching the equivalent of a large circuit breaker to the "off" position. The technician then applies a lock to the switch in such a way that the switch cannot be turned

A137

back on as long as that lock is in place. Each technician applies his own lock and maintains control of the key that opens the lock, so that no other person is able to remove the lock and then re-energize the turbine as long as the technician is working on the equipment and exposed to electrical hazards. The technician then applies a tag on which he writes pertinent information about the service being performed (e.g. his name, the date, the time), so that anyone else coming along will understand the reason for the lock on the switch. The tag states that it is only to be removed by the person who placed the tag.

41.    Once the technician has applied the lock, established control of the key and then applied the tag, the technician would climb up to the top of the turbine tower, perform the service, and then descend back to the bottom of the tower to unlock the lock, and thereby allow the re-energization of the turbine.

42.    Again, the approach described above is the standard LOTO procedure. That standard LOTO procedure was the only LOTO procedure approved by Outland health and safety management and protocols at that time.

43.    All Outland technicians were trained and instructed to use only that standard LOTO procedure.

44.    Like all other Outland technicians, Plaintiff McCoy was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

45.    Alex Rice was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

46.    The standard Outland LOTO procedure follows the standard (aka individual) LOTO procedures set forth in 29 C.F.R. 1910.147 (general industry) and 29 C.F.R. 1910.269 (electric power generation, transmission, and distribution).

**A138**

47.     Other LOTO procedures may be permissible. For example, 29 C.F.R. 1910.147(f)(3) describes a group LOTO procedure.

48.     On or about September 23, 2010, at a meeting of Gamesa, Iberdrola and Outland on-site personnel at the Cayuga Ridge site, Iberdrola and Gamesa instructed Outland's personnel in that meeting that a modified LOTO procedure would be used for the Modification Procedure.

49.     In attendance at that meeting were the following individuals: (a) from Iberdrola: Curtis Radke (site supervisor), Evan Bonnel, Dale Thomas, Andrew Morrissey, and Chris Tolian; (b) from Gamesa: Ross Williamson (site manager); (c) from Outland: Alex Rice, Mike Piper.

50.     Under that modified LOTO procedure, each Outland technician performing the design modification was to leave his key at the base of the wind turbine tower, near the lock, and then climb uptower to perform services. Under this approach, when a given team of two Outland technicians had completed their work and needed the turbine re-energized so that they could check the effectiveness of that work, the Outland team was to remain uptower and call to an Iberdrola technician via radio.

51.     That Iberdrola technician would be stationed down on the ground and would be available to re-energize any of the turbines in which Outland's technicians were working uptower. Upon receiving a call to re-energize a given turbine, the Iberdrola technician would proceed to the given turbine, radio again to Outland's technicians uptower to confirm that they were in a so-called "safe zone," i.e., away from the electrical equipment, take one of the keys left downtower by Outland's technicians, unlock the lock, and then re-energize the equipment.

52.     The benefit to Iberdrola and Gamesa of this modified LOTO procedure was that it would reduce a) the amount of time it would take to perform the design modification, thereby

**A139**

reducing turbine downtime and increasing production of electricity; and b) the number of climbs

and re-energizations, thereby reducing wear and tear on the turbine and its components.

53.     At no time did anyone who participated in that meeting notify anyone from

Outland's off-site management—not Outland's health and safety management, not Outland's

operations management, not Outland's technical training management, not Outland's human

resources management, and not Outland's legal management—that Outland's on-site personnel

would be using that modified LOTO procedure.

54.     This modified LOTO approach appears to have been inconsistent with some

Gamesa guidance, but consistent with other Gamesa guidance. Although Gamesa's general

instruction for "Locking and Signaling Procedure for Electrical Equipment" states that "[i]t is

absolutely forbidden for the employees to remove whatever personal warning labels or padlocks

which are not theirs," the procedure that Gamesa issued for performance of the transformer

design modification (the work that Outland's technicians were performing at the time of the

accident) refers to the separate roles of "operator" and "technician" indicating the use of a system

operator LOTO procedure with the "operator" controlling the lock at the base of the tower and

the "technician" working uptower. That is, both the instructions of Iberdrola and Gamesa's on-

site managers and the documentation that Gamesa provided Outland in accordance with which

Outland was to perform the procedure called for Outland technicians to surrender control of their

LOTO keys to another party, specifically, Iberdrola.

55.     On October 20, 2010, the accident at Cayuga Ridge occurred involving Plaintiff

Aaron McCoy.

56.     On that day, multiple teams of Outland technicians were working uptower in

different turbines. When one such team called to the downtower Iberdrola technician to re-

energize their turbine, that Iberdrola technician went to another tower and re-energized that other tower.

57.    In that tower, McCoy and his work partner were not expecting re-energization but rather were working near the transformer. Upon re-energization, an arc flash (electrical explosion) emerged out of the electrical equipment uptower in front of which Aaron McCoy was working, thereby burning McCoy.

58.    In taking these actions, the Iberdrola technician purposefully and knowingly removed a lock that was not his lock, using a key that was not his key. The Iberdrola technician was reckless and negligent in his decision to energize a turbine without first confirming that Outland's technicians uptower were in a safe position.

59.    The period from September 27, 2010, to October 20, 2010, was between the regular monthly site visit from Outland health and safety management during which site EHS audits would have been completed.

60.    At the time of the accident, McCoy was performing the Modification Procedure at the direction of Gamesa while using the modified LOTO procedure that Outland was using at the direction of Iberdrola and Gamesa.

61.    As a result of the accident, an investigation was undertaken by the United States Occupational Health and Safety Administration ("OSHA").

62.    Outland's personnel cooperated fully with the OSHA investigation, and answered all questions truthfully, even when those answers hurt Outland's interests.

63.    In contrast, on information and belief, Gamesa's personnel did not participate in all of the interviews that OSHA requested.

64.     Both before and after the October 20, 2010, Cayuga Ridge incident, Outland's industry-leading O&M Services teams had performed at all sites and projects under the MSA – including Cayuga Ridge – in a safe, efficient, effective and high quality manner.

65.     Specifically, Outland has met or exceeded all defined service standards, including for ensuring the availability of the turbines, completing all administrative duties in a timely manner, and completing all maintenances within the contractually-defined schedule.

*Gamesa's Secret Plan to Put Outland Out of Business and Gamesa's Intentional Interference with the Acquisition of Outland, and Gamesa's Actions to Improperly and the Duke Fleet Services Agreement*

66.     In August 2010, Gamesa hired, Rick Hammill and Gary Stansbury to lead the services area of Gamesa.

67.     On information and belief, Hammill or others at Gamesa decided that the existing Gamesa O&M Service business model, where Gamesa would always subcontract the provision of O&M Services, was going to change.

68.     On information and belief, Hammill or other at Gamesa decided that Gamesa would establish its own O&M Service group with technicians that can self-perform to reduce the amount of work (and revenue) given to independent service providers like Outland.

69.     That complete shift in its business model was contrary to all the prior representations and assurances provided to Outland.

70.     Outland reasonably expected based upon Gamesa's promises and statements the prior year's level of business with Gamesa to be maintained and an increase in business from Gamesa in 2011 due to Gamesa's ongoing assurance that it was not going to compete with Outland.  Gamesa requested that Outland purchase certain flame-retardant clothing, and that Outland pay for certain training provided by Gamesa as their preferred partner and in preparation

**A142**

for the expected growth in business with Outland. Gamesa also told Outland that it needed to have additional personnel to handle the work that Gamesa would provide.

71.    In early January 2011, Gary Stansbury of Gamesa stated to Steve Scott that Gamesa was interested in acquiring Outland.

72.    Steve Scott thanked Gary for Gamesa's interest but indicated that Outland intended to remain independent from any one particular manufacturer because otherwise Outland might be prevented from acquiring work for turbines manufactured by others.

73.    Sometime between the end of 2010 and January 2011, however, Gamesa secretly and with malicious intent, devised a strategy to destabilize Outland if Outland rejected Gamesa's acquisition overture.  Gamesa's plan would be to put Outland out of business so that Outland technicians would be available for Gamesa to hire in large numbers, which would allow Gamesa to acquire all or a substantial portion of Outland's business and personnel at no cost and allow Gamesa to achieve its goal of creating its own large O&M Service group, while at the same time eliminating Outland as a competitor of Gamesa's new O&M Service group.

74.    The plan devised by Gamesa provided for Gamesa to keep telling Outland that Outland was going to keep getting more business from Gamesa.

75.    That approach would mean that Outland would continue to train and hire new technicians.

76.    That approach would mean that Outland would continue to acquire assets and protective equipment for its technicians as directed by Gamesa.  One such example, is the approximately $250,000 of flame-retardant clothing that Gamesa's policy required Outland to acquire at Outland's own expense in 2010 and 2011.

77.     The basic approach was to keep Outland believing it would continue to receive more work from Gamesa and then, at the right moment, to pull the rug out from under Outland and watch the business fall, thus allowing Gamesa to pick up the pieces for its own hoped-for O&M Service business.

78.     In January and February 2011, Gamesa continued to implement its secret plan. Unknown to Outland and contrary to the representations made by Gary Stansbury, Gamesa had secretly decided to cease all Purchase Order business with Outland as a first step, and started to look for ways to terminate the MSA as a second step.

79.     On February 17, 2011, Outland and Duke Energy ("Duke") entered into a letter agreement pursuant to which Duke was to purchase a 25% interest in Outland (the "Original Acquisition Agreement").

80.     On February 24, 2011, Outland informed Gary Stansbury that Outland and Duke Energy had entered into the Original Acquisition Agreement for Duke to acquire a substantial minority stake in Outland, with the possibility that Duke or another party eventually acquiring all of Outland.

81.     As part of the acquisition transaction, Duke had agreed with Outland that Outland would be receiving all of the operations and maintenance contracts for the Duke Energy fleet of wind farms (the "Duke Fleet Services Agreement").

82.     Gamesa knew or had reason to know that Duke and Outland would enter into the Duke Fleet Services Agreement based upon its conversations with Steve Scott of Outland and Jason Allen of Duke.

83.     Upon learning of the execution of the Original Acquisition Agreement Gamesa realized that if Duke acquired a stake in, or completely acquired, Outland, that Outland would be

15

**A144**

able to withstand any attempt by Gamesa to destabilize Outland. If that occurred, Gamesa's plan to build its own O&M Service business at the expense of Outland would fail.

84.     Gamesa reacted quickly.   On February 26, 2011, Gary Stansbury of Gamesa called Steve Scott of Outland and gave the concept a thumbs down for the stated reason that Gamesa believed Iberdrola would force Outland off their sites because Iberdrola and Duke compete on the development front.

85.     However, in keeping with the façade to try to keep Outland vulnerable to Gamesa's plan, on that same February 26, 2011 call, Gary Stansbury stated to Steve Scott that Gamesa was very happy with the quality of service that Outland continued to deliver, and reiterated that Outland was Gamesa's key vendor. In that connection, Stansbury stated that they were seeking up to 24 additional technicians from Outland because Gamesa was getting ready to replace a competing service provider at some sites.

86.     In continuing the façade in order to preserve the element of surprise needed to execute the plan, as late as March 2011, Gamesa was still telling Outland that Gamesa had a long list of projects they wanted Outland to commission under Purchase Orders in 2011, and that Outland needed to be ready to handle the work, which would require Outland to hire and train more personnel and acquire more equipment.

87.     In response to Gamesa's statements of February 26, Steve Scott contacted Iberdrola directly.   After several missed attempts at direct contact, on March 27, 2011, Kevin Devlin, Vice President of Commercial Operations for Iberdrola stated that he endorsed the concept of Duke acquiring an interest in Outland.   Devlin stated that the competition issue between Duke and Iberdrola was not a concern.

88.     As a result of Iberdrola's direct statements to Outland, Gamesa realized that its false statement regarding Iberdrola would not be sufficient to prevent the consummation of either the Original Acquisition Agreement or the Duke Fleet Services Agreement.  On April 14, 2011, Gamesa called Duke directly to attempt to scuttle the Duke/Outland transaction.  Not only did Gamesa inform Duke that Gamesa's position was that the deal should not happen, Gamesa took affirmative economic steps to try to induce Duke not to do the transaction with Outland. Specifically, Gamesa discussed a turbine supply offer that tied in a five-year extension of the O&M Services on Duke's North Allegheny project, which is located in Pennsylvania.  The Duke North Allegheny project was the first Duke project with Gamesa turbines that was scheduled to enter the post-warranty period starting in September 2011.

89.     Duke rejected Gamesa's interference, and attempt at bribing Duke, to terminate or modify Duke's transaction with Outland.

90.     At that time Duke told Gamesa that Duke was not going to engage Gamesa to provide any future services work and that Outland would be getting Duke's services work.

*With No Place to Turn, Gamesa Looks to the OSHA Citations and the McCoy Accident*

91.     On April 8, 2011, OSHA issued six citations to Outland related to the LOTO procedure that was in use at the Cayuga Ridge wind farm at the time of the accident that occurred involving Plaintiff Aaron McCoy.

92.     After Gamesa learned of the citations, Gamesa's Gary Stansbury stated to Steve Scott of Outland that, "To be honest, we're shocked we weren't cited as well."

93.     Neither Gamesa nor Iberdrola were issued citations by OSHA.

94.     Upon information and belief, neither Gamesa nor Iberdrola were issued citations because it was an Outland employee that was injured, and no injury occurred to either a Gamesa employee or an Iberdrola employee.

95.     Also on information and belief, Iberdrola was told informally by OSHA at the 2011 American Wind Energy Association conference in Anaheim, California, on or about May 23, 2011, that if another accident occurred at an Iberdrola site that OSHA would seek criminal sanctions against Iberdrola.

96.     After the rebuke that Gamesa received from Duke on April 14, 2011, Gamesa was desperate and needed to find a way to destabilize Outland quickly, and interfere with the pending acquisition of Outland and the Duke Fleet Services Agreement.

97.     By April 15, 2011, various parties (including Gamesa) in the wind turbine services market believed that Duke was in fact purchasing 100% of Outland.

98.     On May 11, 2011, the terms of the Original Acquisition Agreement was amended to add another party, Sterling Partners which is an institutional investor, and provide for the sale of 100% of the member interests in Outland (the "Restated Acquisition Agreement").

99.     As the result of Gamesa's knowledge of the Original Acquisition Agreement, its knowledge that Outland and Duke would be entering into the Duke Fleet Services Agreement, and its belief that Duke was or was likely acquiring all of Outland, Gamesa knew or had reason to know of the existence of the Restated Acquisition Agreement.

*Gamesa Realizes It is Out of Time and Implements its Plan to Topple Outland and Implicates Iberdrola*

100.     In order to interfere with the Original Acquisition Agreement, the Restated Acquisition Agreement and the Duke Fleet Services Agreement, and Outland's other existing and potential economic relations, on May 12, 2011, Gamesa took further steps to implement its

**A147**

plan to scuttle the acquisition transaction, the Duke Fleet Services Agreement and to eliminate Outland as a going concern by sending Outland a letter in bad faith raising frivolous issues and declaring Outland in default under the MSA.

101.    In that same letter, Gamesa implicated Iberdrola in its scheme by stating that Gamesa's customer, Iberdrola, had demanded that Gamesa remove Outland from all of its wind farms.

102.    The May 12 letter stated that "Outland has failed to perform O&M Services in accordance with the health, safety and environmental requirements of the [MSA] and applicable law. This failure has been noted by OSHA . . ."

103.    At the same time, Gamesa implemented the other part of its plan which called for the cessation of any new Purchase Orders for transactional business with Outland and the breach of the unambiguous promises to provide an increase in work to Outland.

104.    Gamesa had implemented its three-prong approach—renege on its promises of work (leaving 40% of Outland's technicians without work), scuttle the acquisition of Outland and the Duke Fleet Services Agreement (so that it would not be able to financially withstand the Gamesa attack), and move to terminate the remaining contractual work represented by the MSA (which would leave another 40% of Outland's technicians without work).

105.    The impact was immediately felt on Outland.  Within days of Gamesa's letter, both Duke and the institutional investor refused to proceed with the transaction under the originally agreed terms, and reduced the amount they were willing to pay for Outland by approximately $15 million.

106.    In addition,  Duke did not enter into a services agreement with Outland to provide services for its fleet of wind farms.

107.   Furthermore, with the full and immediate cessation of Purchase Orders, approximately 40% of Outland's technicians were without work.  In addition, the 18 technicians that were still in training to handle the increase in work promised by Gamesa would have no work once their training was complete.

108.   With respect to Gamesa's attack under the MSA, Outland notified Gamesa that it rejected Gamesa's frivolous and bad faith attempt to declare a default under the MSA.

109.   Gamesa responded by letter dated May 27, 2011, in which Gamesa reiterated that Outland was in default under the MSA stating "Outland was cited by OSHA for failing to comply with various provisions of 29 C.F.R. §1926 et seq."

110.   Outland again notified Gamesa that it rejected Gamesa's frivolous and bad faith attempt to declare a default under the MSA.

111.   In letters dated July 21, 2011, Gamesa admitted that its assertions in its letters of May 12 and May 27 were unjustified, and wholly without basis, under the MSA because the July 21 letters frivolously and in bad faith asserted a completely new basis for default under the MSA, and for the first time, asserting a breach of the dormant FSA.

112.   Outland notified Gamesa that it rejected Gamesa's frivolous and bad faith attempts to declare a default under the MSA and to declare a breach of the FSA in its efforts to destabilize Outland.

113.   Because of Gamesa's actions, the acquisition did not proceed even under the reduced terms with Duke and Sterling, and the Duke Fleet Services Agreement was not consummated.  On November 1, 2012, however, in order to avoid receivership, an action for which had been commenced by Wells Fargo Bank, Outland transferred substantially all the business assets and employees of Outland to Duke.

## CLAIMS FOR RELIEF

### COUNT I
### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS

114.     Outland restates and realleges the foregoing paragraphs.

115.     Outland had contractual relations with third parties, including the Original Acquisition Agreement, the Duke Fleet Services Agreement and the Restated Acquisition Agreement.

116.     Gamesa, was aware of, and had reason to know of, those contractual relations.

117.     Gamesa intentionally interfered with those contractual relations by, among other things, knowingly and purposely and taking actions not in good faith designed and intended (i) to destabilize Outland and eliminate it as a competitor, and (ii) to interfere with, and prevent the consummation of, Outland's acquisition agreements, and the Duke Fleet Services Agreement..

118.     Gamesa, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing those contractual relations.

119.     As a direct and proximate result of Gamesa's improper actions, the Duke failed to consummate the acquisition of Outland pursuant to either the Original Acquisition Agreement or the Restated Acquisition Agreement and failed to enter into the Duke Fleet Services Agreement.

120.     As a direct and proximate result of Gamesa's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**A150**

**COUNT II**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC RELATIONS**

121.    Outland restates and realleges the foregoing paragraphs.

122.    Outland had prospective contractual relations with third parties, including the Original Acquisition Agreement, the Duke Fleet Services Agreement and the Restated Acquisition Agreement.

123.    Gamesa, was aware of, and had reason to know of, those prospective contractual relations.

124.    Gamesa intentionally interfered with those prospective contractual relations by, among other things, knowingly and purposely and taking actions not in good faith designed and intended (i) to destabilize Outland and eliminate it as a competitor, and (ii) to interfere with, and prevent the consummation of, Outland's acquisition agreements, and the Duke Fleet Services Agreement.

125.    Gamesa, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing those prospective contractual relations.

126.    As a direct and proximate result of Gamesa's improper actions, the Duke failed to consummate the acquisition of Outland pursuant to either the Original Acquisition Agreement or the Restated Acquisition Agreement and failed to enter into the Duke Fleet Services Agreement.

127.    As a direct and proximate result of Gamesa's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT III
## PRIMA FACIE TORT

128.    Outland restates and realleges the foregoing paragraphs.

129.    Gamesa intentionally and without justification devised and implemented a plan to put Outland out of business and to harm Outland by doing whatever it could to insure that Outland was not acquired by another company (other than Gamesa).

130.    Gamesa's plan inflicted devastating harm on Outland and its members.

131.    Gamesa's plan resulted in the loss of almost the entire value of Outland as a going concern.  In order to avoid receivership, Outland had to transfer its employees to Duke in November 2012 and transfer its assets to Duke.

132.    None of Gamesa's actions were taken in good faith and none were justified.  In particular, the letter of May 12, 2011, sent by Gamesa was not sent in good faith.

133.    The May 12, 2011, letter was sent for the express purpose to interfere with Outland's economic interests, prevent the acquisition of Outland and the consummation of the Duke Fleet Services Agreement, and start the eventual cascading of Outland into oblivion.

134.    Gamesa's earlier actions of directly contacting Duke in an attempt to scuttle the transaction with Duke, and lying about Iberdrola as being a basis for the May 12 letter provide support to the conclusion of Gamesa's nefarious intentions.

135.    Gamesa's plan was specifically intended to prevent Outland from consummating the Original Acquisition Agreement, the Duke Fleet Services Agreement and the Restated Acquisition Agreement.

136.    Gamesa succeeded with their plan.

**A152**

137.    But for Gamesa's improper and ill-intentioned actions, Outland would have consummated the Original Acquisition Agreement or the Restated Acquisition Agreement, and the Duke Fleet Services Agreement.

138.    Gamesa also utilized its power under the then existing contractor-subcontractor arrangement with Outland to get Outland to make itself more vulnerable by promising Outland work and asking Outland to gear-up for that additional work, knowing all along that Gamesa intended to destroy or injure Outland.

139.    As a direct and proximate result of Gamesa's unjustified actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT IV
## PROMISSORY ESTOPPEL

140.    Outland restates and realleges the foregoing paragraphs.

141.    Gamesa told Outland that Outland was its primary subcontractor and that Gamesa would be providing a continuously increasing stream of business to Outland.  In particular, in 2010 continuing into 2011 Gamesa told Outland that it needed to be ready for the work that Gamesa would be providing to it.  Outland incurred extra costs for equipment, and hiring and training employees on the basis of Gamesa's verbal unambiguous promises of that future work, which it would not have but for Gamesa's promises.

142.    Gamesa made unambiguous promises to Outland that it would provide significant amount of future work to Outland.

143.    Particularly in light of the existing general/subcontractor relationship, Outland's reliance was expected and forseeable by Gamesa.  Indeed the reason why Gamesa told outland

**A153**

that it would be providing the additional work to Outland was so that Outland could ramp-up to be prepared for the additional work.

144.     Outland relied on the promises to its detriment by incurring the additional costs for equipment and hiring and training additional employees, in each case that it would not have incurred but for Gamesa's promises.

145.     Without justification, Gamesa did not provide the additional work.

146.     As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY

147.     Outland restates and realleges the foregoing paragraphs of its Complaint.

148.     Gamesa and Outland were parties to the FSA, the MSA, various purchase orders and to Gamesa's promise to provide future work to Outland.  In each of those arrangements, the relationship between Gamesa and Outland was that of contractor-subcontractor, or principal and agent.

149.     A principal and an agent are in a fiduciary relationship.

150.     Because of the fiduciary relationship, the principal owes the agent a duty of good faith and fair dealing in the incidents of their relationship.

151.     Gamesa had a duty to refrain from actively utilizing some power, control, or opportunity to destroy, injure, or gain preferential advantage over Outland.

152.     Here, Gamesa intentionally and without privilege tried to harm Outland by doing everything it could to interfere with Outland's Acquisition Agreements, the Duke Fleet Services

Agreement, and Outland's very existence.  Those actions breached Gamesa's duty to refrain from actively utilizing power, control, or opportunity to destroy or injure Outland.

153.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**COUNT VI**
**<u>INDEMNIFICATION</u>**

154.    Outland restates and realleges the foregoing paragraphs.

155.    Section 7.4 of the MSA  states that Gamesa will indemnify Outland for losses, fines, damages, claims, penalties or liability for bodily injury or property damage to the other party or any third party to the extent arising out of Gamesa's negligence, gross negligence or intentional misconduct.

156.    Outland has suffered damage, losses, fines as the result of  Gamesa's negligence, gross negligence and intentional misconduct, including, without limitation (i) payments paid or payable to OSHA as a result of the McCoy accident, (ii) the losses suffered from Duke not proceeding with the terms of the Restated Acquisition Agreement or the Original Acquisition Agreement, and Duke not engaging Outland as services provider for its fleet of wind farms and (iii) other damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial, all of which Gamesa is obligated to indemnify Outland for under Section 7.4 of the MSA.

157.    In addition to the indemnification provision contained in Section 7.4 of the MSA, Gamesa has a separate duty to indemnify Outland.

158.    The relationship of Gamesa and Outland was that of contractor-subcontractor or principal and agent.

159.    Outland has suffered losses as the result of Gamesa's actions that fairly should be borne by Gamesa in light of their relationship, such as (1) the losses suffered from Duke not proceeding with the terms of the Restated Acquisition Agreement or the Original Acquisition Agreement, and Duke not engaging Outland as services provider for its fleet of wind farms, (2) the costs that Outland incurred for additional equipment and employees to ramp-up for the promised additional work, and (3) the fines paid to OSHA and the legal fees incurred by Outland related to the OSHA proceeding.    These are all losses in excess of $75,000 that fairly should be borne by Gamesa in light of their relationship.

## COUNT VII
## SECTION 1 OF THE SHERMAN ACT AND CLAYTON ACT, SECTION 3 (TREBLE DAMAGES)

160.    Outland restates and realleges the foregoing paragraphs.

161.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated Section 1 of the Sherman Act and Section 3 of the Clayton Act.

162.    Gamesa's actions constitute unfair trade practices, and a violation of the Sherman Act and Clayton Act.

163.    In 2007 and 2008 (through August 2008), there was a shortage of available wind turbines in the United States.   Wind turbine manufacturers could sell whatever they could manufacture.   While at that time manufacturers were planning to increase their manufacturing

**A156**

capacity, any such increase would be years away.  The demand for wind turbines in the United States exceeded the available supply by multiples.

164.    If a purchaser did not want to agree to the tying of an O&M Service agreement to the sale of wind turbines, other manufacturers did not have the manufacturing capacity to make up the sale.

165.    Demand so exceeded supply that even those manufacturers, such as Gamesa, that had less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market, i.e., purchase O&M Services from Gamesa.

166.    Gamesa's competitors did not have the productive capacity to be able to replace its reduction in output with an increase in their own output at no higher cost.  Here an increase in output by a competitor was simply not physically possible during the relevant time periods

167.    As a result, the shortage of wind turbines resulted in sufficient market power for Gamesa to illegally tie its sale of wind turbines to the provision of O&M Services.

168.    Because there is generally a lag time of approximately one-two years between execution of a contract for the sale of wind turbines and the commencement of O&M Services, contracts executed by Gamesa in 2007 and 2008 would prevent wind turbine owners from entering into contracts for O&M Services in 2008 through 2010.

169.    At the time Gamesa sold the wind turbines to various owners, Gamesa controlled 100% of the O&M Service market for Gamesa wind turbines.

170.    By tying the sale of Gamesa wind turbines to the provision by Gamesa of O&M Services for those wind turbines, Gamesa was able to establish and continue its control of 100% of the O&M Service market for Gamesa wind turbines. That is, even though Gamesa brought in

Outland to perform the actual services on the Gamesa wind turbines that Gamesa had sold to customers, Outland was a subcontractor—Gamesa was the contractor and maintained the actual customer relationship with the turbine owner.

171.     The improper tying arrangement precluded Outland from seeking and/or acquiring that service business in 2008 through 2010 and resulted in wind turbine purchasers paying higher service costs, which were ultimately passed on to consumers. Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

172.     Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

173.     As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

174.     Outland demands an award of treble damages in accordance with law.

**WHEREFORE**, the Outland plaintiffs pray that this Court enter judgment in its favor and against Defendant Gamesa as follows:

1.     Awarding Outland its damages, including all exemplary and treble damages, where available at law.

2.     Requiring Gamesa to disgorge all amounts improperly gained by their improper action.

3.     Granting the relief requested in each Count in these claims against Gamesa.

4.     Awarding Outland its attorneys' fees incurred as a result of Defendants' actions, where available at law.

5.      Awarding Outland its costs, disbursements and additional attorneys' fees incurred

as may be available at law.

6.      Awarding Outland pre- and post-judgment interest.

7.      Awarding Outland all other relief that the Court deems just, proper and equitable,

including where applicable equitable relief, such as disgorgement.


Dated: March 4, 2013                                */s/Thomas Melone*
                                                    Thomas Melone, Esq.
                                                    222 S 9th St, Suite 1600
                                                    Minneapolis, MN 55402
                                                     (212) 681-1120

**A159**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, INC., GAMESA WIND US, LLC, IBERDROLA RENEWABLES, INCORPORATED, and STREATOR-CAYUGA RIDGE WIND POWER, LLC, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and GAMESA TECHNOLOGY CORPORATION, INC. | ) ) ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC and OUTLAND ENERGY SERVICES, LLC, | ) ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |

**MOTION PURSUANT TO FED. R. CIV. P. 59(e)
TO ALTER AND AMEND JUDGMENT**

Now comes Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, and Outland Energy Services, LLC n/k/a Northwind Holdings LLC ("Outland"), by their attorney Thomas Melone, and moves this court pursuant to Fed. R. Civ. P. 59(e), to alter or

amend the judgment entered on August 8, 2013, (Docket Nos. 351 and 352) in favor of Gamesa Technology Corporation, Inc., and Gamesa Wind US LLC (the "Gamesa Parties").

On September 22, 2011, Outland filed various counterclaims (the "Counterclaim") against the Gamesa Parties (Docket No. 112). The Counterclaim included violations of the Sherman Act (15 U.S.C. §1) and the Clayton Act (15 U.S.C. §14) pursuant to which the Court has jurisdiction under 28 U.S.C. §1331 (federal question)(the "Federal Claims"). The Counterclaim also included various state law anti-trust claims (the "State Anti-Trust Claims"), and other state law claims (the "Other State Claims")(the State Anti-Trust Claims and the Other State Claims, being collectively referred to as the "State Claims"). The Court exercised jurisdiction over the State Claims without examination of whether the Court had jurisdiction over the State Claims.

Outland as a limited liability company with many members was a citizen of Minnesota, Delaware, New York, Wisconsin, South Dakota, California, Colorado, Oregon, Ohio, Montana and Arizona, and, as a result, no diversity of citizenship exists between Outland and the Gamesa Parties.

On September 26, 2012, in response to a motion by the Gamesa Parties (Docket No. 252), the Court dismissed the Federal Claims and the State Claims based on the pleadings pursuant to Fed. R. of Civ. P. 12(c), except with respect to one count for indemnification (the "November Order"). *See*, Minute entry (Docket No. 274), and Memorandum Opinion (Docket No. 275). On March 4, 2013, Outland filed a motion for leave to amend the Counterclaim (Docket No. 297), which motion was denied on June 12, 2013 (Docket No. 327) (the "June Order").

In this Motion Outland asks the Court to amend and clarify the judgment to make it clear

**A161**

that the Court had no jurisdiction over the Other State Claims, and the judgment as to the Other

State Claims was entered based upon lack of subject-matter jurisdiction.

In the alternative, Outland requests that the Court alter, amend and vacate the judgment

regarding the Other State Claims for the reasons set forth below.

## I.   THE COURT LACKED SUBJECT MATTER JURISDICTION OVER THE OTHER STATE CLAIMS.

A federal court has jurisdiction to hear "all claims sufficiently related to the claim on

which its original jurisdiction is based to be part of the same case or controversy within the

meaning of Article III of the Constitution." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d

1176, 1181 (7th Cir. 1993). *See also,* 28 U.S.C. § 1367 (granting supplemental jurisdiction to

District Courts "over all other claims that are so related to claims in the action within such

original jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution.")  Claims are sufficiently related if they "'derive from a common

nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state

claim permits the conclusion that the entire action before the court comprises but one

constitutional case.'" *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164-

65, 139 L. Ed. 2d 525, 118 S. Ct. 523 (1997) (quoting *United Mine Workers of America v. Gibbs*,

383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)).  "A loose factual connection

between the claims is generally sufficient." *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.

1994); *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008). But "it is not enough that the

claims be tangentially related." *Hernandez v. Dart*, 635 F. Supp.2d 798, 814 (N.D. Ill. 2009)

(dismissing plaintiff's legal malpractice claim that was "independent of" his claims relating  to an

underlying arrest that formed the basis for original jurisdiction) (citation omitted).

3

Sharing a "factual background" is not necessarily sufficient standing alone; rather, the question is whether the claims share operative facts, that is, facts that are relevant to proving an element of both the federal and state claims. *See, Berg v. BCS Financial Corp.*, 372 F. Supp.2d 1080, 1093 (N.D. Ill. 2005); *Nguyen v. Cumbo*, 2010 U.S. Dist. LEXIS 124330, 2010 WL 4877555, at *5 (N.D. Ill. Nov. 23, 2010) (requiring some overlap in the "legal [or] evidentiary burden"). Furthermore, the "facts linking state to federal claims must be 'operative,' i.e., they must be 'relevant to the resolution of' the federal claims." *U.S. v. Clark*, 2010 U.S. Dist. LEXIS 9712, *1 (N.D. Ill. Feb. 3, 2010). *See, Gen. Auto Serv. Station v. City of Chi.*, 2004 U.S. Dist. LEXIS 3800 at *12 (N.D. Ill. Mar. 9, 2004) (finding shared factual background insufficient to establish supplemental jurisdiction where federal claim would be "wholly unaffected" by dismissal of state-law claim).

Here, because there is no diversity of jurisdiction between Outland and the Gamesa Parties, and the claims are based upon state law, the Court may only exercise jurisdiction over these claims if they meet the requirements for supplemental jurisdiction under 28 U.S.C. § 1367(a). *See, Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) ("jurisdictional issue [that is] unnoticed by the parties and the district court [is] of course, not waivable.")

A summary list of the claims contained in the original Counterclaim and the proposed amended counterclaim are set forth in the table below.

| List of Claims<br>Original Counterclaim | Type of Claim | Proposed Amended Counterclaim | Type of Claim |
|---|---|---|---|
| COUNT I<br>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS (OUTLAND'S EXISTENCE) | Other State Claim | COUNT I<br>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS | Other State Claim |
| COUNT II<br>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (GAMESA'S INTERFERENCE WITH OUTLAND'S PROSPECTIVE CONTRACTS | Other State Claim | COUNT II<br>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS | Other State Claim |

**A163**

| WITH OTHERS) | | | |
|---|---|---|---|
| COUNT III<br>TORTIOUS INTERFERENCE WITH<br>CONTRACTUAL RELATIONS<br>(OUTLAND'S ACQUISITION) | Other State<br>Claim | COUNT III<br>PRIMA FACIE TORT | Other State<br>Claim |
| COUNT IV<br>INTENTIONAL INTERFERENCE WITH<br>OUTLAND'S DIRECTIVES, TRAINING<br>AND SAFETY PROTOCOLS | Other State<br>Claim | COUNT IV<br>PROMISSORY ESTOPPEL | Other State<br>Claim |
| COUNT V<br>BREACH OF CONTRACT<br>(TRANSACTIONAL WORK) | Other State<br>Claim | COUNT V<br>BREACH OF FIDUCIARY DUTY | Other State<br>Claim |
| COUNT VI<br>INDEMNIFICATION UNDER MSA | Other State<br>Claim | COUNT VI<br>INDEMNIFICATION | Other State<br>Claim |
| COUNT VII<br>BREACH OF DUTY TO DEAL FAIRLY | Other State<br>Claim | COUNT VII<br>SECTION 1 OF THE SHERMAN<br>ACT AND CLAYTON ACT,<br>SECTION 3 (TREBLE DAMAGES) | Federal<br>Claim |
| COUNT VIII<br>SECTION 2 OF THE SHERMAN ACT AND<br>CLAYTON ACT, SECTION 3 (TREBLE<br>DAMAGES) | Federal<br>Claim | | |
| COUNT IX<br>SECTION 1 OF THE SHERMAN ACT AND<br>CLAYTON ACT, SECTION 3 (TREBLE<br>DAMAGES) | Federal<br>Claim | | |
| COUNT X<br>BREACH OF DUTY OF GOOD FAITH AND<br>FAIR DEALING | Other State<br>Claim | | |
| COUNT XI<br>COMMERCIAL DISPARAGEMENT | Other State<br>Claim | | |
| COUNT XII<br>INJURIOUS FALSEHOOD | Other State<br>Claim | | |
| COUNT XII [SIC]<br>DISPARAGEMENT OF PROPERTY | Other State<br>Claim | | |
| COUNT XIII<br>DEFAMATION | Other State<br>Claim | | |
| COUNT XIV<br>ACCOUNTING FOR BONUSES | Other State<br>Claim | | |
| COUNT XV<br>MINNESOTA ANTITRUST ACT OF 1971<br>(TREBLE DAMAGES) | State Anti-<br>trust claim | | |
| COUNT XVI<br>MINNESOTA ANTITRUST ACT OF 1971<br>(TREBLE DAMAGES) | State Anti-<br>trust claim | | |
| COUNT XVII<br>TEXAS FREE ENTERPRISE AND<br>ANITTRUST ACT TEXAS BUSINESS AND<br>COMMERCE CODE SECTION 15.05(a) | State Anti-<br>trust claim | | |
| COUNT XVIII<br>TEXAS FREE ENTERPRISE AND<br>ANITTRUST ACT<br>TEXAS BUSINESS AND COMMERCE<br>CODE SECTION 15.05(b) | State Anti-<br>trust claim | | |

**A164**

| COUNT XIX<br>TEXAS FREE ENTERPRISE AND<br>ANITTRUST ACT<br>TEXAS BUSINESS AND COMMERCE<br>CODE SECTION 15.05(c) | State Anti-<br>trust claim | | |
|---|---|---|---|
| COUNT XX<br>ILLINOIS ANTITRUST ACT 740 ILCS<br>10/3(2) AND 10/3(3) | State Anti-<br>trust claim | | |
| COUNT XXI<br>ILLINOIS ANTITRUST ACT 740 ILCS<br>10/3(4) | State Anti-<br>trust claim | | |
| COUNT XXII<br>DECLARATORY JUDGMENT (28 U.S.C. §<br>2201) AND INJUNCTIVE RELIEF | Mix of<br>claims | | |

The Federal Claims were anti-trust claims. The Federal Claims involved the Gamesa Parties alleged practice of tying the sale of operation and maintenance services to the sale of wind turbines. The only State Claims that satisfy the requisite factual connection for subject matter jurisdiction were the State Anti-trust Claims.

The Other State Claims were based upon state contract law and state tort law. The only aspect of the Federal Claims that are common to the Other State Claims is that they are between the same parties.[1] The operative facts that would be relevant to proving the Federal Claims share no overlap in the "legal [or] evidentiary burden" that would be relevant to proving an element of the Other State Claims.

Here the requisite factual connection between the Federal Claims and the Other State Claims does not exist. As a result, because no diversity exists between Outland and the Gamesa Parties, the Court did not have jurisdiction to decide the Other State Claims. *See, e.g., Ballentine v. Birkett*, 2013 U.S. Dist. LEXIS 95932, *4-7 (2013)(finding no factual overlap between the operative facts necessary to establish Federal tort claims and the state tort violation even though the facts that led to the Federal claim caused plaintiff's employer to act committing the state tort

---

[1] The Court concluded in the November Order that the "lawsuit by Outland's employee for personal injuries [is] only tangentially related to the [Outland] counter-claims," thus the Outland claims do not satisfy the requisite factual connection for subject-matter jurisdiction with the McCoy claims either.

**A165**

violations: "[t]he operative facts necessary to prove that the state actors committed federal constitutional violations are separate and distinct from the operative facts necessary to prove that her employer committed state tort violations."); *Berg v. BCS Fin. Corp.*, 372 F. Supp. 2d 1080, 1095 (N.D. Ill. 2005) (finding no common nucleus of operative fact between ERISA claim for denial of benefits and state law breach of contract claim where dismissal of the state law claim would in no way effect the ERISA claim even though the claims emerged out of the same factual background and out of the plaintiff's employment generally); *Angsten v. Blameuser*, No. 05 C 4254, 2005 U.S. Dist. LEXIS 28828, 2005 WL 3095513, at *5 (N.D. Ill. Nov. 16, 2005) (declining supplemental jurisdiction over state law claims that shared "a general factual background (that is, the unchecked harassment of the [the plaintiffs] by their neighbor and his friends)," with the plaintiff's § 1983 claims against the chief of police for denial of equal protection of the law because "the operative facts necessary for the tort claims [were] wholly unrelated to the operative facts essential to the elements of the Section 1983 claim").

The central facts of the Federal Claims are not the same facts that are central to the Outland's state law claims, and the Outland's claims do not comprise "but one constitutional 'case.'" *Gibbs*, 383 U.S. at 725. Here, there is no overlap between facts that are relevant to proving an element of the Federal Claims and facts relevant to proving an element of the Other State Claims. *Berg v. BCS Financial Corp.*, 372 F. Supp.2d 1080, 1093 (N.D. Ill. 2005).

Outland asks the Court to alter, amend and clarify the judgment to make it clear that the Court did not have subject-matter jurisdiction to decide the Other State Claims.

## II.    IN THE ALTERNATIVE, OUTLAND REQUESTS THE COURT TO ALTER, AMEND AND VACATE THE JUDGMENT REGARDING THE OTHER STATE CLAIMS.

In the alternative, Outland requests that the Court alter, amend and vacate the judgment regarding the Other State Claims for the reasons set forth below.

**A166**

Inducement to breach a contract (not an Outland claim), interference with a contractual relationship (Count I in the proposed Amended Counterclaim), and interference with a prospective economic advantage (Count II in the proposed Amended Counterclaim) are separate theories upon which the tort of interference with economic relations may be based. The first theory protects against intentional acts designed to produce an actual breach and requires that a plaintiff prove:  he had a valid and existing contract with a third party; defendant had knowledge of the contract and intended to induce its breach; the contract was in fact breached by the contracting party; the breach was caused by defendant's unjustified or wrongful conduct; and damages were suffered as a result.

The second theory is slightly broader in that it protects against intentional acts not necessarily resulting in a breach. It requires that a plaintiff prove: (1) he had a valid and existing contract with a third party; (2) defendant had knowledge of this contract; (3) defendant committed intentional and unjustified acts designed to interfere with or disrupt the contract; (4) actual interference with or disruption of the relationship; and (5) resulting damages. *See, Carpenter, Interference with Contract Relations* (1928) 41 Harv. L. Rev. 728, 732-742; *Restatement (Second) of Torts*, § 766, com. k, at pp. 12-13; *Prosser & Keeton, Law of Torts*, § 129, p. 991 (5th Ed. 1984) stating:

> Beyond this it may be said that actual inducement [of breach] is not necessarily required at all and that interference with contract may be quite sufficient for liability, provided always that it causes harm and that the interference was unjustified. Thus no actual repudiation of the contract is necessary for liability, and it is enough that the contract performance is partly or wholly prevented, or made less valuable, or more burdensome by the defendant's unjustified conduct.

*Accord, United Bilt Homes, Inc. v. Sampson,* 310 Ark. 47, 52, 832 S.W. 2d 502, 504 (Ark. 1992)(citing *Prosser*); *Pacific Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118,

A167

270 Cal. Rptr. 1, 791 P.2d 587, 592 (Cal. 1990) ("Plaintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations."); *De Jur-Amsco Corp. v. Janrus Camera, Inc.*, 16 Misc. 2d 772, 155 N.Y.S. 2d 123, 125-26 (N.Y. Sup. Ct. 1956)("there may be prima facie liability for interference with contract relations without inducing breach of contract by, for example, injuring persons under contract so that they are disabled from performing, or by destroying or damaging property which is the subject matter of a contract, or by doing other acts which make performance more burdensome, difficult or impossible or of less or no value to the one entitled to performance."); *Kisano Trade & Invest Ltd. v. DEV Lemster*, 2011 U.S. Dist. LEXIS 133089, *23-24 (W.D. Pa. 2011).

The third theory is still broader in that it protects against intentional acts designed to harm an economic relationship which is likely to produce economic benefit. It requires that a plaintiff prove: (1) he had an economic relationship with a third party containing the probability of a future economic benefit; (2) defendant had knowledge of this relationship; (3) defendant committed intentional and unjustified acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) resulting damages.

As discussed below, the judgment against Outland with respect to the tortious interference claims should be vacated under whatever law is applied.

### A.  THE CLAIM FOR TORTIOUS INTERFERENCE.

Illinois state courts generally follow the choice of law principles of the *Restatement (Second) of Conflict of Laws*.  *See*, *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 686 (2001). The general rule for torts, such as the tortious interference claims, is that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties."

9

**A168**

*See, Restatement (Second) of Conflict of Laws* § 145.  Here, Outland is based in Minnesota.  On the other hand, Gamesa is based in Pennsylvania.  Both jurisdictions, however, follow the *Restatement (Second) of Torts* with respect to tortious interference with contract and with prospective economic relations.  *See,  Thompson Coal Co. v. Pike Coal Co*., 488 Pa. 198, 412 A.2d 466 (1979); *Gieseke v. IDCA, Inc*., 2013 Minn. App. LEXIS 2, *12  (Minn. App. 2013).

In the June Order the Court decided the substance of the Other State Claims related to Outland's claim for tortious interference by asserting that Outland had waived any right to assert claims under other than Illinois law.  The Court stated:

> Outland's original twenty-two count complaint asserted several Illinois statutory and common law claims. It now asserts that Minnesota law should govern its non-federal claims.
>
> Courts in Illinois that sit in diversity apply the "most significant contacts test" to determine which state's law governs the dispute. *Auto-Owners Ins. Co. v. Websolv Computing, Inc*., 580 F.3d 543, 547 (7th Cir. 2009). However, a party waives its choice of law argument where it fails to timely assert it. *See Camp v. TNT Logistics Corp*., 553 F.3d 502, 505 (7th Cir. 2009) (Courts sitting in diversity apply the forum state's law where the parties fail to raise the choice of law issue); *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) ("[C]hoice of law, not being jurisdictional, is normally . . . waivable.").
>
> Outland asserts for the first time that its claims arise under Minnesota state law despite not having raised a choice of law issue at any time prior to the instant motion's briefing. In light of Outland's failure to raise the issue before now, the Court will assess Outland's claims under Illinois law. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, No. 92 C 7768, 1999 U.S. Dist. LEXIS 917, at *4 (N.D. Ill. Jan. 15, 1999) (denying the defendant's motion to dismiss based on choice of law argument where it failed to raise the issue on a prior motion for reconsideration with respect to the same claim).

The Court relied on *Camp v. TNT Logistics Corp*., 553 F.3d 502, 505 (7th Cir. 2009) for the proposition that "a party waives its choice of law argument where it fails to timely assert it." The *Camp* decision did not address the issue of waiver.  *Camp* was a diversity action (which the

claims between Outland and Gamesa are not.)  More importantly, in that case neither party raised

the issue at any time prior to *summary judgment* in the District Court or in the Court of Appeals.

As a result, the *Camp* decision merely restated the general rule:

> As a federal court sitting in diversity, we apply state substantive law and federal
> procedural law. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).
> Because none of the parties raised the choice of law issue, we apply the substantive
> law of Illinois, the forum state. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th
> Cir. 1991).

In contrast, Outland has raised the choice of law issue at an early stage, and before any

discovery has commenced on the tortious interference claims.

The June Order relies on *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) for

the proposition that "choice of law, not being jurisdictional, is normally . . . waivable.").  As the

Court in *Vukadinovich* explained, neither party raised a choice of law issue (in that case between

Federal law and Indiana state law), and it was academic in any event because with respect to the

specific issue involved there was no relevant Indiana law:

> We have treated the issue as one of federal law, either common law or statutory
> (42 U.S.C. § 1988), though Rule 69(a) of the Federal Rules of Civil Procedure,
> which governs collection proceedings in the federal courts, adopts whatever
> procedures are followed by the state courts in the state in which collection is
> sought, here Indiana, unless there is an applicable federal statute expressly
> regulating the execution of judgments. *Resolution Trust Corp. v. Ruggiero*, 994
> F.2d 1221, 1226 (7th Cir. 1993). Neither party has mentioned Indiana law,
> however, so we have approached the issue as one of federal law. Rule 69(a) is a
> choice of law provision, and choice of law, not being jurisdictional, is normally,
> *see, e.g., Advance Concrete Forms, Inc. v. McCann Construction Specialties
> Co.*, 916 F.2d 412, 414 n. 4 (7th Cir. 1990); *Patton v. Mid-Continent Systems,
> Inc.*, 841 F.2d 742, 750 (7th Cir. 1988), and we think here, waivable, although
> we cannot find any case in which the issue has been addressed. *The issue is
> pretty academic, since we cannot find any Indiana cases, statutes, or rules of
> court bearing on the question* whether a defendant who receives an award of
> attorney's fees should be entitled as a matter of course to reimbursement of the
> expense of collecting the fees. (emphasis added.)

Here the facts are remarkably different.  First, the Outland Counterclaim contained claims

**A170**

under Federal law and state law, including the state law of Minnesota, Illinois and Texas.  The Court dismissed the Counterclaim on the basis that the claims where insufficient.  When Outland then filed leave to amend the claims (which the Court stated in the June Order was no surprise), the Court then concluded that Outland was bound by insufficiently stated claims.  Second, the dismissed tortious interference claim did not refer to the law of a specific state. Third, the issue has been raised at an early stage of the proceeding, where no discovery has taken place.  Fourth, the Court's choice of Illinois law *is* the deciding factor in the Court's view.

The Court's approach would prevent any amendment to a complaint because the Court would deem anything not raised initially as waived, which is what the Court did with respect to the claims that were included in the proposed amended complaint that were not in the original Counterclaim even though those additional claims were based upon the same facts originally pled.

Here the business claims were severed from the other parts of the case (Docket No. 205), discovery that had occurred was limited to the narrow issues related to the one wind farm (Docket No. 204), discovery had not commenced on the other claims because no schedule was established and Gamesa refused to produce any documents until its motions to dismiss where decided. As a result, this is not a situation, even if viewed as a new theory or a new complaint, where it is late in the game and there may be prejudice to the defendant.  The business claims were at the starting gate. *Compare, Muslin v. Frelinghuysen Livestock Managers, Inc*., 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (stating "waiting until 'a late point in' the litigation waived objecting to choice of law"); *International Admrs., Inc. v. Life Ins. Co*., 753 F.2d 1373, 1378 (7th Cir. 1985) (finding it "manifestly unfair and inappropriate, absent compelling reasons . . . to disapprove" of a court's choice of law when neither party objected); *Casio, Inc. v. S.M. & R. Co*.,

**A171**

755 F.2d 528, 530-31 (7th Cir. 1985) (parties functionally stipulated to the law by not objecting*);*

*Restatement (Second) of Conflicts of Law § 136(2) cmt. h* (when neither party refers to foreign

law "in the pre-trial stages," the court "will usually decide the case" under local law).

Moreover, based upon the interpretation given by the Court to Illinois law, here the

difference "change[s] the outcome." *Int'l Adm'rs*, 753 F.2d at 1376 & n.4; *see also, In re Air*

*Crash Disaster*, 644 F.2d 594, 605 & n.2 (7th Cir. 1981) (a conflict must actually exist for choice

of law to matter).

One of the elements of a claim for tortious interference is that the defendant had

knowledge of the contract.  Here, Outland alleged that the Gamesa Parties knew of the

Acquisition Agreement, and by April 2011 believed that the Acquisition Agreement provided for

the acquisition of 100% of Outland.  Yet the Court ruled that the Gamesa Parties needed to have

knowledge of the Amended Acquisition Agreement even though it had knowledge that an

acquisition was in process pursuant to some agreement.

Whether or not Illinois state courts would take such a highly technical and ultra-

conservative approach to the issue of knowledge of a final version of an agreement is

questionable in light of the general rule stated in *Prosser & Keeton, Law of Torts*, § 129, p. 991

(5th Ed. 1984) that:

> Intentional interference of curse presupposes knowledge of the plaintiff's
> contract or interest, or at least of facts which would lead a reasonable person to
> believe that such interest exists.

What is certain, however, is that under Minnesota law (as well as other states that have

had to face the issue directly) it is not necessary to show actual knowledge, although here

Gamesa did have actual knowledge that there was an agreement for the acquisition of all or part

of Outland.  Rather, it is enough to show that the tortfeasor "had knowledge of facts which if

**A172**

followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *Kallok v. Medtronic, Inc*., 573 N.W. 2d 356, 362 (Minn. 1998). "[T]he law will impute bad faith when the wrongdoer has knowledge that the contract existed." *Id.* at 365. When a defendant knows of a contract between the plaintiff and a third party, the defendant "is on notice as to the terms of the agreement and has a duty to learn whether his actions will cause the [third party] to breach his agreement.'" *JIT Concepts, Inc. v. Shelby County Healthcare Corp*., 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005) (quoting *Wells Fund I v. The Shoe Show of Rocky Mount, Inc*., 863 S.W.2d 731, 733 (Tenn. Ct. App. 1993)). "[T]he alleged inducer may not close its eyes and ears and thereafter claim a lack of knowledge when the [contract] could have been easily obtained." *Id*. (internal quotations omitted). *See also Rain Bird Corp. v. Nat'l Pump Co*., No. 2:02CV018, 2003 U.S. Dist. LEXIS 26792, at *49 (N.D. Miss. 2003) ("A finding of willful ignorance is sufficient to infer knowledge of the contract."); *Major Computer, Inc. v. Academy Life Ins. Co*., 929 F.2d 1249, 1252 (8th Cir. 1991) ("'It is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties.'" (quoting *Swaney v. Crawley*, 154 Minn. 263, 191 N.W. 583, 584 (Minn. 1923)). *Accord*, *Prudential Real Estate Affiliates, Inc., v. Long & Foster Real Estate, Inc*., 2000 U.S. App. LEXIS 3394, *14 (4th Cir. 2000)(stating

> defendant cannot "insulate itself from Prudential's tortious interference claim by asserting that it did not know about the specific terms of the franchise agreement. *See Stannard v. McCool*, 198 Md. 609, 84 A.2d 862, 867 (Md. 1951) (To be liable for intentional interference with a contract, "the actor must have knowledge of the business expectancy with which he is interfering . . . . But it is not necessary that the actor appreciate the legal significance of the facts which give rise to the contractual duty. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean." (internal quotation marks

**A173**

omitted)); *cf. St. George Antiochian Orthodox Christian Church v. Aggarwal*, 326 Md. 90, 603 A.2d 484, 490 (Md. 1992) ("There is more than one mental state that may constitute 'knowledge.' The first and highest form of 'knowledge' is actual knowledge, that is, an actual awareness or an actual belief that a fact exists. A second form of 'knowledge' is what has often been called 'deliberate ignorance' or 'willful blindness.' The latter form of 'knowledge' exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth." (citation omitted))."

As the above cited cases show, in Minnesota, as well as in other states that have addressed a similar issue, such as Tennessee, Maryland and Mississippi, the Court's narrow reading of Illinois law, and refusal to look to Minnesota law, is the deciding factor in its decision.

Moreover, the Court elevates form over substance when it states:

> With respect to Outland's claim regarding the Acquisition Agreement, Outland cannot plausibly show a breach of that agreement. The Amended Acquisition Agreement altered the Acquisition Agreement; therefore, if Duke were guilty of a breach, it logically would have to be a breach of the Amended Acquisition Agreement. As the Acquisition Agreement could not have been breached due to the amendment, Outland's claim based upon it also must fail.

The Court acknowledges that Outland sufficiently pled that Gamesa knew of the Acquisition Agreement, but concludes that because the Acquisition Agreement was amended there is no reason to believe that Gamesa knew about the amendment.  Thus while Gamesa thought it was interfering with the Acquisition Agreement, because it serendipitously interfered with an amended version of the Acquisition Agreement, the Court concludes that Gamesa gets off scot-free.

Outland made a *prima facie* showing that Gamesa had knowledge of Outland's contract with Duke to acquire all or part of its business, but because the contract was amended, the Court feels that the Gamesa Parties had the right to do whatever it wanted so long as it did not have knowledge of the amendment to the agreement.  The Court has taken an incorrect narrow view of

A174

the scope of the claim for tortious interference with contractual relations because the Court is requiring a breach of the agreement of which the tortfeasor had knowledge.  As the above-cited authority shows, that is not a requirement.  The Gamesa Parties had knowledge of the acquisition of Outland, the fact that they did not know the precise terms of the agreement does not excuse them from liability.

The Court next concludes that Outland's third claim under count I is deficient "because it asserts a breach by Duke of a 'commitment' to enter into the DFSA." The Court stated that it "is unaware of a cause of action for breach of a commitment."

Black's law dictionary defines "commitment" as "[a]n agreement to do something in the future."  *See, also, Crosspoint Seven v. Mfrs. Life Ins. Co*., 148 Fed. Appx. 535 (7th Cir. 2005) (commitment letters were treated as contracts).  Whether the commitment rose to the level of a contract is a factual issue.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of tortious interference with contractual relations.

### B. OUTLAND'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

The Court dismissed the tortious interference with prospective economic advantage for three reasons:

1. the Court did not deem the knowledge prong of the *Voyles* test to have been satisfied.

2. the relationship between Outland and Duke must have been terminated to be entitled to relief, and

3. Gamesa was not wholly motivated by ill will towards Outland but sought to advance its interest as a competitor.

The Knowledge prong of the *Voyles* test.

**A175**

In the June Order, the Court did not deem the knowledge prong of the *Voyles* test to have been satisfied. The Court's conclusion is incorrect for two reasons. First, as noted above, the Court improperly did not apply Minnesota law. Second, under Illinois law knowledge of the actual Amended Acquisition Agreement was not necessary.  It was only necessary that the Gamesa Parties had knowledge of the Outland's expectancy of entering into a valid business relationship, which the Gamesa Parties clearly had. *See, Disher v. Fulgoni*, 161 Ill. App. 3d 1, 47 (Ill. App. 1987)("In Illinois, a claim for tortious interference with a prospective economic expectancy must rest upon a plaintiff's reasonable expectations of entering into a valid business relationship, a defendant's knowledge of the expectancy and intentional and malicious interference with the expectancy without just cause, to plaintiff's damage.")

The Requirement of Termination of the Relationship

In the June Order, the Court concluded that the relationship between Outland and Duke must have been terminated to be entitled to relief. The Court's conclusion is incorrect for two reasons. First, as noted above, the Court improperly did not apply Minnesota law. Second, under Illinois law the elements of tortious interference with prospective economic advantage are: "(1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the plaintiff's expectancy; (3) defendant's purposeful interference to defeat the expectancy; and (4) damages." *See, Douglas Theater Corp. v. Chicago Title & Trust Co*., 288 Ill. App. 3d 880, 887 (Ill. App. 1997).  The third and fourth element only requires that the "expectancy" be defeated, which is directly related to what was expected.  Outland clearly alleged what it expected and what eventually occurred was markedly different due to the tortious interference of the Gamesa Parties. *See, Prosser & Keeton, Law of Torts, supra,* § 129, p. 991 (5th Ed. 1984); *United Bilt Homes, Inc. v. Sampson, supra; Pacific Gas & Elec. Co. v. Bear Stearns & Co*.,

**A176**

*supra*; *De Jur-Amsco Corp. v. Janrus Camera, Inc.*, *supra*; *Kisano Trade & Invest Ltd. v. DEV Lemster*, *supra*.

Comment c to the *Restatement (Second) of Torts* § 766 also makes clear that inducement to breach, and thus a termination of the relationship, is not an absolute requirement for liability under that section. It states:

> The *liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations. . . .*
> The plaintiff's interest in his contractual rights and expectancies must be weighed, however, against the defendant's interest in freedom of action. If the defendant's conduct is predatory the scale on his side may weigh very lightly . . . . The issue is whether in the given circumstances his interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce. In deciding this issue, *the nature of his conduct is an important factor*. (emphasis added).

Other treatises support this interpretation of the law. *See* 2 Fowler V. Harper, Fleming James, Jr. & Oscar F. Gray, *Harper, James and Gray on Torts* §§ 6.7, 6.9, at 366, 379 (3d ed. 2006) ("The contemporary view of the action is that it lies[] more broadly"; "Protection is afforded the interest in contractual relations against harms other than inducement of breach. We may generalize that any intended and unprivileged interference . . . that causes loss to either party to a transaction is actionable by the party suffering the loss."); *id.* § 6.8, at 377 ("The term *inducing breach of contract* is somewhat misleading as a description of the tort in question.") (emphasis in original); *id.* § 6.5, at 356 ("The interest involved in this tort may be described as the interest of the individual in the security and integrity of the contractual relations into which he has entered."); W. Prosser & W. Keeton, *Torts* § 129, at 991 (5th ed. 1984) ("no actual repudiation of the contract is necessary for liability"); *id.* at 979 ("It may be sufficient for liability that the defendant has acted intentionally to interfere with a known contract or prospect, that he has caused harm in so doing, and that he has acted in pursuit of some purpose considered

**A177**

improper."); *id.* at 945 (indicating that a defendant may be liable when it commits a tort against a person with whom the plaintiff has a contract: "If the plaintiff's interests and those of the contracting party are sufficiently close, a tort to the one may be sufficient basis for liability to the other, if harm results."); 1A *Callmann on Unfair Competition, Trademarks & Monopolies* § 9:16 (4th ed. 1981) ("Some cases treat interference as a more comprehensive concept than inducement of breach; and therefore hold that there may be tort liability where a contractual relationship is rendered less valuable or more burdensome by some impairment, even though it is not breached."). "The most numerous of the tortious interference cases are those in which the disruption is caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach his contract with the plaintiff *or causes a third person not to confer a benefit on the plaintiff.*" Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U. Chi. L. Rev. 61, 106 (1982) (emphasis added). "In most jurisdictions, the fact of competition alone does not justify interference, and at least a prima facie case of liability attaches if the competitor *intentionally interferes with* a known contract." *Id.* (emphasis added) (citing Prosser, § 129, at 945).

Gamesa's motivation

In the June Order, the Court concluded that Gamesa was not wholly motivated by ill will towards Outland but sought to advance its interest as a competitor and as a result has no liability. The Court's conclusion is incorrect for two reasons. First, as noted above, the Court improperly did not apply Minnesota law. Second, under Illinois law, the *Restatement (Second) of Torts*, Section 766B, comment f, establishes that ill-will is not a prerequisite for liability ("Ill will on the part of the actor toward the person harmed is not an essential condition of liability. . . [a]lthough the actor is acting for the purpose of advancing an interest of his own, that interest

**A178**

may not be of sufficient importance to make his interference one that is not improper and avoid liability." *See, also*, Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U. Chi. L. Rev. 61, 106 (1982) (emphasis added). "In most jurisdictions, the fact of competition alone does not justify interference, and at least a prima facie case of liability attaches if the competitor *intentionally interferes with* a known contract." *Id*. (emphasis added) (citing Prosser, § 129, at 945).

Citing *Imperial Apparel, Ltd. v. Cosmos's Designer Direct, Inc*. 882 N.E. 2d 1011, 1019 (Ill. 2008), the June Order concluded that because Outland and Gamesa were competitors, the Gamesa Parties had a privilege to take the action they did (stating "[u]nder Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will. *General Motors Corp. v. State of Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 15, 862 N.E.2d 209, 308 Ill. Dec. 611 (2007)").

However, the *Imperial Apparel* court also stated: "[t]he privilege to compete does not, however, encompass the use of improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement. *See Cohabaco Cigar Co. v. United States Tobacco Co.*, No. 98-C-1580, 1998 U.S. Dist. LEXIS 17472 (N.D. Ill. October 29, 1998)." The Imperial Apparel court relied on the General Motors case, which in turn, relied on the *Soderland Brothers* case.

In the *General Motors* case, the Illinois Supreme Court stated:

> The terms "lawful competition," "privileged competition," "privilege of competition" and "competitor's privilege" appear in the case law and all refer to the same privilege, which is an affirmative defense to the tort of intentional interference with prospective business advantage. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398-99 (7th Cir. 2003); *International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir.

20

**A179**

1999); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985). It "allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *See Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615, 663 N.E.2d 1, 215 Ill. Dec. 251 (1995).

The *Soderland Brothers* case on which both the *General Motors* and *Imperial Apparel* cases find their source, clearly establishes that under Illinois law the privilege is based upon the *Restatement (Second) of Torts §768. See, Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill. App. 3d at 615 (stating

> The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will. (*See Candalaus Chicago, Inc. v. Evans Mill Supply Co.* (1977), 51 Ill. App. 3d 38, 366 N.E.2d 319, 9 Ill. Dec. 62; *Restatement (Second) of Torts* § 768(1)(d) & Comment b, at 40 (1979).) That privilege extends to the tort of interference with a prospective business relation or economic advantage but does not apply to the tort of interference with a contractual relation. (*See Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 610, 480 N.E.2d 1176, 1182, 89 Ill. Dec. 433 ("unlike the right to receive the benefits of a contract, the right to engage in a business relationship is not absolute, and must be exercised with regard to the rights of others"); *Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101, 45 Ill. Dec. 765 ("the sacrosanct contractual relation takes precedence over the conflicting rights of any presumptive interferor, including his right to compete and his own prospective advantage"); *see generally Restatement (Second) of Torts* § 768, Comment a, at 39 (1979).) Section 768 of the *Restatement (Second) of Torts* sets forth the elements for competition or permissible interference as follows:
>
> "(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue in an unlawful restraint of trade and

**A180**

(d) his purpose is at least in part to advance his interest in competing with the other."

(*Restatement (Second) of Torts* § 768, at 39 (1979).)

Acts of competition, which are never privileged, include fraud, deceit, intimidation, or deliberate disparagement. *Belden Corp. v. InterNorth, Inc.; see Galinski v. Kessler. See generally, Prosser, Torts* § 130, at 956 (4th ed. 1971).

Here the Court's decision is incorrect because the factor of in part advancing one's interest is only one factor that must be satisfied in order to use the privilege. It is not a sole and deciding factor as the Court determined—all four factors must be met. In addition, the Gamesa Parties and Outland were not competitors in the sense used in §768. Gamesa did not have its own internal O&M service group. Amended Complaint ("Am. Comp.") ¶¶6, 67.

The Gamesa Parties would not be able to avail themselves of the *Restatement (Second) of Torts*, Section 768, privilege. First, the matter did not involve a matter involved a competition between the Gamesa Parties and Outland. The matter involved Gamesa interfering with the acquisition of Outland. *See*, Comment d (stating "[t]he rule stated in this Section applies only in the situation in which the business diverted from the competitor relates to the competition between him and the actor. It does not apply when the business diverted by the actor does not relate to his competition with his competitor.") *See also*, Comment e stating

> "The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged. If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition. For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

Here, Gamesa did not succeed by virtue of matters relating to the competition.  On the contrary, Gamesa succeeded because it was exerting superior power in affairs unrelated to competition.

Moreover, Gamesa also employed unlawful means.  Acts of fraud and deceit are never privileged.  Here, the Gamesa Parties deceived Outland by leading them to believe that the Gamesa Parties were not going to compete with Outland. Am. Comp. ¶¶7, 69, 70, 73, 74, 77, 85, 86, 100, 104. Furthermore five additional torts that Gamesa committed provide the basis to conclude that their interference was improper: (i) fraudulent misrepresentation  (*Restatement (Second) of Torts, §549*),  (ii) negligent misrepresentation (*Restatement (Second) of Torts, §552*), (iii) tortious interference with contract (*Restatement (Second) of Torts, §766*), (iv) the breach of fiduciary duties of Gamesa as a principal in the principal-agent relationship that existed between Gamesa and Outland (*Restatement (Second) of Torts*, §874), and (v) liability for intended consequences, which is sometimes referred to a prima facie tort (*Restatement (Second) of Torts*, §870) .

Whether the interference was improper, and the certainty of the desired result, are factual questions that cannot be resolved at the pleading stage.  For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of tortious interference with economic advantage.

## C.  THE OUTLAND PLAINTIFFS' CLAIM FOR PRIMA FACIE TORT

The amended counterclaim added the claim of prima facie tort as defined by the *Restatement (Second) of Torts*, §870.  The Court dismissed the count concluding that it would not be recognized under Illinois law.   First, the Court improperly did not apply Minnesota or Pennsylvania law. Second, even under Illinois law the Court did not sufficiently address the

**A182**

United States Supreme Court's, citing the *Restatement (Second) of Torts*, Sec. 870, recognition of the "[g]eneral [p]rinciple" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." *See, Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008). While the Court stated that it not see any issue raised by the Seventh Circuit in *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1042 (7th Cir. 1999) with *Barry Gilberg, Ltd v. Craftex Corp.*, 665 F. Supp. 585 (N.D. Ill. 1987), the plain language of the Seventh Circuit's comment "*not yet anyway*" could only be read as an expectation that the Illinois Supreme Court would recognize it. And that comment occurred before the United States Supreme Court's recognition of the prima facie tort principle of *Restatement (Second) of Torts*, §870.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of prima facie tort.

### D. PROMISSORY ESTOPPEL AND BREACH OF FIDUCIARY DUTY.

Despite the Gamesa Parties not raising the issue, the Court *sua sponte* decided at this early stage of the proceeding that it would not allow the specific claim because it was not in the original Counterclaim, and allowing it would change "the theory of the case."

The Court stated that it was so ruling because it might be burdensome on Gamesa to engage in additional discovery citing the brief discovery that was conducted on the narrow issue of the work at one wind farm. No other discovery has been conducted on the business claims. Moreover, a claim of promissory estoppel as an alternative to a breach of contract claim that was in the original complaint could not reasonably be considered to (i) require any burdensome additional discovery, or (ii) markedly change the theory of the case. Similarly, the original complaint contained related claims of breach of duty to deal fairly and breach of duty of good

24

faith.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of promissory estoppel and breach of fiduciary duty.

### E.  GAMESA'S OBLIGATION TO INDEMNIFY OUTLAND

The Court dismissed this count as it relates to contractual indemnification stating that the "Court's Order of Good Faith Settlement bars Outland's indemnification claim with respect to OSHA costs relating to McCoy's accident."  Earlier in the ruling, however, the Court correctly stated that "the Court's February 5, 2013, Order on Gamesa's Motion for Finding of Good Faith Settlement relating to McCoy's claims expressly disclaimed any effect that the settlement would have on the viability of Outland's counterclaims and Gamesa's crossclaims."

The Court's order of February 5, 2013 (Docket No. 290) clearly excludes Outland's claim:

> 4. Nothing in this Order shall limit, impinge, pertain to or effect the claims and causes of action arising out of or relating to the allegations set forth in the Counterclaims of OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, entitled "*Counterclaims of Outland Against Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC" filed on or about September 22, 2011, Document No. 112 in this litigation,* and nothing in this Order shall limit, impinge, pertain to, or effect the claims or causes of action arising out of or relating to the allegations asserted by GAMESA TECHNOLOGY CORPORATION, INC. and GAMESA WIND US, LLC, against OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC in the pleading entitled "Gamesa Technology Corporation, Inc.'s and Gamesa Wind US, LLC's Answer, Affirmative and Additional Defenses, and Counterclaim to Outland's Counterclaim" filed on or about February 9, 2012, Document No. 215 in this litigation. (emphasis added.)

**A184**

Outland's indemnification claim was Count VI in Document No. 112. The plain meaning of the order excludes it.

Moreover, the purpose of a good faith finding under the Illinois Joint Tortfeasors Contribution Act is to address various potential tortfeasors contribution related to McCoy's claims, not claims that are wholly unrelated to injuries to payments to which McCoy would be entitled. For that reason, the finding itself only addresses claims arising out of and related to AARON MCCOY's claims. The OSHA penalties did not arise from and were not related to the *claims* of McCoy, which were the only matters covered in paragraphs 2 and 3 of the February 5, 2013, Order.

Outland's claim for indemnification for the OSHA penalties was not released by the good faith settlement.

The Court then declined to allow Outland to add a common law indemnification claim solely because it was not in the original complaint. Clearly, no theory of the case would be changed by the addition of such a claim. The Court cited *Johnson v. Sales Consultants, Inc.*, 61 F.R.D. 369, 371 (N.D. Ill. 1973), but in *Johnson* the plaintiff sought to change the theory of the case from a fraud in the inducement to an anti-trust action. Moreover, additional and wide-ranging additional discovery would need to occur. Here the change is a refinement to an indemnification claim, hardly a change in the theory of the case, and a claim that would not require any additional discovery above and beyond what would occur with respect to the Other State Claims, once discovery commenced.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim for indemnification.

**III.    CONCLUSION.**

A185

For the reasons stated above, Outland asks the Court to amend and clarify the judgment to make it clear that the Court had no subject matter jurisdiction over the Other State Claims, or, in the alternative, that the Court alter, amend and vacate the judgment regarding the Other State Claims for the reasons set forth above.

Dated: September 4, 2013

_____

Thomas Melone, Esq.
222 S 9th St, Suite 1600
Minneapolis, MN 55402
 (212) 681-1120

**A186**

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
    AARON McCOY,                        ) No. 11 C 592
 4                                      )
                                        )
 5          Plaintiff,                  )
                                        )
 6                 v.                   )
                                        )
 7  GAMESA TECHNOLOGY CORPORATION,      )
    INC.; GAMESA WIND US, LLC;          )
 8  IBERDROLA RENEWABLES, INC.;         )
    STREATOR-CAYUGA RIDGE WIND          )
 9  POWER, LLC,                         )
                                        )
10          Defendants.                 )
    ------------------------------- )
11  IBERDROLA RENEWABLES, INC.;         )
    and GAMESA TECHNOLOGY               )
12  CORPORATION, INC.,                  )
                                        )
13          Third-Party Plaintiffs,     )
                                        )
14                 v.                   )
                                        )
15  OUTLAND RENEWABLE ENERGY, LLC;      )
    OUTLAND RENEWABLE ENERGY FIELD      )
16  SERVICES, LLC; and OUTLAND          )
    ENERGY SERVICES, LLC,               ) Chicago, Illinois
17                                      ) August 8, 2013
            Third-Party Defendants.  ) 9:30 o'clock a.m.
18

19              TRANSCRIPT OF PROCEEDINGS - MOTION
               BEFORE THE HONORABLE CHARLES P. KOCORAS
20

21  APPEARANCES:

22  For the Defendant          KUTAK ROCK, LLP
    Gamesa:                    BY:  MR. MATTHEW M. ENENBACH
23                             One South Wacker Drive, Suite 2050
                               Chicago, Illinois  60606
24

25
```

```
 1   APPEARANCES:   (Continued):

 2
     For the Third-Party            KEELEY KUENN & REID
 3   Outland Defendants:            BY:  MR. THOMAS EDWARD ROCHE
                                    150 North Wacker Drive, Suite 1100
 4                                  Chicago, Illinois  60606-1602

 5
     Court Reporter:                MR. ANTHONY W. LISANTI
 6                                  United States Courthouse
                                    219 South Dearborn St., Suite 1744-A
 7                                  Chicago, Illinois 60604
                                    (312) 405-1383
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A188**

```
 1              THE CLERK:  11 C 592, McCoy vs. Gamesa Technology.

 2    Motion for entry of final judgment.

 3              MR. ROCHE:  Good morning, your Honor, Tom Roche, local

 4    counsel for Outland.

 5              THE COURT:  Good morning.

 6              MR. ENENBACH:  And Matthew Enenbach for the Gamesa

 7    entities, your Honor.

 8              THE COURT:  For, who?

 9              MR. ENENBACH:  The Gamesa entities.

10              THE COURT:  These were the two parties that have

11    resolved their differences?

12              MR. ENENBACH:  Gamesa obtained a judgment on the

13    pleadings as to Outland's counterclaims.  Outland moved for

14    leave to amend and that was denied, as well.

15              THE COURT:  What is in the Court of Appeals?

16              Is there something in the Court of Appeals?

17              MR. ROCHE:  Nothing.  It was dismissed because we did

18    not have a final appealable order.  It was withdrawn.

19              THE COURT:  So, you are going back there?

20              MR. ROCHE:  I am not sure if we are going back to the

21    Seventh Circuit --

22              THE COURT:  Is there any reason I should not grant

23    this motion?

24              MR. ROCHE:  No.

25              THE COURT:  The motion is granted.
```

```
1          MR. ENENBACH:  Thank you, your Honor.

2          THE COURT:  All right.

3          MR. ROCHE:  Thank you, your Honor.

4

5                     *   *   *   *   *

6  I certify that the foregoing is a correct transcript of the
   original shorthand notes of proceedings in the above-entitled
7  matter.

8
   /s/ Anthony W. Lisanti            September 12, 2013
9  Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A190**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY,<br><br>    Plaintiff<br><br>v.<br><br>GAMESA TECHNOLOGY CORPORATION, INC.,<br>and IBERDROLA RENEWABLES, INC.,<br><br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | District Judge<br>The Honorable Charles P. Kocoras<br><br>Magistrate Judge:<br>The Honorable Arlander Keys<br><br>Case No. 11-CV-00592<br><br>JURY DEMAND |
| IBERDROLA RENEWABLES, INC. and<br>GAMESA TECHNOLOGY CORPORATION, INC.,<br><br>    Third-Party Plaintiffs,<br><br>v.<br><br>OUTLAND RENEWABLE ENERGY, LLC.<br>OUTLAND ENERGY SERVICES, LLC<br>OUTLAND RENEWABLE ENERGY FIELD<br>SERVICES, LLC,<br><br>    Third-Party Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| IBERDROLA RENEWABLES, INC.<br><br><br>    Third-Party Plaintiffs,<br><br>v.<br><br>GAMESA WIND US, LLC<br><br>    Third-Party Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |

### GAMESA TECHNOLOGY CORPORATION, INC'S CROSS-CLAIM AGAINST OUTLAND ENERGY SERVICES, LLC, INDIVIDUALLY, AND AS SUCCESSOR TO, AND ASSIGNEE OF, OUTLAND RENEWABLE ENERGY, LLC

NOW COMES Defendant/Third-Party Plaintiff, Gamesa Technology Corporation, Inc. ("Gamesa"), by and through its attorney, Julie Negovan, Esq., of Kutak Rock LLP, as and for its Cross-claim against Third-Party Defendant Outland Energy Services, LLC, Individually, and as Successor to, and Assignee of, Outland Renewable Energy, LLC ("OES"), states as follows:

### INTRODUCTION

1.      On December 7, 2010, Plaintiff Aaron McCoy filed a two count Complaint at Law ("Plaintiff's Complaint at Law") against Defendant/Third-Party Plaintiff Gamesa Technology Corporation, Inc. and Defendant/Third-Party Plaintiff Iberdrola Renewables, Inc. ("Iberdrola").    Plaintiff alleged, *inter alia*, that on or about October 20, 2010, he was an electrician employed by Outland Renewable Energy, LLC ("ORE," sometimes hereinafter referred to collectively with OES, "Outland") and that he was installing a turbine at a wind farm near Cayuga Ridge South, Livingston County, Illinois when, during the course of said employment, the power source for the wind turbine at issue was turned on or otherwise activated, causing Plaintiff to suffer significant injuries.    Plaintiff seeks damages from Defendant/Third-Party Plaintiffs Gamesa and Iberdrola based upon alleged negligent and careless acts or omissions in, among other things more fully set forth in the Plaintiff's Complaint at Law, turning on the power source to the turbine at issue.    A copy of Plaintiff's Complaint at Law is attached hereto and made a part hereof as Exhibit "A" and is incorporated herein by reference as if set forth at length.

**A50**

2.    Upon information and belief, it is averred that Outland Energy Services, LLC is the successor in interest and assignee of the duties, obligations, and responsibilities of Outland Renewable Energy, LLC.

3.    Iberdrola subsequently filed Third-Party Complaints against various parties, including, among others, OES.

4.    Defendant/Third-Party Plaintiff Gamesa has filed an Answer and Affirmative Defenses to Plaintiff's Complaint at Law, denying all material allegations set forth therein. Furthermore, Defendant/Third-Party Plaintiff Gamesa continues to deny said allegations, and nothing contained herein is intended as a waiver or withdrawal of said denials. A copy of Defendant/Third-Party Plaintiff Gamesa's Answer and Affirmative Defenses is attached hereto and made a part hereof as Exhibit "B" and is incorporated by reference herein as if set forth at length. Without making any admissions to the contrary, and pleading strictly in the alternative, Defendant/Third-Party Plaintiff Gamesa asserts this Cross-claim against OES.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction to hear and determine this Cross-claim pursuant to Rule 14 of the Federal Rules of Civil Procedure and the ancillary jurisdiction of this Court.

6.    Venue is proper in this District pursuant to Rule 14 of the Federal Rules of Civil Procedure.

## COUNT I — CONTRIBUTION

7.    Defendant/Third-Party Plaintiff Gamesa incorporates paragraphs 1-6 above by reference as if set forth at length herein.

8.    At all times relevant hereto, including on October 20, 2010, the date of the occurrence alleged in Plaintiff's Complaint at Law, Third-Party Defendant ORE was Plaintiff's employer and, as such, had a duty, among other things, to exercise ordinary and reasonable care

**A51**

for Plaintiff's safety, to provide Plaintiff with a safe working environment, and to ensure that Plaintiff had the appropriate skills, training, supervision, and safety equipment necessary to perform Plaintiff's job in a safe and proper manner.

9.      At all times relevant hereto, including on October 22, 2010, the date of the occurrence alleged in Plaintiff's Complaint at Law, Third-Party Defendant OES was the successor in interest and assignee to ORE, who was Plaintiff's employer, and as such had a duty, among other things, to exercise ordinary and reasonable care for Plaintiff's safety, to provide Plaintiff with a safe working environment, and to ensure that Plaintiff had the appropriate skills, training, supervision, and safety equipment necessary to perform Plaintiff's job in a safe and proper manner.

10.     If Plaintiff proves that the power source for the wind turbine at issue was negligently, carelessly, and without warning turned on or otherwise activated, thus causing the injuries allegedly suffered by Plaintiff, then Third-Party Defendant OES, individually and as successor in interest and/or assignee to ORE, in breach of its and their duties alleged above, was then and there guilty of one or more of the following negligent acts or omissions:

(a)     failing to provide a reasonably safe work environment;

(b)     failing to properly train Plaintiff;

(c)     failing to properly supervise Plaintiff;

(d)     failing to provide Plaintiff with proper safety equipment;

(e)     failing to properly instruct Plaintiff regarding the use of safety equipment;

(f)     being otherwise careless and negligent.

11.     If Plaintiff is entitled to any recovery from Defendant/Third-Party Plaintiff Gamesa, which Gamesa has expressly denied and continues to deny, such injuries or damages

were not proximately caused by any act or omission of Defendant/Third-Party Plaintiff Gamesa, but rather, were the direct and proximate result of the aforementioned negligent acts and/or omissions of Third-Party Defendant OES, individually and as successor in interest and/or assignee of ORE and/or other parties, including co-defendants.

12.    During all times relevant hereto, including all times alleged in Plaintiff's Complaint at Law, there was in effect a statute entitled "Joint Tortfeasors Contribution Act," 740 ILCS 100/0.01 *et seq.*, which applies to actions for contribution arising after March 1, 1978, and Defendant/Third-Party Plaintiff Gamesa brings this action for contribution pursuant to said Act.

13.    Accordingly, to the extent that the negligence of OES, individually and as successor in interest to ORE, was the direct and/or proximate cause, or a proximate cause, of the damages for which recovery is sought from Defendant/Third-Party Plaintiff Gamesa, and in the event that Defendant/Third-Party Plaintiff Gamesa is found liable to Plaintiff for the injuries and other damages allegedly sustained by Plaintiff, Defendant/Third-Party Plaintiff Gamesa is entitled to contribution from and against OES in accordance with the Joint Tortfeasors Contribution Act, 740 ILCS 100/0.01 *et seq*.

WHEREFORE, Defendant/Third-Party Plaintiff, Gamesa Technology Corporation, Inc., respectfully requests that, in the event that Gamesa Technology Corporation, Inc. is found liable to Plaintiff, judgment should be entered in favor of Gamesa Technology Corporation, Inc. and against Third-Party Defendant, Outland Energy Services, LLC, individually and as successor in interest and/or assignee to Outland Renewable Energy, LLC to the fullest extent provided by law for its proportionate share of fault in causing such liability, in an amount to be determined at trial, and for such other and further relief this Court deems just and proper.

## COUNT II – INDEMNIFICATION

14.    Defendant/Third-Party Plaintiff Gamesa incorporates paragraphs 1-13 above by reference as if set forth at length herein.

15.    At all times relevant hereto, including on and before the date of the occurrence alleged in Plaintiff's Complaint at Law, October 20, 2010, there existed a certain Framework Services Agreement Contract ("the Outland/Gamesa Contract") entered into between ORE and Gamesa Wind US, LLC ("Gamesa Wind"). A copy of the Outland/Gamesa Contract is attached hereto and is made a part hereof as Exhibit "C" and is incorporated herein by reference as if set forth at length.

16.    Gamesa Wind is an affiliate of Gamesa Technology Corporation, Inc.

17.    Section 7.4 of the Outland/Gamesa Contract states:

> "Each Party (each, and "Indemnifying Party") shall defend, indemnify, and hold harmless the other Party, its partners and its parent corporations, subsidiaries, affiliates, members, agents, officers, directors and employees (each, an "Indemnified Party") from and against any and all suits, actions, proceedings, judgments, losses, damages, claims, fines, penalties, litigation, court costs, and reasonable attorneys' fees, for bodily injury (including death) or property damage to the other Party of any third party to the extent arising out of the Indemnifying Party's negligence, gross negligence, strict liability or intentional conduct, or that of its subcontractors, agents or employees in connection with the Indemnifying Party's performance under this Agreement."

18.    Gamesa is an "Indemnified Party," as defined in the Outland/Gamesa Contract.

19.    Thus, ORE agreed to defend, indemnify and hold harmless Gamesa Wind and Gamesa for any damages caused by the negligence, gross negligence, strict liability or intentional conduct of ORE or ORE's subcontractors, agents or employees.

20.    Gamesa denies that it was negligent or that its acts or omissions in any way contributed to Plaintiff's injuries as alleged in the Plaintiff's Complaint at Law. To the contrary,

Gamesa alleges and hereby avers that the negligent acts and omissions of ORE and of OES, individually and as successor and/or assignee of ORE, as set forth in paragraph 10 above, which is incorporated by reference herein as if set forth at length, were a proximate cause of Plaintiff's injuries as alleged in Plaintiff's Complaint at Law.

21.    OES therefore has the duty to defend, indemnify and hold harmless Gamesa from all damages sustained by Gamesa in connection with Plaintiff's Complaint at Law as defined by the Agreement, including any adverse judgment, all expense of litigation, court costs, and attorneys' fees.

WHEREFORE, Defendant/Third-Party Plaintiff, Gamesa Technology Corporation, Inc., respectfully requests that, in the event that Gamesa Technology Corporation, Inc. is found liable to Plaintiff, judgment should be entered in favor of Gamesa Technology Corporation, Inc. and against Third-Party Defendant, Outland Energy Services, LLC, individually and as successor and/or assignee of Outland Renewable Energy, LLC,  in an amount equal to any judgment entered against Gamesa Technology Corporation, Inc., any attorneys' fees incurred, and all costs of litigation and such other and further relief this Court deems just and proper.

Dated:  July 13, 2011

**KUTAK ROCK LLP**

_____*/s/ Julie B. Negovan*_____
Julie Negovan, Esq.
Michael T. McDonnell, III., Esq.
Suite 2050
One South Wacker Avenue
Chicago, IL 60606-4614
(312) 602-4100
(312) 602-4101
*Julie.Negovan@kutakrock.com*

*Attorneys for Defendants*
*Gamesa Technology Corporation, Inc.*
*and Third-Party Defendant*
*Gamesa Wind US, LLC*

**A55**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |

**COUNTERCLAIMS OF OUTLAND AGAINST GAMESA TECHNOLOGY
CORPORATION, INC. AND GAMESA WIND US LLC**

**OVERVIEW OF COUNTERCLAIMS**

Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland

Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC and Outland

**A56**

Energy Services, LLC f/k/a Outland Energy Field Services, LLC, ("Outland"), by their attorney Randolph C. Winton states the following in support of their counterclaims against Gamesa Wind U.S., LLC and Gamesa Technology Corp., Inc. ("Gamesa").

*Introduction of the Parties*

1.      Founded by five Minnesota farmers in 2005, Outland provides wind farm operation, maintenance and repair services ("O&M Services") to the wind energy industry throughout the United States and abroad.  It currently employs approximately 144 employees, down from 175 employees it employed before Gamesa, Gamesa Corporación Tecnológica, S.A. ("Gamesa Spain") and Iberdrola's damaging actions. Outland is headquartered in Canby, Minnesota, with additional offices in Mendota Heights, Minnesota and Guymon, Oklahoma.

2.      Outland has been providing O&M Services to Gamesa since 2006.

3.      The counter-claims and claims that Outland has set forth below are related to and/or arise out of the third-party claims brought by Iberdrola and Gamesa against Outland, and relate to and/or arise out of an interrelated set of facts, and common parties. These counterclaims and cross claims seek to remedy substantial and ongoing harm sustained by Outland at the hands of Gamesa and Gamesa Spain, and to a different degree, Iberdrola.  These claims relate to the accident involving Plaintiff Aaron McCoy in three ways.  They relate to Iberdrola's and Gamesa's desire to evade responsibility for the accident, Iberdrola's and Gamesa's desire to use the occurrence of the accident as a subterfuge for a more sinister agenda to damage Outland, and Gamesa's improper attempts to use the accident to terminate existing agreements with Outland.

4.      Gamesa and Iberdrola are owned and controlled by Spanish companies.  Gamesa is owned and controlled by Gamesa Spain. Upon information and belief, Iberdrola owns at least 14% of Gamesa.  Upon information and belief, until 2009, Iberdrola owned approximately 25%

**A57**

of Gamesa. Upon information and belief, Gamesa Spain has conspired with Gamesa and acted in concert with respect to all the actions that have been harmful to Outland. Gamesa Spain owns property in the United States subject to this Court's jurisdiction, which includes 100% of the shares of Gamesa Technology Corporation, Inc., a Delaware corporation.

*Gamesa's Business Model and Its Change Targeted at Outland*

5.     Gamesa is a manufacturer of wind turbines.  Gamesa's standard practice was, and is, to sell its wind turbines to various asset owners, such as Iberdrola.  As part of the sale of the wind turbines, Gamesa (similar to most other wind turbine manufacturers) would require that the purchaser also contract with Gamesa for O&M Services for those wind turbines for a specified period of time.

6.     Gamesa did not have its own internal O&M Service group.  Rather, its business model was to be the general contractor for the O&M Service with the wind turbine owner, and then provide those O&M Services using the services of a limited number of subcontractors, such as Outland. In the general/sub approach, Gamesa would manage the process but the majority of the O&M Service work was completed by independent service providers, such as Outland.

7.     That business model worked during the boom years of 2007 through 2010 but the global markets started to turn leaving wind turbine manufacturers' traditional pipeline (turbine sales) uncertain and vulnerable. Complicating matters for Gamesa was their shrinking market share in the United States.

8.     Upon information and belief, at one point, Gamesa controlled more than 10% of the United States market for wind turbine sales.  Upon information and belief, that market share is shrinking.  That shrinking market share coupled with global uncertainty over turbine sales has left Gamesa in an extremely vulnerable economic position.

**A58**

9.      Therefore, Gamesa decided to change its strategy and target longer warranties and the related revenue from service contracts as one of several keys to their survival.  The challenge for Gamesa was that they entered into service agreements with Outland and others prior to the market turn and without fully realizing their market share was evaporating.

10.     In order for the Gamesa strategy to work, however, it would need to eliminate Outland as a competitor, which resulted in Gamesa devising the plan laid out in these claims.

*The Outland-Gamesa Relationship*

11.     Since 2006, Outland has made substantial investments in personnel and equipment to build the business based upon the request from Gamesa, Gamesa's representations and assurances that it did not intend to self-perform (i.e., create its own O&M Service group to compete with Outland), and the promises to Outland that Gamesa would continue to provide a certain minimum level of work that would allow Outland the ability to fairly recover the investments it had made.

12.     Outland delivered, and continues to deliver, superior performance to Gamesa, became Gamesa's number one provider of services, achieved unprecedented recognition for its quality, occupational health and safety, and environmental management programs, and experienced steady growth.

13.     Outland's investment in, and focus upon, safety, quality, performance and productivity has resulted in Outland achieving certifications for its quality (ISO 9001:2008), environmental (ISO 14001:2004) and occupational health and safety (OHSAS 18001:2007) management programs.  No other independent wind O&M Service provider in North America has attained these certifications.

14.     From August 2006 to October 2008, the work to be performed at a particular site

4

on Gamesa's behalf was governed by a purchase order (a "Purchase Order").  Work under a Purchase Order would be for a specific task, or set of tasks, at a wind farm that would require Outland personnel to perform work for anywhere from a few days to several months.

15.     The annual revenue received by Outland from Gamesa from Purchase Orders grew from approximately $225,000 in 2006 to approximately $6.1 million in 2010.

16.     On October 3, 2008, Outland and Gamesa entered into their first contract that specified the use of Outland personnel at certain Iberdrola-operated wind farms for a longer-term period of time.  That contract was entitled the Framework Services Agreement (the "FSA") and provided separate terms and conditions related to work at those wind farms over a longer period of time, generally approximately two years.

17.     After Outland and Gamesa entered into the FSA, Gamesa continued to issue separate Purchase Orders for the shorter duration assignments.

18.     On November 19, 2009, Outland and Gamesa entered into new framework agreement entitled the Maintenance Services Agreement (the "MSA"), which placed additional Iberdrola-operated wind farms under a long-term agreement (including the Cayuga Ridge site which was the site of Plaintiff's accident).

19.     The MSA revised many of the provisions that were in the FSA governing the relationship between Outland and Gamesa.

20.     Specifically, the MSA revised the terms of a noncompetition clause (a clause which in the FSA was unenforceable under Minnesota law), the governing law clause, the dispute resolution clause, and the provision dealing with the solicitation of the other party's employees.

21.     Under the MSA, Outland is required to satisfy the needs of Gamesa's customer,

Iberdrola. Specifically, Outland is required to provide all O&M Services, including preventative maintenance, corrective maintenance, design modifications, technical support and weekend, holiday, emergency and on-call work coverage. (MSA, § 2.2.)

22.    Pursuant to the MSA, Outland must train all its personnel on health and safety, and on industry technical standards, in order to allow its employees to effectively perform O&M Services. (MSA, § 4.4.)

23.    Outland performs O&M Services pursuant to technical documentation, manuals and quality procedures supplied by Gamesa; safety rules, regulations and manuals supplied by Gamesa and Iberdrola; and applicable federal, state or local health and safety laws and regulations. (MSA, § § 4.2 and 4.3.)

24.    Further, if Iberdrola establishes site-specific rules and/or safety procedures, Outland must comply with Iberdrola's mandates. (MSA, § 4.4.)

25.    On a regular basis, Outland supplies Gamesa with a regular O&M Services report for each project site, including descriptions of services completed; delays experienced in performing services; significant issues experienced in losses of turbine availability, causes and remedies; actualized inventory of warehouse items; and health and safety reports and inspection reports performed during the month. (MSA, § 2.6.)

26.    Gamesa and Outland expressly agreed that only certain limited events would be considered an event of default by Outland (an "Event of Default") under the MSA. If an Event of Default existed, and if Gamesa in good faith gave immediate written notice to Outland, and if Outland could demonstrate that the existence of such event arose for reasons not attributable to Outland, then such event would not be considered an Event of Default. (MSA, § 6.1.)

27.    If an Event of Default existed, and if Gamesa in good faith gave immediate

6

**A61**

written notice to Outland, and if Outland could not demonstrate that the event arose for reasons not attributable to Outland, then Outland would be entitled to five (5) working days to initiate a cure. If Outland could not cure within five (5) working days after initiating such a cure, then Gamesa would be entitled to remedies. (MSA, § 6.2.)

28.     A valid Event of Default has never existed under the MSA.

29.     Also in 2009, Iberdrola and Gamesa entered into a strategic accord on wind-farm development that allowed for joint development and operation of wind farms.

30.     Since Outland has been performing services for Gamesa, Outland has met and exceeded all safety and performance benchmarks. On information and belief, Outland's performance for Gamesa was far superior then what Gamesa received from any other subcontractor.  For example, in 2010 when Gamesa was facing the potential payment of approximately $15 million in liquidated warranty damages for failure to maintain a specified wind turbine availability percentage, Gamesa replaced the subcontractor that had been working on the site, with Outland.  Outland was able to improve the availability at the site in a very short period of time saving Gamesa approximately $15 million in warranty payments.

31.     Outland has achieved similar results under similar circumstances at other wind farms. In each case, Outland replaced an existing O&M Service subcontractor and immediately was able to improve production while maintaining the highest levels of safety.

32.     Through providing these services for Gamesa on wind farms throughout the United States, Outland's personnel developed a particular expertise in troubleshooting Gamesa-made turbines. When Outland's business for Gamesa was at its peak in the first quarter of 2011, Outland had approximately 100 technicians working on Gamesa turbines, and provision of services to Gamesa accounted for the vast majority of Outland's revenue.

**A62**

*The Tying of Wind Turbine Sales and O&M Services*

33.    At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for wind turbines existed in the United States.

34.    At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for Gamesa wind turbines existed in the United States.

35.    At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for parts for Gamesa wind turbines existed in the United States.

36.     At the time that Gamesa sold the wind turbines to various owners, a market for the O&M Service of Gamesa wind turbines existed in the United States.

37.    At the time Gamesa sold the wind turbines to various owners, Gamesa controlled 100% of the O&M Service market for Gamesa wind turbines.

38.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

39.    Gamesa has market power over the market for parts for Gamesa wind turbines.

40.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

41.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

42.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to

A63

the O&M Service for their wind turbines.

43.     By tying the sale of Gamesa wind turbines to the provision by Gamesa of O&M Services for those wind turbines, Gamesa was able to establish and continue its control of 100% of the O&M Service market for Gamesa wind turbines. That is, even though Gamesa brought in Outland to perform the actual services on the Gamesa wind turbines that Gamesa had sold to customers, Outland was a subcontractor—Gamesa was the contractor and maintained the actual customer relationship with the turbine owner.

*The Events Leading to the McCoy Accident*

44.     On September 23, 2010, the following Outland personnel were assigned to the Cayuga Ridge wind farm in order to perform a waffle block design modification procedure (the "Modification Procedure") specified by Gamesa: Alex Rice (Project Manager), Mike Piper (Lead Technician), Matt Davis, Kyle Nieman, Adam Hengesteg, Nathan Black, Cory Hart, Alex Anderson, Andrew Ehrhardt, and Aaron McCoy.

45.     Cayuga Ridge was one of the sites covered in the MSA.

46.     In order to perform the Modification Procedure the turbine needs to be de-energized.

47.     When dealing with potentially hazardous electrical energy, technicians use a lock-out tag-out ("LOTO") procedure to ensure their safety.  The procedure is so named because it consists of using a lock—to lock the electrical equipment in the "off" position—and a tag—to inform other employees of who locked the equipment, and when they did so.

48.     Outland trained all of its personnel to use a standard LOTO procedure. Under that standard LOTO procedure, when a technician wants to perform services on a turbine, that turbine must be "turned off" by switching the equivalent of a large circuit breaker to the "off" position.

A64

The technician then applies a lock to the switch in such a way that the switch cannot be turned back on as long as that lock is in place. Each technician applies his own lock and maintains control of the key that opens the lock, so that no other person is able to remove the lock and then re-energize the turbine as long as the technician is working on the equipment and exposed to electrical hazards. The technician then applies a tag on which he writes pertinent information about the service being performed (e.g. his name, the date, the time), so that anyone else coming along will understand the reason for the lock on the switch. The tag states that it is only to be removed by the person who placed the tag.

49.    Once the technician has applied the lock, established control of the key and then applied the tag, the technician would climb up to the top of the turbine tower, perform the service, and then descend back to the bottom of the tower to unlock the lock, and thereby allow the re-energization of the turbine.

50.    Again, the approach described above is the standard LOTO procedure. That standard LOTO procedure is the only LOTO procedure approved by Outland health and safety management and protocols.

51.    All Outland technicians are trained and instructed to use only that standard LOTO procedure.

52.    Like all other Outland technicians, Plaintiff McCoy was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

53.    Alex Rice was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

54.    The standard Outland LOTO procedure follows the standard (aka individual) LOTO procedures set forth in 29 C.F.R. 1910.147 (general industry) and 29 C.F.R. 1910.269

**A65**

(electric power generation, transmission, and distribution).

55.     Other LOTO procedures may be permissible. For example, 29 C.F.R. 1910.147(f)(3) describes a group LOTO procedure.

56.     On or about September 23, 2010, at a meeting of Gamesa, Iberdrola and Outland on-site personnel at the Cayuga Ridge site, Iberdrola and Gamesa instructed Outland's personnel in that meeting that a modified LOTO procedure would be used for the Modification Procedure.

57.     In attendance at that meeting were the following individuals: (a) from Iberdrola: Curtis Radke (site supervisor), Evan Bonnel, Dale Thomas, Andrew Morrissey, and Chris Tolian; (b) from Gamesa: Ross Williamson (site manager); (c) from Outland: Alex Rice, Mike Piper.

58.     Under that modified LOTO procedure, each Outland technician performing the design modification was to leave his key at the base of the wind turbine tower, near the lock, and then climb uptower to perform services. Under this approach, when a given team of two Outland technicians had completed their work and needed the turbine re-energized so that they could check the effectiveness of that work, the Outland team was to remain uptower and call to an Iberdrola technician via radio.

59.     That Iberdrola technician would be stationed down on the ground and would be available to re-energize any of the turbines in which Outland's technicians were working uptower. Upon receiving a call to re-energize a given turbine, the Iberdrola technician would proceed to the given turbine, radio again to Outland's technicians uptower to confirm that they were in a so-called "safe zone," i.e., away from the electrical equipment, take one of the keys left downtower by Outland's technicians, unlock the lock, and then re-energize the equipment.

60.     The benefit to Iberdrola and Gamesa of this modified LOTO procedure was that it

would reduce a) the amount of time it would take to perform the design modification, thereby reducing turbine downtime and increasing production of electricity; and b) the number of climbs and re-energizations, thereby reducing wear and tear on the turbine and its components.

61.    At no time did anyone who participated in that meeting notify anyone from Outland's off-site management—not Outland's health and safety management, not Outland's operations management, not Outland's technical training management, not Outland's human resources management, and not Outland's legal management—that Outland's on-site personnel would be using that modified LOTO procedure.

62.    This modified LOTO approach appears to have been inconsistent with some Gamesa guidance, but consistent with other Gamesa guidance. Although Gamesa's general instruction for "Locking and Signaling Procedure for Electrical Equipment" states that "[i]t is absolutely forbidden for the employees to remove whatever personal warning labels or padlocks which are not theirs," the procedure that Gamesa issued for performance of the transformer design modification (the work that Outland's technicians were performing at the time of the accident) refers to the separate roles of "operator" and "technician" indicating the use of a system operator LOTO procedure with the "operator" controlling the lock at the base of the tower and the "technician" working uptower. That is, both the instructions of Iberdrola and Gamesa's on-site managers and the documentation that Gamesa provided Outland in accordance with which Outland was to perform the procedure called for Outland technicians to surrender control of their LOTO keys to another party, specifically, Iberdrola.

63.    On October 20, 2010, the accident at Cayuga Ridge occurred involving Plaintiff Aaron McCoy.

**A67**

64.     On that day, multiple teams of Outland technicians were working uptower in different turbines. When one such team called to the downtower Iberdrola technician to re-energize their turbine, that Iberdrola technician went to another tower and re-energized that other tower.

65.     In that tower, McCoy and his work partner were not expecting re-energization but rather were working near the transformer. Upon re-energization, an arc flash (electrical explosion) emerged out of the electrical equipment uptower in front of which Aaron McCoy was working, thereby burning McCoy.

66.     In taking these actions, the Iberdrola technician purposefully and knowingly removed a lock that was not his lock, using a key that was not his key. The Iberdrola technician was reckless and negligent in his decision to energize a turbine without first confirming that Outland's technicians uptower were in a safe position.

67.     The period from September 27, 2010, to October 20, 2010, was between the regular monthly site visit from Outland health and safety management during which site EHS audits would have been completed.

68.     At the time of the accident, McCoy was performing the Modification Procedure that Outland was performing at the direction of Gamesa while using the modified LOTO procedure that Outland was using at the direction of Iberdrola and Gamesa.

69.     As a result of the accident, an investigation was undertaken by the United States Occupational Health and Safety Administration ("OSHA").

70.     Outland's personnel cooperated fully with the OSHA investigation, and answered all questions truthfully, even when those answers hurt Outland's interests.

71.     In contrast, on information and belief, Gamesa's personnel did not participate in

all of the interviews that OSHA requested.

72.    Both before and after the October 20, 2010, Cayuga Ridge incident, Outland's industry-leading O&M Services teams have performed at all sites and projects under the MSA – including Cayuga Ridge – in a safe, efficient, effective and high quality manner.

73.    Specifically, Outland has met or exceeded all defined service standards, including for ensuring the availability of the turbines, completing all administrative duties in a timely manner, and completing all maintenances within the contractually-defined schedule.

*Gamesa's Secret Plan to Put Outland Out of Business so Gamesa Could Acquire Outland Technicians, Gamesa's Intentional Interference with the Acquisition of Outland, and Gamesa's Actions to Improperly and Unlawfully Monopolize and Attempt to Monopolize the O&M Service Market in Gamesa Wind Turbines*

74.    In summer 2010, Outland and Gamesa began discussing the possibility of working together to provide O&M Services to Gamesa wind project owners when the Gamesa wind turbines enter their post-warranty period. Joe Thorpe the existing head of service at Gamesa told Outland President Steve Scott that Gamesa knew that the relationship with both Duke Energy and Horizon Wind LLC (both owners of Gamesa wind turbines) was so bad that Gamesa was not going to sell any more turbines to either party and they knew they had no chance to secure any contract with either party to perform post warranty work.

75.    As a result, Gamesa encouraged Outland to try to secure that work outside of whatever joint arrangement Outland and Gamesa might create for bidding on post-warranty work for other Gamesa wind turbine owners.

76.    In August 2010, Joe Thorpe was transitioning to another position within Gamesa. A new person, Rick Hammill was brought in to lead the services area of Gamesa, and he brought in another new person, Gary Stansbury to replace Thorpe.

**A69**

77.     On information and belief, Hammill and/or his superior(s) decided that the existing Gamesa O&M Service business model, where Gamesa would always subcontract the provision of O&M Services, was going to change.

78.     On information and belief, Hammill and/or his superior(s) decided that Gamesa would establish its own O&M Service group with technicians that can self-perform to reduce the amount of work (and revenue) given to independent service providers like Outland.

79.     That complete shift in its business model was contrary to all the prior representations and assurances provided to Outland.

80.     In order to achieve Gamesa's new goal to have its internal O&M Service group, Gamesa—at first secretly, and then openly—started to recruit Outland technicians to join Gamesa.

81.     Personnel within Gamesa admitted to Outland that they were coming after Outland's technicians and that Gamesa wanted to hire more than 40 technicians by the end of 2010 and that most of those hires would come from Outland.

82.     Around this time period, Gamesa accounted for approximately 90% of Outland's business, and virtually all Outland technicians were certified for work on Gamesa wind turbines, which contributed to Gamesa's strategy.

83.     Despite the full assault by Gamesa on Outland technicians, few Outland technicians moved to Gamesa.

84.     As a result, Gamesa needed to devise a new strategy to secure Outland technicians.

85.     Outland reasonably expected based upon Gamesa's promises and statements the prior year's level of business with Gamesa to be maintained and an increase in business from

15

**A70**

Gamesa in 2011 due to Gamesa's ongoing assurance that it was not going to compete with Outland,   Gamesa's request that Outland purchase certain flame-retardant clothing, and Gamesa's request that Outland pay for certain training provided by Gamesa as their preferred partner and in preparation for the expected growth in business with Outland.

86.    After the failure of its malicious attempt to hire a substantial part of Outland workforce, in early January 2011, Gary Stansbury of Gamesa stated to Steve Scott that Gamesa was interested in acquiring Outland.

87.    Steve Scott thanked Gary for Gamesa's interest but indicated that Outland intended to remain independent from any one particular manufacturer because otherwise Outland might be prevented from acquiring work for turbines manufactured by others.

88.    Sometime between the end of 2010 and January 2011, however, Gamesa secretly and with malicious intent, devised a strategy to destabilize Outland if Outland rejected Gamesa's acquisition overture.  Gamesa's plan would be to put Outland out of business so that Outland technicians would be available for Gamesa to hire in large numbers, which would allow Gamesa to acquire all or a substantial portion of Outland's business and personnel at no cost and allow Gamesa to achieve its goal of creating its own large O&M Service group, while at the same time eliminating Outland as a competitor of Gamesa's new O&M Service group.

89.    The plan devised by Gamesa provided for Gamesa to keep telling Outland that Outland was going to keep getting more business from Gamesa.

90.    That approach would mean that Outland would continue to train and hire new technicians.

91.    That approach would mean that Outland would continue to acquire assets and protective equipment for its technicians as directed by Gamesa.  One such example, is the

**A71**

approximately $250,000 of flame-retardant clothing that Gamesa's policy required Outland to acquire at Outland's own expense in 2010 and 2011.

92.    The basic approach was to keep Outland believing it would continue to receive more work from Gamesa and then, at the right moment, to pull the rug out from under Outland and watch the business fall, thus allowing Gamesa to pick up the pieces for its own hoped-for O&M Service business.

93.    In January and February 2011, Gamesa continued to implement its secret plan. Unknown to Outland and contrary to the representations made by Gary Stansbury, Gamesa had secretly decided to cease all Purchase Order business with Outland as a first step, and started to look for ways to terminate the MSA as a second step.

94.    On February 17, 2011, Outland and Duke Energy ("Duke") entered into a letter of intent pursuant to which Duke was to purchase a 25% interest in Outland.

95.    On February 24, 2011, Outland informed Gary Stansbury of Gamesa that Outland and Duke Energy had entered into an agreement for Duke to acquire a substantial minority stake in Outland, with the possibility that Duke could eventually acquire all of Outland.

96.    Upon learning that information Gamesa realized that it might need to accelerate its plan or adjust its approach.

97.    Gamesa quickly realized that if Duke acquired a stake in Outland, that Outland might be able to withstand any attempt by Gamesa to destabilize Outland. If that occurred, Gamesa's plan to build its own business at the expense of Outland would fail.

98.    Gamesa reacted quickly.  On February 26, 2011, Gary Stansbury of Gamesa called Steve Scott of Outland and gave the concept a thumbs down for the stated reason that Gamesa believed Iberdrola would force Outland off their sites because Iberdrola and Duke

**A72**

compete on the development front.

99.     In keeping with the façade, however, on that same February 26, 2011 call, Gary Stansbury stated to Steve Scott that Gamesa was very happy with the quality of service that Outland continued to deliver, and reiterated that Outland was Gamesa's key vendor. In that connection, Stansbury stated that they were seeking up to 24 additional technicians because Gamesa was getting ready to potentially replace a competing service provider at some sites.

100.     Stansbury, however, set the stage for possibly using the McCoy accident as part of its secret plan to destabilize Outland.  Stansbury told Steve Scott that Gamesa had been getting "beat up badly" by Iberdrola over the McCoy accident and the McCoy lawsuit. Stansbury stated that there was much concern over what might be coming from OSHA and the litigation with Plaintiff McCoy.

101.     Nevertheless, in continuing the façade in order to preserve the element of surprise needed to execute the plan, as late as March 2011, Gamesa was still telling Outland that Gamesa had a long list of projects they wanted Outland to commission under Purchase Orders in 2011.

102.     In response to Gamesa's statements of February 26, Steve Scott contacted Iberdrola directly.  After several missed attempts at direct contact, on March 27, 2011, Kevin Devlin, Vice President of Commercial Operations for Iberdrola stated that he endorsed the concept of Duke acquiring an interest in Outland.  Devlin stated that the competition issue between Duke and Iberdrola was not a concern.

103.     As a result of Iberdrola's direct statements to Outland, Gamesa needed to escalate its approach.  On April 14, 2011, Gamesa called Duke directly to attempt to scuttle the Duke/Outland transaction.  Not only did Gamesa inform Duke that Gamesa's position was that the deal should not happen, Gamesa took affirmative economic steps to try to induce Duke not to

**A73**

do the transaction with Outland.  Specifically, Gamesa discussed a turbine supply offer that tied in a five-year extension of the O&M Services on Duke's North Allegheny project.  The Duke North Allegheny project was the first Duke project with Gamesa turbines that was scheduled to enter the post-warranty period starting in September 2011.

104.    Duke rejected Gamesa's interference, and attempt at bribing Duke, to terminate Duke's transaction with Outland. Gamesa left that conversation knowing they were not going to be selling any more turbines to Duke and would be losing the maintenance contract at North Allegheny.

*With No Place to Turn, Gamesa Looks to the OSHA Citations and the McCoy Accident*

105.    On April 8, 2011, OSHA issued six citations to Outland related to the LOTO procedure that was in use at the Cayuga Ridge wind farm at the time of the accident that occurred involving Plaintiff Aaron McCoy.

106.    After Gamesa learned of the citations, Gamesa's Gary Stansbury stated to Steve Scott of Outland that, "To be honest, we're shocked we weren't cited as well."

107.    Neither Gamesa nor Iberdrola were issued citations by OSHA.

108.    Upon information and belief, neither Gamesa nor Iberdrola were issued citations because it was an Outland employee that was injured, and no injury occurred to either a Gamesa employee or an Iberdrola employee.

109.    Also on information and belief, Iberdrola was told informally by OSHA at the 2011 American Wind Energy Association conference in Anaheim, California, on or about May 23, 2011, that if another accident occurred at an Iberdrola site that OSHA would seek criminal sanctions against Iberdrola.

**A74**

110.    After the rebuke that Gamesa received from Duke on April 14, 2011, Gamesa was desperate and needed to find a way to destabilize Outland quickly.

111.    On May 11, 2011, the Duke agreement of February 17, 2011, was replaced with an agreement among Outland, Duke and an institutional investor for the sale of 100% of the interests in Outland.

*Gamesa Realizes It is Out of Time and Implements its Plan to Topple Outland and Implicates Iberdrola*

112.    In order to interfere with the Outland acquisition contract and Outland's existing and potential economic relations, on May 12, 2011, the day after the agreement for the sale of Outland was signed, Gamesa implemented its plan to scuttle the transaction and destabilize Outland.

113.    Gamesa sent a letter to Outland raising frivolous issues and declared Outland in default under the MSA.

114.    In that same letter, Gamesa implicated Iberdrola in its scheme by stating that Gamesa's customer, Iberdrola, had demanded that Gamesa remove Outland from all of its wind farms.

115.    The May 12 Letter stated that "Outland has failed to perform O&M Services in accordance with the health, safety and environmental requirements of the [MSA] and applicable law. This failure has been noted by OSHA . . ."

116.    At the same time, Gamesa implemented the other part of its plan which called for the cessation of any new Purchase Orders for transactional business with Outland.

117.    Gamesa had implemented its three-prong approach—terminate all Purchaser Orders (leaving 40% of Outland's technicians without work), scuttle the acquisition of Outland (so that it would not be able to financially withstand the Gamesa attack), and move to terminate

**A75**

the remaining contractual work represented by the MSA (which would leave another 40% of Outland's technicians without work).

118.    The impact was immediately felt on Outland.  Within days of Gamesa's letter, both Duke and the institutional investor refused to proceed with the transaction under the originally agreed terms, and reduced the amount they were willing to pay for Outland by approximately $15 million. Because of Gamesa's continued frivolous attempts to terminate the Outland-Gamesa agreements, and Gamesa's false statements to others, the acquisition did not proceed even under the reduced terms.

119.    In addition, with the full and immediate cessation of Purchase Orders, approximately 40% of Outland's technicians were without work.  In addition, the 18 technicians that were still in training would have no work once their training was complete.

120.    With respect to Gamesa's attack under the MSA, Outland notified Gamesa that it rejected Gamesa's frivolous attempt to declare a default under the MSA.

121.    Gamesa responded by letter dated May 27, 2011, in which Gamesa reiterated that Outland was in default under the MSA stating "Outland was cited by OSHA for failing to comply with various provisions of 29 C.F.R. §1926 et seq."

122.    Outland again notified Gamesa that it rejected Gamesa's frivolous attempt to declare a default under the MSA.

123.    Finally realizing that its assertions in its letters of May 12 and May 27 were unjustified, and wholly without basis, under the MSA, Gamesa took a different tack to try to finish the job it started on May 12.

124.    On July 21, 2011, Gamesa sent two new letters to Outland frivolously asserting a completely new basis for default under the MSA, and for the first time, asserting a breach of the

**A76**

dormant FSA.

125.    Outland notified Gamesa that it rejected Gamesa's frivolous attempts to declare a default under the MSA and to declare a breach of the FSA in its efforts to destabilize Outland.

126.    Then on August 31, 2011, Gamesa's outside legal counsel sent letters to Outland re-asserting the frivolous position of Gamesa's July 21 letters.

127.    In the August 31, 2011, letters it became clear that Gamesa intended to continue to push its plan to destabilize Outland by attempting to frivolously terminate the MSA.  Gamesa knew that such a continued push also served the additional goal of keeping away potential investors or acquirers of Outland.

128.    More alarming, however, was the statement in those August 31 letters that made it clear that Gamesa had engaged in new interference with Outland's ongoing prospective economic relations by referencing specific third parties that Gamesa had contacted in an attempt to interfere with Outland's attempts to obtain work from those entities.

129.    Because Outland had not yet toppled, those August 31 letters confirmed that Gamesa had opened up a new front against Outland, even though it had already substantially reduced the Outland workforce.

130.    The August 31 letters confirmed that Gamesa was continuing its active campaign to interfere with Outland's prospective business and to put Outland in a false light with Outland's potential customers.

131.    Most recently, on September 16, 2011, Outland was notified by one of its partners, Hansen Transmissions International NV ("Hansen"), who is a manufacturer of gearboxes in Gamesa wind turbines, that Gamesa Spain informed Hansen that Gamesa would "no longer allow access to Gamesa wind turbines for the HOGUT (Hansen Outland Gear Unit

**A77**

Team)." As a result, Hansen suspended its partnership with Outland with respect to Hansen gearbox maintenance and repair services for Gamesa wind turbines.

132.    Gamesa's unlawful and tortious actions with respect to Outland's partnership with Hansen, and Hansen's immediate suspension of the Outland partnership, *prima facie* establishes Gamesa's market power over the Gamesa parts market.

133.    Gamesa is attempting to prohibit Outland from providing O&M Services for Gamesa wind turbines in various states, including, without limitation, Texas, Illinois, California, West Virginia and Pennsylvania.

134.    Gamesa's and Gamesa Spain's actions – in concert, combination or conspiracy with each other and/or with Iberdrola – have systematically inflicted immediate, immeasurable and irreparable harm upon Outland through a sustained course of improper and illegal actions over recent months.

### CLAIMS FOR RELIEF

### COUNT I
### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS (OUTLAND'S EXISTENCE)

135.    Outland restates and realleges the foregoing paragraphs.

136.    Outland has contractual relations, and prospective contractual relations, with third parties.

137.    Gamesa, Gamesa Spain and Iberdrola were and are aware of those contractual relations and prospective contractual relations.

138.    Gamesa, Gamesa Spain and Iberdrola intentionally interfered with Outland's contractual relations and prospective contractual relations by, among other things, engaging in unfair competition against Outland, by committing commercial disparagement, making false

**A78**

statements, misrepresentations of fact, improper inducement of employees, breaches of contract and breaches of good faith and fair dealing, knowingly and purposely and secretly taking actions and conspiring to take actions designed to destabilize Outland and eliminate it as a competitor, interfering with Outland's acquisition agreements, interfering with Outland's agreements with others, such as Hansen, falsely informing prospective customers that Outland was contractually prevented by Gamesa from servicing their turbines, instructing Outland personnel to follow a LOTO procedure that was not the standard Outland LOTO procedure, conspiring to remove Outland from Iberdrola sites, engaging in unfair trade practices, engaging in unlawful restraints on trade, and violating Federal and state anti-trust laws.

139.    Gamesa, Gamesa Spain and Iberdrola, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing its contractual relations and prospective contractual relations.

140.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**COUNT II**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC RELATIONS (GAMESA'S INTERFERENCE WITH**
**OUTLAND'S PROSPECTIVE CONTRACTS WITH OTHERS)**

141.    Outland restates and realleges the foregoing paragraphs.

142.    Outland has contractual relations, and prospective contractual relations, with third parties. Outland has and had prospective contractual relations with Gamesa.

143.    Those prospective contractual relations include and included ongoing and future work for O&M Services for owners of wind turbines that were manufactured by Gamesa and

A79

others manufacturers.

144.    Gamesa and Gamesa Spain were and are aware of those contractual relations and prospective contractual relations.

145.     Gamesa and Gamesa Spain intentionally and improperly interfered, and continue to interfere, with those prospective contractual relations.

146.    Gamesa's and Gamesa Spain's intentional and improper interference induced or otherwise caused those other parties not to enter into or continue the prospective relations.

147.    Gamesa's and Gamesa Spain's intentional and improper interference prevented Outland from acquiring or continuing the prospective relations.

148.    Gamesa and Gamesa Spain have employed wrongful means.

149.    Gamesa's and Gamesa Spain's actions are an attempt to create or continue an unlawful restraint on trade.

150.    Defendants Gamesa and Gamesa Spain and Defendant Iberdrola intentionally interfered with Outland's contractual relations and prospective contractual relations by, among other things, engaging in unfair competition against Outland, by committing commercial disparagement, misrepresentations of fact, making false statements, making statements to put Outland in a false light, improper inducement of employees, breaches of contract and breaches of good faith and fair dealing, knowingly and purposely and secretly taking actions and conspiring to take actions designed to destabilize Outland and eliminate it as a competitor,  interfering with Outland's acquisition agreements, interfering with Outland's agreements with others, such as Hansen, falsely informing prospective customers that Outland was contractually prevented by Gamesa from servicing their turbines, engaging in unfair trade practices, engaging in unlawful restraints on trade, and violating Federal and state anti-trust laws.

**A80**

151.    Gamesa and Gamesa Spain, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing its contractual relations and prospective contractual relations.

152.    As a direct and proximate result of Gamesa's and Gamesa Spain's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT III
## TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONS (OUTLAND'S ACQUISITION)

153.    Outland restates and realleges the foregoing paragraphs.

154.    Outland has contractual relations, and prospective contractual relations, with third parties, specifically, parties interested in an investment in, or acquisition of, Outland.

155.    Gamesa, Gamesa Spain and Iberdrola were and are aware of those contractual relations and prospective contractual relations.

156.    Gamesa, Gamesa Spain and Iberdrola intentionally interfered with Outland's contractual relations and prospective contractual relations by, among other things, engaging in unfair competition against Outland by committing by engaging in unfair competition against Outland, by committing commercial disparagement, misrepresentations of fact, making false statements, making statements to put Outland in a false light, improper inducement of employees, breaches of contract and breaches of good faith and fair dealing, knowingly and purposely and secretly taking actions and conspiring to take actions designed to destabilize Outland and eliminate it as a competitor, interfering with Outland's acquisition agreements, interfering with Outland's agreements with others, such as Hansen, falsely informing prospective customers that Outland was contractually prevented by Gamesa from servicing their turbines,

engaging in unfair trade practices, engaging in unlawful restraints on trade, and violating Federal and state anti-trust laws.

157.    Gamesa, Gamesa Spain and Iberdrola, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing its contractual relations and prospective contractual relations with respect to the acquisition of Outland or an interest in Outland.

158.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH
## OUTLAND'S DIRECTIVES, TRAINING AND SAFETY PROTOCOLS

159.    Outland restates and realleges the foregoing paragraphs.

160.    Gamesa and Iberdrola knowingly and purposefully interfered with Outland's directives, training and safety protocols by directing Outland's on-site technicians to use a group LOTO procedure.

161.    As a direct and proximate result of Gamesa's and Iberdrola's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT V
## BREACH OF CONTRACT (TRANSACTIONAL WORK)

162.    Outland restates and realleges the foregoing paragraphs of its Complaint.

163.    Outland and Gamesa have agreements for transactional work. Transactional work is the recurring work that Gamesa provided for shorter duration assignment through Purchase

**A82**

Orders.

164.    Outland made investments in its business based upon Gamesa's representations of a continued amount of transactional business.

165.    Gamesa's actions described herein represent a clear repudiation and breach by Gamesa of the agreements for transactional work with Outland.

166.    Outland has justifiably and reasonably relied on Gamesa's continued issuance of Purchase Orders for ongoing future work.

167.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT VI
## INDEMNIFICATION UNDER MSA

168.    Outland restates and realleges the foregoing paragraphs.

169.    Section 7.4 of the MSA  states that Gamesa will indemnify Outland for losses, fines, damages, claims, penalties or liability for bodily injury or property damage to the other Party or any third party to the extent arising out of Gamesa's negligence, gross negligence or intentional misconduct.

170.    Outland has suffered and continues to suffer damage, losses, fines as the result of Gamesa's negligence, gross negligence or intentional misconduct, including, without limitation (i) payments paid or payable to OSHA as a result of the McCoy accident, (ii) damage to its reputation, (iii) damage from the failure of the purchase of all the assets of Outland by Duke and the institutional investor, (iv) lost profits, (v) other damages in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial, all of which Gamesa is obligated to indemnify Outland for under Section 7.4 of the MSA.

**A83**

## COUNT VII
## <u>BREACH OF DUTY TO DEAL FAIRLY</u>

171.    Outland restates and realleges the foregoing paragraphs.

172.    Gamesa has a duty to deal with Outland fairly and in good faith, including a duty to provide Outland with information about risks of physical harm or pecuniary loss that the Gamesa knows, has reason to know, or should know are present in the Outland's work but unknown to Outland.

173.    Gamesa's failure to disclose each and every step of its secret plan to hire Outland technicians, destabilize Outland, interfere with Outland's contracts, interfere with Outland's prospective economic relations is, individually and collectively, a breach of that duty.

174.    As a result of Gamesa's breach of that duty, Outland has been and continues to suffer damage.

175.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT VIII
## <u>SECTION 2 OF THE SHERMAN ACT AND</u>
## <u>CLAYTON ACT, SECTION 3 (TREBLE DAMAGES)</u>

176.    Outland restates and realleges the foregoing paragraphs.

177.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of Section 2 of the Sherman Act.

**A84**

178.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

179.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

180.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

181.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

182.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

183.    Outland demands an award of treble damages in accordance with law.

**COUNT IX**
**SECTION 1 OF THE SHERMAN ACT AND**
**CLAYTON ACT, SECTION 3 (TREBLE DAMAGES)**

184.    Outland restates and realleges the foregoing paragraphs.

185.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated Section 1 of the Sherman Act and Section 3 of the Clayton Act.

186.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

187.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of the Sherman Act and Clayton Act.

**A85**

188.     Gamesa has market power over the O&M Services market for Gamesa wind turbines.

189.     Gamesa has market power over the market for parts for Gamesa wind turbines.

190.     Gamesa had at the time relevant market power over the market for wind turbines in the United States.

191.     At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

192.     At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

193.     Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

194.     Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

195.     As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

196.     Outland demands an award of treble damages in accordance with law.

**COUNT X**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

197.     Outland restates and realleges the foregoing paragraphs.

**A86**

198.    Gamesa owes Outland a duty of good faith and fair dealing in the conduct and transaction concerning the Agreement.

199.    Gamesa's conduct, as set forth herein in this Complaint, constitutes breaches of its duty of good faith and fair dealing it owes to Outland.

200.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

201.    Outland has been, and will continue to be, irreparably harmed and damaged by Gamesa's breaches of this duty of good faith and fair dealing, and is without a complete and adequate remedy at law.

202.    Gamesa must be enjoined from continued breaches of its duty of good faith and fair dealing.

203.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial, relative to these breaches of their duties of good faith and fair dealing, along with attorneys' fees and costs incurred, to be proven with specificity at trial.

## COUNT XI
## COMMERCIAL DISPARAGEMENT

204.    Outland restates and realleges the foregoing paragraphs.

205.    Gamesa has published false and disparaging statements about Outland concerning its performance under the Agreement, with the intent the publication would cause pecuniary loss and harm or reasonably recognized that the publication would result in pecuniary loss and harm.

206.    Outland has been, and will continue to be, irreparably harmed and damaged by Gamesa's false and disparaging statements.

207.    Gamesa knew the statements were false, or acted with reckless disregard of its truth or falsity.

208.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

**A87**

209.    As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue with those new investments, the loss of opportunities to acquire new contracts, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

210.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial, along with attorneys' fees and costs incurred, to be proven with specificity at trial.

## COUNT XII
## <u>INJURIOUS FALSEHOOD</u>

211.    Outland restates and realleges the foregoing paragraphs.

212.    Gamesa has published false statements harmful to Outland.

213.    Gamesa intended for the publication of those statements to result in harm to Outland, or recognized or should have recognized that it was likely to do so.

214.    Gamesa knows that the statements were false, acted in reckless disregard of its truth or falsity, or acted negligently regarding the truth or falsity of the statements.

215.    Gamesa made those statements with motive of ill will toward Outland.

216.    Gamesa made those statements with an intent to interfere in an unprivileged manner with Outland's interests.

217.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

218.    As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue

with those new investments, the loss of opportunities to acquire new contracts, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

219.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial along with attorneys' fees and costs incurred, to be proven with specificity at trial.

## COUNT XII
## DISPARAGEMENT OF PROPERTY

220.    Outland restates and realleges the foregoing paragraphs.

221.    Gamesa has published false statements harmful to Outland's business reputation, quality of service, quality of safety.

222.    Gamesa intended for the publication of those statements to result in harm to Outland, or recognized or should have recognized that it was likely to do so.

223.    Gamesa intended the statements to cast doubt, and the recipient's understanding of it as casting doubt was reasonable.

224.    Gamesa knows that the statements were false, acted in reckless disregard of its truth or falsity, or acted negligently regarding the truth or falsity of the statements.

225.    Gamesa made those statements with motive of ill will toward Outland.

226.    Gamesa made those statements with an intent to interfere in an unprivileged manner with Outland's interests.

227.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

228.    As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue

**A89**

with those new investments, the loss of opportunities to acquire new contracts, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

229.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial along with attorneys' fees and costs incurred, to be proven with specificity at trial.

**COUNT XIII**
**<u>DEFAMATION</u>**

230.    Outland restates and realleges the foregoing paragraphs.

231.    Gamesa has published false statements harmful to Outland.

232.    Gamesa intended for the publication of those statements to result in harm to Outland, or recognized or should have recognized that it was likely to do so.

233.    Gamesa knows that the statements were false, acted in reckless disregard of its truth or falsity, or acted negligently regarding the truth or falsity of the statements.

234.    Gamesa made those statements with motive of ill will toward Outland.

235.    Gamesa made those statements with an intent to interfere in an unprivileged manner with Outland's interests.

236.    The statements tend to prejudice Outland in the conduct of its business or deters others from dealing with it.

237.    The recipients of the statements correctly, or mistakenly but reasonably, understood that the statements referred to Outland.

238.    Such statements ascribed to Outland conduct, characteristics or a condition that would adversely affect its fitness for the proper conduct of its lawful business.

239.    Gamesa Spain has conspired with, and aided and abetted, Gamesa in its efforts.

240.    As a result of Gamesa's actions, Outland has suffered damage, including, without limitation, damage to its reputation, damage to the value of its business, the loss of investments in Outland by third parties, the loss of opportunities that Outland would have been able to pursue with those new investments, the loss of revenue for the sale of its business, and loss of revenue due to wind farm Iberdrola requesting that Outland be removed from its sites.

241.    Gamesa must pay damages in an amount exceeding $75,000, to be determined with specificity at trial along with attorneys' fees and costs incurred, to be proven with specificity at trial.

**COUNT XIV**
**ACCOUNTING FOR BONUSES**

242.    Outland restates and realleges the foregoing paragraphs.

243.    Under the FSA and the MSA, Outland was entitled to receive certain bonuses. Outland has not received and bonuses and Gamesa has not provided an accounting of bonuses due to Outland under the FSA or the MSA.

244.    In addition, under Section 3.3 of the MSA, Gamesa was under an obligation to attempt to negotiate in good faith an availability bonus payable to Outland.

245.    Gamesa breached its obligation.

246.    Outland seeks an accounting for all bonuses that are due and payable under the FSA and MSA, a determination of the availability bonuses that reasonably should have been negotiated for Outland's benefit and payment of such bonuses.

**COUNT XV**
**MINNESOTA ANTITRUST ACT OF 1971 (TREBLE DAMAGES)**

247.    Outland restates and realleges the foregoing paragraphs.

**A91**

248.    The Minnesota Antitrust Act of 1971, Minn. Stat. §325D.52 (the "Minnesota Antitrust Act") states: "The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful".

249.    Under Minn. Stat. §325D.57 the injured party is entitled to an award of treble damages.

250.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of the Minnesota Antitrust Act.

251.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

252.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

253.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

254.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

255.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

256.    Outland demands an award of treble damages in accordance with law.

**A92**

## COUNT XVI
## MINNESOTA ANTITRUST ACT OF 1971 (TREBLE DAMAGES)

257.    Outland restates and realleges the foregoing paragraphs.

258.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated the Minnesota Antitrust Act.

259.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

260.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of the Minnesota Antitrust Act.

261.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

262.    Gamesa has market power over the market for parts for Gamesa wind turbines.

263.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

264.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

265.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

266.    Not an insubstantial dollar volume of commerce in the O&M Service market for

**A93**

Gamesa wind turbines is affected.

267.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

268.    As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

269.    Outland demands an award of treble damages in accordance with law.

**COUNT XVII**
**TEXAS FREE ENTERPRISE AND ANITTRUST ACT**
**TEXAS BUSINESS AND COMMERCE CODE SECTION 15.05(a)**

270.    Outland restates and realleges the foregoing paragraphs.

271.    The Texas Free Enterprise and Antitrust Act, the Texas Business and Commerce Code, Section 15.05(a) ("Section 15.05(a)") provides:   "(a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."

272.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of Section 15.05(a).

273.    Gamesa's actions are designed to, among other things, prohibit or restrict Outland from bidding on O&M Service work in Texas.

274.    Gamesa's actions have been willful and flagrant.

275.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

276.    Gamesa has market power over the O&M Services market for Gamesa wind

**A94**

turbines.

277.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

278.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

279.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

280.    Outland demands an award of treble damages in accordance with law.

## COUNT XVIII
## TEXAS FREE ENTERPRISE AND ANITTRUST ACT
## TEXAS BUSINESS AND COMMERCE CODE SECTION 15.05(b)

281.    Outland restates and realleges the foregoing paragraphs.

282.    The Texas Free Enterprise and Antitrust Act, the Texas Business and Commerce Code, Section 15.05(b) ("Section 15.05(b)") provides:   "(b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."

283.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of Section 15.05(b).

284.    Gamesa's actions are designed to, among other things, prohibit or restrict Outland from bidding on O&M Service work in Texas.

285.    Gamesa's actions have been willful and flagrant.

286.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa

**A95**

in those efforts.

287.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

288.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

289.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

290.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

291.    Outland demands an award of treble damages in accordance with law.

**COUNT XIX**
**TEXAS FREE ENTERPRISE AND ANITTRUST ACT**
**TEXAS BUSINESS AND COMMERCE CODE SECTION 15.05(c)**

292.    Outland restates and realleges the foregoing paragraphs.

293.    The Texas Free Enterprise and Antitrust Act, the Texas Business and Commerce Code, Section 15.05(c) ("Section 15.05(c)") provides:  "(c) It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods, whether patented or unpatented, for use, consumption, or resale or to fix a price for such use, consumption, or resale or to discount from or rebate upon such price, on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce."

294.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland

**A96**

as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated the Section 15.05(c), Section 15.05(b) and Section 15.05(a).

295.     Gamesa's actions have been willful and flagrant.

296.     Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

297.     Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of Section 15.05(c), Section 15.05(b) and Section 15.05(a).

298.     Gamesa has market power over the O&M Services market for Gamesa wind turbines.

299.     Gamesa has market power over the market for parts for Gamesa wind turbines.

300.     Gamesa had at the time relevant market power over the market for wind turbines in the United States.

301.     At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

302.     At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

303.     Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

304.     Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

305.     As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

306.     Outland demands an award of treble damages in accordance with law.

## COUNT XX
## ILLINOIS ANTITRUST ACT 740 ILCS 10/3(2) AND 10/3(3)

307.     Outland restates and realleges the foregoing paragraphs.

308.     The Illinois Antitrust Act, 740 ILCS 10/3(3) (the "IAA Section 3") states that it is a violation of the Illinois Antitrust Act to: "(3) [e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce".

309.     The Illinois Antitrust Act, 740 ILCS 10/3(2) (the "IAA Section 2") states that it is a violation of the Illinois Antitrust Act to: "(2) [b]y contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce."

310.     Gamesa's actions are designed to, among other things, prohibit or restrict Outland from bidding on O&M Service work in Illinois.

311.     Gamesa's actions in violation of IIA Section 2 and IIA Section 3 have been willful.

312.     Under 740 ILCS 10/7(2) the injured party is entitled to an award of treble damages.

313.     Gamesa has engaged in a premeditated plan to systematically eliminate Outland

**A98**

as a competitor to Gamesa, and taken other actions to monopolize, or in an attempt to monopolize, the sale of O&M Services for Gamesa wind turbines in violation of the IIA Section 2 and IIA Section 3.

314.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

315.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

316.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

317.    Gamesa's and Gamesa Spain's actions constitute an unlawful and willful attempt to monopolize the O&M Service market for Gamesa wind turbines.

318.    As a direct and proximate result of Gamesa's, Gamesa Spain's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

319.    Outland demands an award of treble damages in accordance with law.

## COUNT XXI
## ILLINOIS ANTITRUST ACT 740 ILCS 10/3(4)

320.    Outland restates and realleges the foregoing paragraphs.

321.    The Illinois Antitrust Act, 740 ILCS 10/3(4) (the "IAA Section 4") states that it is a violation of the Illinois Antitrust Act to::  "(4) [l]ease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services (including master antenna television service), whether patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price charged thereof, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or

**A99**

deal in the goods, wares, merchandise, machinery, supplies, or other commodity or service (including cable television service or cable television relay service), of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for such sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

322.    Under 740 ILCS 10/7(2) the injured party is entitled to an award of treble damages.

323.    Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated the IIA Section 2, IIA Section 3 and IAA Section 4.

324.    Iberdrola and Gamesa Spain have conspired with, and aided and abetted, Gamesa in those efforts.

325.    Gamesa's, Gamesa Spain's and Iberdrola's actions constitute unfair trade practices, and a violation of IAA Section 2, IAA Section 3 and IAA Section 4.

326.    Gamesa has market power over the O&M Services market for Gamesa wind turbines.

327.    Gamesa has market power over the market for parts for Gamesa wind turbines.

328.    Gamesa had at the time relevant market power over the market for wind turbines in the United States.

329.    At the time relevant Gamesa and other wind turbine manufacturers that sold wind turbines in the United States, all improperly and unlawfully tied the sale of their wind turbines to the O&M Service for their wind turbines.

**A100**

330.    At all times relevant, there was such a scarcity of available wind turbines for purchase because demand exceeded supply by multiples that even those wind turbines manufacturers that had significantly less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

331.    Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

332.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

333.    As a direct and proximate result of Gamesa's and Iberdrola's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

334.    Outland demands an award of treble damages in accordance with law.

## COUNT XXII
## DECLARATORY JUDGMENT (28 U.S.C. § 2201) AND INJUNCTIVE RELIEF

335.    Outland restates and realleges the foregoing paragraphs.

336.    An actual case or controversy exists between Outland and Gamesa with respect to the FSA; a declaratory action would settle the case and controversy.

337.    Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, et. seq., Outland is entitled to a declaratory judgment declaring and adjudicating: (a) that the restrictions on competition in the FSA are invalid and unenforceable or have been superseded by the restrictions on competition in the MSA; and (b) that the restrictions on competition in the MSA are invalid and unenforceable.

338.    Outland seeks an order enjoining (i) Gamesa and Iberdrola from taking any

further actions interfering with Outland's contractual relations or prospective contractual relations, and making false or disparaging statements with respect to Outland, (ii) Gamesa from offering O&M Service in connection with any sale of Gamesa wind turbines in the United States, and (iii) Gamesa from offering any O&M Service in connection with any Gamesa wind turbine.

**WHEREFORE**, Plaintiff Outland prays that this Court enter judgment in its favor and against Defendant Gamesa as follows:

1.      Enjoining Gamesa from further (i) engaging in unfair trade practices, (ii) engaging in actions and practices that violate Federal or state anti-trust laws, (iii) violating, breaching or otherwise interfering with the terms, conditions and provisions of any agreements to which Outland is or may be a party, and (iv) engaging in any conduct that interferes with Outland's economic relations or prospective economic relations.

2.      Enjoining Gamesa from (i) tying O&M Service in connection with any future sale of Gamesa wind turbines in the United States, and (ii) offering any O&M Service in connection with any Gamesa wind turbine already sold in the United States.

3.      Awarding Outland its damages, including all exemplary and treble damages, where available at law.

4.      Requiring Gamesa to disgorge all amounts improperly gained by their improper action at Outland's expense.

5.      Granting the relief requested in each Count in these claims against Gamesa.

6.      Awarding Outland its attorneys' fees incurred as a result of Defendants' actions, where available at law.

7.      Awarding Outland its costs, disbursements and additional attorneys' fees incurred on tortious interference with contract and/or prospective business advantage, or as otherwise may

**A102**

be available at law.

        8.        Awarding Outland pre- and post-judgment interest.

        9.        Awarding Outland all other relief that the Court deems just, proper and equitable,

including where applicable equitable relief, such as disgorgement.

OUTLAND ENERGY SERVICES, LLC


/s/  Randolph C. Winton
Randolph C. Winton

Randolph C. Winton
Vice President & General Counsel
Outland Energy Services, LLC
302 1st Street East
Canby, MN 56220
612-655-6178
MN Bar #: 0387118
Pro hac vice for N.D. Ill. granted Sept. 19, 2011

**A103**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**NOTICE OF FILING**

TO:    SEE ATTACHED SERVICE LIST

PLEASE TAKE NOTICE that on September 22, 2011 we filed a Counterclaim with the

United States District Court Northern District of Illinois Eastern Division, a copy of which is

attached hereto and hereby served upon you.

**A104**

OUTLAND ENERGY SERVICES, LLC

/s/  Randolph C. Winton
Randolph C. Winton

Randolph C. Winton
Vice President & General Counsel
Outland Energy Services, LLC
302 1st Street East
Canby, MN 56220
612-655-6178
MN Bar #: 0387118
Pro hac vice for N.D. Ill. granted Sept. 19, 2011

**A105**

<u>**SERVICE LIST**</u>

       I hereby certify that on September 22, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Alexander Nicholas Hattimer
Dominic R. Fichera
Fichera & Miller, P.C.
415 N. LaSalle St., Suite 301
Chicago, IL 60654
312-673-2222
Fax:  312-673-4545
alex.hattimer@ficheramiller.com
domfichera@aol.com

*Attorney for Plaintiff*

Jennifer Jerit Johnson
Andrew Scott Paine
Tressler LLP
233 S. Wacker Drive, 22nd Floor
Chicago, IL 60606-6308
312-627-4000
Fax:  312-627-1717
jjohnson@tresslerllp.com
apaine@tresslerllp.com

*Attorneys for Iberdrola Renewables, Inc. and Streator-Cayuga Ridge Wind Power LLC*

Julie Beth Negovan
Paul Sullivan Gerding, Jr.
Kutak Rock LLP
One S. Wacker Dr., Suite 2050
Chicago, IL 60606
312-602-4100
julie.negovan@kutakrock.com
paul.gerding@kutakrock.com

*Attorneys for Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC*

**A106**

Todd Edward Carlson
Grant & Fanning
10 South Riverside Dr., Suite 1770
Chicago, IL 60606
312-775-9743
Fax:  312-775-9777
todd.carlson@zurichna.com

**Attorneys for Gamesa Technology Corporation, Inc.**

Michael T. McDonnell, III
Kutak  Rock LLP
50 S. 16th Street
Two Liberty Tower, Suite 2700
Philadelphia, PA 19102
215-299-4384
michael.mcdonnell@kutakrock.com

**Attorneys for Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC**

Michael A. Strom
Law Offices of David A. Izzo& Associates
333 S. Wabash Ave., 25th Floor
Chicago, IL 60604
312-822-3350
michael.strom@cna.com

**Attorney for Outland Renewable Energy, LLC, Outlaw Energy Services, LLC, and Outland Renewable Energy Field Services, LLC**

Joseph G. Skryd
Mulherin, Rehfeldt & Varchetto, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
630-653-9300
jskryd@mrvlaw.com

**Attorney for Outland Renewable Energy, LLC, Outlaw Energy Services, LLC, and Outland Renewable Energy Field Services, LLC**

4

**A107**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 11-CV-00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants/Cross-Defendants. | ) | |

**<u>ORDER</u>**

The matter coming before the Court on the Motion for Good Faith Finding of the
Third-Party Defendants/Cross-Defendants, OUTLAND RENEWABLE ENERGY, LLC
n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY
FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND
ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES,

LLC, due notice having been given and the Court being fully advised on the premises, IT IS HEREBY ORDERED:

1.      The settlement reached between the Plaintiff, AARON MCCOY, and Third-Party Defendants/Cross-Defendants, OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, is an arms-length resolution of a disputed matter and has been made in good faith pursuant to the Illinois Joint Tortfeasors Contribution Act, 740 ILCS 100/.01, *et seq.*;

2.      Any and all Counterclaims, Cross-Claims, and/or Third-Party Complaints for contribution, indemnity, contractual indemnity, indemnification, indemnification pursuant to the Maintenance Service Agreement dated November 19, 2009, all indemnification and contractual indemnification counts that were voluntarily dismissed, and all other causes of action arising out of and related to AARON MCCOY's claims in this action filed by and/or on behalf of the Defendants, GAMESA TECHNOLOGY CORPORATION, INC., GAMESA WIND US, LLC, IBERDROLA RENEWABLES, INCORPORATED, and/or STREATOR-CAYUGA RIDGE WIND POWER, LLC, against OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, OUTLAND RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC, INDIVIDUALLY, AND AS SUCCESSOR TO AND ASSIGNEE OF OUTLAND RENEWABLE ENERGY, LLC (hereinafter referred to collectively as "OUTLAND"), are hereby dismissed with prejudice, and any and all future claims for contribution, indemnity, contractual indemnity, indemnification, indemnification pursuant to the Maintenance Service Agreement dated November 19, 2009, or other causes of action arising out of or relating to AARON MCCOY's claims in this action against OUTLAND, including Counterclaims,

**A109**

Cross-Claims, or Third-Party Complaints, if any, by any person or entity, are hereby barred; and

3.      Any and all claims for contribution arising out of or relating to AARON MCCOY's claims in this action filed by and/or on behalf of the Third-Party Defendants/Cross-Defendants, OUTLAND, against the Defendants, GAMESA TECHNOLOGY CORPORATION, INC., GAMESA WIND US, LLC, IBERDROLA RENEWABLES, INCORPORATED, and STREATOR-CAYUGA RIDGE WIND POWER, LLC, are hereby dismissed with prejudice.

4.      Nothing in this Order shall limit, impinge, pertain to or effect the claims and causes of action arising out of or relating to the allegations set forth in the Counterclaims of OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, entitled "Counterclaims of Outland Against Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC" filed on or about September 22, 2011, Document No. 112 in this litigation, and nothing in this Order shall limit, impinge, pertain to, or effect the claims or causes of action arising out of or relating to the allegations asserted by GAMESA TECHNOLOGY CORPORATION, INC. and GAMESA WIND US, LLC, against OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC in the pleading entitled "Gamesa Technology Corporation, Inc.'s and Gamesa Wind US, LLC's Answer, Affirmative and Additional Defenses, and Counterclaim to Outland's Counterclaim" filed on or about February 9, 2012, Document No. 215 in this litigation.

5.    The Court finds that there is no just reason to delay enforcement of, or appeal from, this Order pursuant to Federal Rule of Civil Procedure 54(b).


ENTERED BY:


_____
                    Judge


_____
                    February 5, 2013                    .
                    Date




Prepared by:
**Mulherin, Rehfeldt & Varchetto, P.C.**
211 South Wheaton Avenue, Suite 200
Wheaton, IL 60187
(630) 653-9300

**A111**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY,<br><br>     Plaintiff<br><br>v.<br><br>GAMESA TECHNOLOGY CORPORATION, INC., and<br>IBERDROLA RENEWABLES, INC.,<br><br>     Defendants. | : : : : : : : : : : : : | District Judge<br>The Honorable Charles P. Kocoras<br><br>Magistrate Judge:<br>The Honorable Arlander Keys<br><br>Case No. 11-CV-00592<br><br>JURY DEMAND |
| IBERDROLA RENEWABLES, INC. and<br>GAMESA TECHNOLOGY CORPORATION, INC.,<br><br>     Third-Party Plaintiffs,<br><br>v.<br><br><br>OUTLAND RENEWABLE ENERGY, LLC.<br>OUTLAND ENERGY SERVICES, LLC<br>OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC,<br><br>     Third-Party Defendants. | : : : : : : : : : : : : : | |
| IBERDROLA RENEWABLES, INC.<br><br><br>     Third-Party Plaintiffs,<br><br>v.<br><br><br>GAMESA WIND US, LLC<br><br>     Third-Party Defendants. | : : : : : : : : : : : : | |
| GAMESA TECHNOLOGY CORPORATION, INC.,<br><br><br>     Third-Party Plaintiffs,<br><br>v.<br><br><br>STREATOR - CAYUGA RIDGE WIND POWER, LLC<br><br>     Third-Party Defendants. | : : : : : : : : : : : : : | |

**A112**

**<u>ORDER</u>**

The matter coming before the Court on the Motion for Finding of Good Faith Settlement by Defendants Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC, due notice having been given and the Court being fully advised on the premises, IT IS HEREBY ORDERED:

1.      The settlement reached between the Plaintiff AARON MCCOY and Defendants Gamesa Wind US, LLC and Gamesa Technology Corporation, Inc. is an arms-length resolution of a disputed matter and has been made in good faith pursuant to the Illinois Joint Tortfeasors Contribution Act, 740 ILCS 100/.01, *et seq*.;

2.      All contract, contribution or indemnification claims based upon the Joint Tortfeasors Contribution Act, the Turbine Supply and Delivery Agreement between Streator-Cayuga Ridge Wind Power, LLC and Gamesa Wind US, LLC, or the Maintenance Service Agreement dated November 19, 2009 between Gaemsa Wind US, LLC and Outland Energy Services, LLC, whether presented by Counterclaims, Cross-Claims, and/or Third-Party Complaints, and whether or not previously voluntarily dismissed, arising out of and related to the allegations in Plaintiff's Complaint at Law against Gamesa Wind and Gamesa Technology, excluding those claims and causes of action arising out of and relating to the allegations in the pleadings set forth in Paragraph 4 of this Order, be and hereby are DISMISSED WITH PREJUDICE and the parties hereto are barred from filing any and all future claims for contribution, indemnity, contractual indemnity, indemnification, indemnification pursuant to the Turbine Supply and Delivery Agreement, or indemnification pursuant to the Maintenance Service Agreement dated November 19, 2009, or other causes of action against Gamesa Wind and Gamesa Technology arising out of or relating to the allegations in Plaintiff's Complaint at

<u>**A113**</u>

Law, excluding those claims and causes of action arising out of and relating to the allegations in the pleadings set forth in Paragraph 4 of this Order.

3.     Any and all claims for contribution and indemnification filed by and/or on behalf of Gamesa Wind and Gamesa Technology, against Iberdrola Renewables, Inc., Streator-Cayuga Ridge Wind Power, LLC, Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC, and Outland Energy Services, LLC f/k/a Outland Renewable Energy Field Services, LLC arising out of or relating to the allegations set forth in Plaintiff's Complaint at Law be and hereby are DISMISSED WITH PREJUDICE.

4.     Nothing in this Order shall limit, impinge, pertain to or effect the claims and causes of action arising out of or relating to the allegations asserted by Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC, and Outland Energy Services, LLC f/k/a Outland Renewable Energy Field Services, LLC against Gamesa Wind US, LLC and Gamesa Technology Corporation, Inc. in the pleading entitled "COUNTERCLAIM" filed on or about September 22, 2011 (Docket No. 112) and dismissed by the Court on September 27, 2012 (Docket No. 275) and nothing in this Order shall limit, impinge or effect the claims or causes of action arising out of or related to the allegations asserted by Gamesa Wind US, LLC and Gamesa Technology Corporation, Inc. against Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Renewable Energy Field Services, LLC n/k/a Outland Energy Services, LLC, and Outland Energy Services, LLC f/k/a Outland Renewable Energy Field Services, LLC in the pleading entitled "ANSWER TO COUNTERCLAIM and COUNTERCLAIM" filed on or about February 9, 2012 (Docket No. 215); and

5.      There is no just reason to delay enforcement of, or appeal from, all dismissal

orders referenced above pursuant to Federal Rule of Civil Procedure 54(b).


ENTERED BY:



_____
                Judge



    February 5, 2013                                          .
                Date




Prepared by:
**Kutak Rock, LLP**
Julie B. Negovan, Esq.
Matthew M. Enenbach, Esq., NE#22891
Suite 2050
One South Wacker Avenue
Chicago, IL 60606-4614
(312) 602-4100

4

**A115**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., GAMESA WIND US, LLC, IBERDROLA | ) | |
| RENEWABLES, INCORPORATED, and | ) | |
| STREATOR-CAYUGA RIDGE WIND | ) | |
| POWER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |

**MOTION FOR LEAVE TO FILE FIRST AMENDED COUNTERCLAIMS OF**
**OUTLAND AGAINST GAMESA TECHNOLOGY CORPORATION, INC. AND**
**GAMESA WIND US LLC**

Now comes Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC,

Outland Energy Services, LLC n/k/a Northwind Holdings LLC ("Outland"), by its attorney

Thomas Melone, and moves this court pursuant to Fed. R. Civ. P. 15(a)(2), for leave to amend its

counterclaims against Gamesa Technology Corporation, Inc., and Gamesa Wind US LLC ("Gamesa"),  On September 22, 2011, Outland filed a 23-count counterclaim against Gamesa. On September 26, 2012, the Court granted Gamesa's motion for judgment on the pleadings for all counts except Count VI relating to Outlands' indemnification claims.

Outland's amended counterclaim against Gamesa has remedied the deficiencies in the original counterclaim.

<u>Legal Standard</u>

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts have wide discretion in deciding whether to grant leave to amend. *Johnson v. Cypress Hill*, 641 F.3d 867, 871-72 (7th Cir. 2011). The court may deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendant, or where the amendment would be futile. *Id*. Delay, alone, is generally insufficient reason to deny a motion to amend, but the longer the delay, the greater the presumption against granting leave to amend. *Id*.

As the Court is aware, Outland and Gamesa have settled the claims of Plaintiff McCoy, which now allows the parties to focus on the various business claims between them. Here there is no prejudice to the defendant from filing the amended claims against Gamesa.  In addition, there has not been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies. The parties focused on resolving the claims of Plaintiff McCoy and a settlement has been achieved.

The amendment would not be futile. As discussed herein, the amended allegations support the amended claims against Gamesa.

The amended complaint omits the business defamation related claims, most of the anti-trust claims, and certain other claims.  Set forth below is a discussion of the amended claims that

have been retained.

### THE OUTLAND PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE

In dismissing the tortious interference claims with respect to the acquisition by Duke Energy ("Duke"), the Court focused on the fact that there was no allegation in the counterclaim that Gamesa had knowledge of the May 11, 20111, agreement (the "Restated Acquisition Agreement") when Gamesa issued its letter of May 12, 2011. The amended counterclaim addresses that fact. More importantly, however, whether or not Gamesa had actual knowledge of the Restated Acquisition Agreement is not determinative. Gamesa had actual knowledge that Outland and Duke had entered into an agreement in February 2011 (the "Original Acquisition Agreement") for Duke to acquire a significant stake in Outland, and that Duke might acquire all of Outland. In addition, by April 15, 2011, various parties (including Gamesa) in the wind turbine services market believed that Duke was in fact purchasing 100% of Outland. The Restated Acquisition Agreement was merely an amendment to the written agreement that Gamesa already existed.

In addition, Gamesa had knowledge that Duke had also agreed with Outland that Outland would be receiving all of the operations and maintenance contracts for the Duke Energy fleet of wind farms (the "Duke Fleet Services Agreement").

In dismissing Outland's claims, the Court noted that Duke rejected Gamesa's attempts to scuttle Duke's plans to acquire a stake in Outland, and that Outland "cannot plausibly claim that it was harmed by Gamesa's efforts to stifle the acquisition where Gamesa's attempts were rebuffed."2 The amended claims clarify that Gamesa's unsuccessful attempt to scuttle Duke's

---

[1] *See, McCoy v. Gamesa Technology Corporation, Inc.*, 2012 U.S. Dist. LEXIS 138417, *13 (N.D. Ill. 2012) (stating "[t]hat the letter was sent one day after the acquisition agreement was signed is not enough to infer Gamesa's knowledge of the agreement.")

[2] *See, McCoy v. Gamesa Technology Corporation, Inc.*, 2012 U.S. Dist. LEXIS 138417, *12 (N.D. Ill. 2012).

**A118**

plans in April 2011 was not the basis of Outlands' claim for damages. Rather, that incident (i) confirmed Gamesa's knowledge of the agreement for Duke's acquisition, (ii) confirmed Gamesa's knowledge that Outland would be receiving the services business for Duke's fleet of wind farms, and (iii) confirmed that the Gamesa Defendants were intent on taking all necessary steps to interfere with the acquisition and the economic relations that the Outland plaintiffs would realize therefrom. The April 2011 direct contact with Duke was just one aspect that revealed Gamesa's true intention.

Neither Duke nor Sterling Partners proceeded to close an acquisition of all or any part of the member interests of Outland. In addition, Duke did not enter into a services agreement with Outland to provide services for its fleet of wind farms. On November 1, 2012, however, Duke acquired substantially all the business assets and employees of Outland. As the direct result of the Gamesa Defendant's tortious actions, the final acquisition price was reduced by approximately $15 million.

Outlands' tortious interference claims are divided as follows:

1. Tortious interference with contract.

   a. Against Gamesa for causing Duke and Sterling Partners to fail to proceed to close the acquisition of all the member interests of Outland at the price set forth in the Restated Acquisition Agreement;

   b. In the alternative, against Gamesa for causing Duke to fail to proceed to close the acquisition of a portion of the member interests of Outland at the price set forth in the Original Acquisition Agreement;

   c. Against Gamesa for causing Duke to breach its commitment to enter into the Duke Fleet Services Agreement with Outland for Duke's fleet of wind farms; and

4

**A119**

2.  Tortious interference with prospective economic relations.

    a.  Against Gamesa for causing Duke and Sterling Partners to fail to proceed to close the acquisition of all the member interests of Outland at the price set forth in the Restated Acquisition Agreement;

    b.  In the alternative, against Gamesa for causing Duke to fail to proceed to close the acquisition of a portion of the member interests of Outland at the price set forth in the Original Acquisition Agreement;

    c.  Against Gamesa for causing Duke to breach its commitment to enter into the Duke Fleet Services Agreement with Outland for Duke's fleet of wind farms; and

Illinois state courts generally follow the choice of law principles of the *Restatement (Second) of Conflict of Laws*. *See*, *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 686 (2001). The general rule for torts, such as the tortious interference claims, is that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." *See, Restatement (Second) of Conflict of Laws* § 145.  Here, Outland is based in Minnesota.  On the other hand, Gamesa is based in Pennsylvania, and the MSA governing law is Pennsylvania.  Both jurisdictions, however, follow the Restatement (Second) of Torts with respect to tortious interference with contract and with prospective economic relations.  *See, Thompson Coal Co. v. Pike Coal Co*., 488 Pa. 198, 412 A.2d 466 (1979); *Gieseke v. IDCA, Inc,*, 2013 Minn. App. LEXIS 2, *12  (Minn. App. 2013)

A cause of action for tortious interference with a contractual relationship requires five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."  *Kjesbo v.*

A120

*Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

One of the elements of a claim for tortious interference is that the defendant had knowledge of the contract. It is not necessary to show actual knowledge. It is enough to show that he "had knowledge of facts which if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *Kallok v. Medtronic, Inc*., 573 N.W. 2d 356, 362 (Minn. 1998). "[T]he law will impute bad faith when the wrongdoer has knowledge that the contract existed." *Id.* at 365. When a defendant knows of a contract between the plaintiff and a third party, the defendant "is on notice as to the terms of the agreement and has a duty to learn whether his actions will cause the [third party] to breach his agreement.'" *JIT Concepts, Inc. v. Shelby County Healthcare Corp*., 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005) (quoting *Wells Fund I v. The Shoe Show of Rocky Mount, Inc*., 863 S.W.2d 731, 733 (Tenn. Ct. App. 1993)). "[T]he alleged inducer may not close its eyes and ears and thereafter claim a lack of knowledge when the [contract] could have been easily obtained." *Id.* (internal quotations omitted). *See also Rain Bird Corp. v. Nat'l Pump Co*., No. 2:02CV018, 2003 U.S. Dist. LEXIS 26792, at *49 (N.D. Miss. 2003) ("A finding of willful ignorance is sufficient to infer knowledge of the contract."); *Major Computer, Inc. v. Academy Life Ins. Co*., 929 F.2d 1249, 1252 (8th Cir. 1991) ("'It is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties.'" (quoting *Swaney v. Crawley*, 154 Minn. 263, 191 N.W. 583, 584 (Minn. 1923)).

Here, Gamesa had actual knowledge of the Original Acquisition Agreement because Outland informed Gamesa of the Agreement. Gamesa also had actual knowledge that Duke agreed to enter into the Duke Fleet Services Agreement for Duke's fleet of wind farms.

**A121**

Moreover, Gamesa's attempt to scuttle the transaction with Outland by directly engaging Duke, and by its attempts to destabilize Outland provides direct evidence of Gamesa's bad faith.

In addition, by April 2011, upon information and belief, the Gamesa Defendants believed that Duke was acquiring all of Outland.  Timing as to when the Gamesa Defendants had knowledge of the amendments to the Original Acquisition Agreement that were embodied in the Restated Acquisition Agreement is a factual question that cannot be resolved at the pleading stage, and is not determinative.  Quite simply, Gamesa knew that Duke and Outland entered into an agreement, and Gamesa intentionally took actions that it hoped would, and did, interfere with it.

Gamesa had knowledge of the Original Acquisition Agreement and the Duke Fleet Services Agreement.  Gamesa therefore had knowledge or had reason to be aware of the Restated Acquisition Agreement. At the very least, Gamesa had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of Outland.  Gamesa cannot avoid liability for interference with the Restated Acquisition Agreement simply because they may not have known the precise amendments to the Original Acquisition Agreement embodied therein.

The Amended Counterclaim alleges Gamesa's involvement in procuring the breaches of the Acquisition Agreements and the Duke Fleet Services Agreement.  Gamesa took its actions for the specific purpose of inducing Duke and Sterling Partners to fail to proceed with the terms of the Acquisition Agreements, and Duke to not enter into the Duke Fleet Services Agreement for its fleet of wind farms.  Moreover, Gamesa, without justification or privilege, engaged in these improper actions by employing wrongful means in breaching its fiduciary duty to Outland that existed under the principal-agent relationship.  Furthermore, while Gamesa has attempted to

**A122**

cloak some of their actions under the guise of maintaining safety at their wind farms, it is a factual question as to whether that assertion was made in good faith or whether it was just a subterfuge for Gamesa's overarching plan to prevent Outland from consummating either the Acquisition Agreement or the Duke Fleet Services Agreement, and causing harm to Outland.

**THE OUTLAND PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS.**

Under Pennsylvania and Minnesota law, a plaintiff may recover from one who intentionally or improperly interferes with the plaintiff's prospective contractual relationships by inducing or causing a third person not to enter into or continue the prospective relationship or by preventing the plaintiff from acquiring or continuing the prospective relationship. *S.N.T. Industries, Inc. v. Geanopulos*, 525 A.2d 736, 739 (Pa. Super. 1987); *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1982) (citing *Restatement (Second) of Torts* § 766B. The interference with another's prospective contractual relation "is intentional if the actor desires to bring it about or if he know that the interference is certain or substantially certain to occur as a result of his action." *Restatement (Second) of Torts* § 766B, comment d. The interference must also be improper. *Restatement (Second) of Torts § 766B*, comment d.

Here there are three additional torts that Gamesa committed that provide the basis to conclude that their interference was improper: the tortious interference with contract (*Restatement (Second) of Torts, §766*), the breach of fiduciary duties of Gamesa as a principal in the principal-agent relationship that existed between Gamesa and Outland (*Restatement (Second) of Torts*, §874), and liability for intended consequences, which is sometimes referred to a prima facie tort (*Restatement (Second) of Torts*, §870) .

Whether the interference was improper and the certainty of the desired result are factual questions that cannot be resolved at the pleading stage.

**A123**

The amended claims specify Gamesa's involvement in attempting to and then successfully scuttling the consummation of the Acquisition Agreements and the Duke Fleet Services Agreement. Those actions of Gamesa caused Duke and Sterling not to enter into or continue the prospective relationship or prevented Outland from acquiring or continuing the prospective relationships.

**THE OUTLAND PLAINTIFFS' CLAIM FOR PRIMA FACIE TORT**

The amended counterclaim has added the claim of prima facie tort as defined by the *Restatement (Second) of Torts*, §870.

In 1889 Lord Bowen wrote the famous dictum which has become the classic statement of the prima facie tort doctrine:

> "Now intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that person's property or trade, is actionable if done without just cause or excuse."[3]

Lord Bowen's rule now finds itself in the *Restatement (Second) of Torts* § 870, which states:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

The United States Supreme Court has more recently, citing the *Restatement (Second) of Torts*, Sec. 870, recognized that "[g]eneral [p]rinciple" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." *See, Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008).

---

[3] *See, Mogul Steamship Co. v. McGregor, Gow & Co.*, 23 Q.B.D. 598, 613 (1889), *aff'd* [1892] A.C. 25.

**A124**

Neither the Pennsylvania nor the Minnesota Supreme Courts has ruled on whether those states would recognize the cause of action of prima facie tort.  However, since the United States Supreme Court's statement in *Bridge*, the Federal Courts in Pennsylvania have allowed the cause of action of prima facie tort to proceed. *See, Devon IT, Inc. v. IBM Corp*. 805 F. Supp. 2d 110 (E.D.Pa. 2011).[4]

## ANTITRUST CLAIMS

In dismissing Outland's antitrust claims the Court stated that Outland failed to make a threshold showing that Gamesa participated in an unlawful conspiracy or that it possessed monopoly power[5].  The Court stated that Outland's statement that Gamesa possessed at its height approximately 10% of the wind turbine market in the United States was far below what is necessary for the Court to infer that it possessed monopoly power, and that Outland's attempt to save its claim by alleging that demand for wind turbines so far outpaced supply was "at odds with Gamesa's supposed motivation for starting an internal O&M services division".[6]

The amended claims make it clear that the anti-trust claim relates to the turbine sales period between 2007 and October 2008 (the onset of the economic recession) during which demand for wind turbines far outpaced supply by multiples resulting in sufficient market power for Gamesa to illegally tie its sale of wind turbines to the provision of services.  Wind turbines ordered during that time would have been placed in service during the periods from 2008 through 2010. The improper tying arrangement precluded Outland from seeking and/or acquiring that service business during the years 2008 through 2010 and resulted in wind turbine purchasers paying higher service costs, which were ultimately passed on to consumers.

---

[4] There is no reported case in Minnesota post the 2009 statement by the United States Supreme Court.  An earlier reported case, *Keckhafer v. Prudential Ins. Co. of Am*., 2002 U.S. Dist. LEXIS 19320 (D. Minn. Oct. 1, 2002), did not allow the cause of action for prima facie tort to proceed.
[5] *See, McCoy v. Gamesa Technology Corporation, Inc*., 2012 U.S. Dist. LEXIS 138417, *13 (N.D. Ill. 2012).
[6] *Id*. at  15.

**A125**

The situation here is contrary to the facts of the *Sheridan v. Marathon Petroleum Co*., 530 F.3d 590, 594 (7th Cir. 2008), because here, at all times relevant, there was a scarcity of available wind turbines for purchase.  Demand so exceeded supply that even those manufacturers that had less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market. Gamesa's competitors did not "have the productive capacity to be able to replace its reduction in output with an increase in their own output at no higher cost." *Sheridan*, 530 F.3d at 594.  Here an increase in output by a competitor was simply not physically possible during the relevant time periods.

**PROMISSORY ESTOPPEL**

The amended claims include a claim based on promissory estoppel Outland was an existing subcontractor for Gamesa.  Gamesa told Outland that Outland was its primary subcontractor and that Gamesa would be providing a continuously increasing stream of business to Outland.  In particular, in late 2010 continuing into 2011 Gamesa told Outland that it needed to be ready for the work that Gamesa would be providing to it.  Outland incurred extra costs for equipment, and hiring and training employees on the basis of Gamesa's verbal unambiguous promises of future work that it would not have but for Gamesa's promises.

The elements of promissory estoppel are (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by  defendants, and (4) plaintiff relied on the promise to its detriment. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 565 N.E.2d 990, 152 Ill. Dec. 308, 309-310 (1990). *See also, Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co*., 90 Ill. App. 3d 768, 770 (1980) (stating "[p]romissory estoppel is a doctrine under which the plaintiff

may recover without the presence of a contract."); *Newton Tractor Sales, Inc. v. Kubota Tractor Corporation*, 233 Ill. 2d 46; 906 N.E.2d 520; 329 Ill. Dec. 322 (2009) (stating "promissory estoppel is an affirmative cause of action in Illinois.")

Here, Gamesa made unambiguous promises to Outland that it would provide significant amount of future work to Outland. Outland relied on those promises when it incurred additional expenses for equipment, and hiring and training additional employees. Particularly in light of the existing general/subcontractor relationship, Outland's reliance was expected and foreseeable by Gamesa. Indeed the reason why Gamesa promised the additional work to Outland was so that Outland could ramp-up to be prepared for the additional work. Outland relied on the promises to its detriment by incurring the additional costs for equipment and additional employees, in each case that it would not have incurred but for Gamesa's promises.

### BREACH OF FIDUCIARY DUTY OF GAMESA AS PRINCIPAL

The amended counterclaim adds claims based upon Gamesa's breach of its fiduciary duty to Outland. Gamesa and Outland were parties to the FSA, the MSA, various purchase orders and to Gamesa's promise to provide future work to Outland. In each of those arrangements, the relationship between Gamesa and Outland was that of contractor-subcontractor, or principal and agent.

"A principal and an agent are in a fiduciary relationship. . . . Because of the fiduciary relationship, the principal owes the agent a duty of good faith and fair dealing in the incidents of their relationship." *Shen v. Leo A. Daly Co*., 222 F.3d 472 (8th Cir.2000). Moreover, "correlative with the duties of the agent to serve loyally and obediently are the principal's duties of compensation, indemnity, and protection." *Id.* (internal citations omitted)). In the existence of a fiduciary relationship, each party has a duty to refrain from "actively utilizing some power,

**A127**

control, or opportunity to destroy, injure, or gain preferential advantage over [the] party with whom it has a mutual interest." *Cottingham v. Gen. Motors Corp.*, 119 F.3d 373, 380 (5th Cir. 1997) (internal citations omitted).

Here, Gamesa intentionally and without privilege tried to harm Outland by doing everything it could to interfere with Outland's Acquisition Agreements, the Duke Fleet Services Agreement, and Outland's very existence. Those actions breached Gamesa's duty to refrain from actively utilizing power, control, or opportunity to destroy or injure Outland.

### GAMESA'S OBLIGATION TO INDEMNIFY OUTLAND

Count VI (which was not dismissed) has been expanded to include common law duties of indemnification. In addition to the indemnification provision contained in the agreements between Gamesa and Outland, Gamesa has a separate duty to indemnify Outland. *See, Restatement (Third) of Agency*, § 8.14 (stating "a principal has a duty to indemnify an agent (1) in accordance with the terms of any contract between them; and (2) unless otherwise agreed . . . when the agent suffers a loss that fairly should be borne by the principal in light of their relationship.") Here Outland suffered (1) the losses suffered from Duke not proceeding with the terms of the Restated Acquisition Agreement and not engaging Outland as services provider for its fleet of wind farms, (2) the costs that it incurred for additional equipment and employees to ramp-up for the promised additional work, and (3) the fines paid to OSHA and the legal fees incurred by Outland related to the OSHA proceeding. These are all losses that fairly should be borne by Gamesa in light of their relationship.

Dated: March 4, 2013                    */s/Thomas Melone*
                                        Thomas Melone, Esq.
                                        222 S 9th St, Suite 1600
                                        Minneapolis, MN 55402
                                        (212) 681-1120

13

**A128**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 CV 00592 |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC., a Delaware Corporation, GAMESA | ) | |
| WIND US, LLC, a Delaware Limited Liability | ) | |
| Corporation, IBERDROLA RENEWABLES, | ) | |
| INCORPORATED, an Oregon Corporation, and | ) | |
| STREATOR-CAYUGA RIDGE WIND POWER, | ) | |
| LLC, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| IBERDROLA RENEWABLES, INC. and | ) | |
| GAMESA TECHNOLOGY CORPORATION, | ) | |
| INC. | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| ——————————————— | ) | |

**<u>FIRST AMENDED COUNTERCLAIMS OF OUTLAND AGAINST AND GAMESA</u>**
**<u>TECHNOLOGY CORPORATION, INC. AND GAMESA WIND US LLC.</u>**

## OVERVIEW OF COUNTERCLAIMS

Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC, Outland Energy Services, LLC n/k/a Northwind Holdings LLC ("Outland"), by their attorney Thomas Melone states the following in support of their counterclaims against Gamesa Wind U.S., LLC and Gamesa Technology Corp., Inc. ("Gamesa").

*Introduction of the Parties*

1.      Founded by five Minnesota farmers in 2005, Outland at all relevant times provided wind farm operation, maintenance and repair services ("O&M Services") to the wind energy industry throughout the United States and abroad.  At the commencement of this case, it employed approximately 144 employees, down from 175 employees it employed before Gamesa's damaging actions.  Outland now has no employees.

2.      Outland provided O&M Services to Gamesa between 2006 and 2012.

3.      The counter-claims that Outland has set forth below are related to and/or arise out of the third-party claims brought by Gamesa against Outland, and arise out of an interrelated set of facts, and common parties involved in this litigation. These counterclaims seek to remedy substantial harm sustained by Outland at the hands of Gamesa.

4.      Gamesa is owned and controlled by Gamesa Corporación Tecnológica, S.A. ("Gamesa Spain").

*The Outland-Gamesa Relationship*

5.      Gamesa is a manufacturer of wind turbines.  Gamesa's standard practice was to sell its wind turbines to various asset owners, such as Iberdrola Renewables Inc. ("Iberdrola").

A130

As part of the sale of the wind turbines, Gamesa (similar to most other wind turbine manufacturers) would require that the purchaser also contract with Gamesa for O&M Services for those wind turbines for a specified period of time.

6.    Gamesa did not have its own internal O&M Service group.  Rather, its business model was to be the general contractor for the O&M Service with the wind turbine owner, and then provide those O&M Services using the services of a limited number of subcontractors, such as Outland. In the general/subcontractor approach, Gamesa would manage the process but the majority of the O&M Service work was completed by independent service providers, such as Outland.

7.    Since 2006, Outland has made substantial investments in personnel and equipment to build the business based upon the request from Gamesa, Gamesa's representations and assurances that it did not intend to self-perform (i.e., create its own O&M Service group to compete with Outland), and the promises to Outland that Gamesa would continue to provide a certain minimum level of work that would allow Outland the ability to fairly recover the investments it had made.

8.    Outland delivered superior performance to Gamesa, became Gamesa's number one provider of services, achieved unprecedented recognition for its quality, occupational health and safety, and environmental management programs, and experienced steady growth.

9.    Outland's investment in, and focus upon, safety, quality, performance and productivity had resulted in Outland achieving certifications for its quality (ISO 9001:2008), environmental (ISO 14001:2004) and occupational health and safety (OHSAS 18001:2007) management programs.  No other independent wind O&M Service provider in North America had attained these certifications.

10.    From August 2006 to October 2008, the work to be performed at a particular site on Gamesa's behalf was governed by a purchase order (a "Purchase Order").  Work under a Purchase Order would be for a specific task, or set of tasks, at a wind farm that would require Outland personnel to perform work for anywhere from a few days to several months.

11.    The annual revenue received by Outland from Gamesa from Purchase Orders grew from approximately $225,000 in 2006 to approximately $6.1 million in 2010.

12.    On October 3, 2008, Outland and Gamesa entered into their first contract that specified the use of Outland personnel at certain Iberdrola-operated wind farms for a longer-term period of time.  That contract was entitled the Framework Services Agreement (the "FSA") and provided separate terms and conditions related to work at those wind farms over a longer period of time, generally approximately two years.

13.    After Outland and Gamesa entered into the FSA, Gamesa continued to issue separate Purchase Orders for the shorter duration assignments.

14.    On November 19, 2009, Outland and Gamesa entered into new framework agreement entitled the Maintenance Services Agreement (the "MSA"), which placed additional Iberdrola-operated wind farms under a long-term agreement (including the Cayuga Ridge site which was the site of Plaintiff's accident).

15.    The MSA revised many of the provisions that were in the FSA governing the relationship between Outland and Gamesa.

16.    Specifically, the MSA revised the terms of a noncompetition clause (a clause which in the FSA was unenforceable under Minnesota law), the governing law clause, the dispute resolution clause, and the provision dealing with the solicitation of the other party's employees.

17.     Under the MSA, Outland was required to satisfy the needs of Gamesa's customer, Iberdrola. Specifically, Outland was required to provide all O&M Services, including preventative maintenance, corrective maintenance, design modifications, technical support and weekend, holiday, emergency and on-call work coverage. (MSA, § 2.2.)

18.     Pursuant to the MSA, Outland was required to train all its personnel on health and safety, and on industry technical standards, in order to allow its employees to effectively perform O&M Services. (MSA, § 4.4.)

19.     Outland performed O&M Services pursuant to technical documentation, manuals and quality procedures supplied by Gamesa; safety rules, regulations and manuals supplied by Gamesa and Iberdrola; and applicable federal, state or local health and safety laws and regulations. (MSA, § § 4.2 and 4.3.)

20.     Further, if Iberdrola established site-specific rules and/or safety procedures, Outland was required to comply with Iberdrola's mandates. (MSA, § 4.4.)

21.     On a regular basis, Outland supplied Gamesa with a regular O&M Services report for each project site, including descriptions of services completed; delays experienced in performing services; significant issues experienced in losses of turbine availability, causes and remedies; actualized inventory of warehouse items; and health and safety reports and inspection reports performed during the month. (MSA, § 2.6.)

22.     Since Outland had been performing services for Gamesa, Outland had met and exceeded all safety and performance benchmarks. On information and belief, Outland's performance for Gamesa was far superior then what Gamesa received from any other subcontractor.  For example, in 2010 when Gamesa was facing the potential payment of approximately $15 million in liquidated warranty damages for failure to maintain a specified

A133

wind turbine availability percentage, Gamesa replaced the subcontractor that had been working on the site, with Outland.  Outland was able to improve the availability at the site in a very short period of time saving Gamesa approximately $15 million in warranty payments.

23.    Outland had achieved similar results under similar circumstances at other wind farms. In each case, Outland replaced an existing O&M Service subcontractor and immediately was able to improve production while maintaining the highest levels of safety.

24.    Through providing these services for Gamesa on wind farms throughout the United States, Outland's personnel developed a particular expertise in troubleshooting Gamesa-made turbines. When Outland's business for Gamesa was at its peak in the first quarter of 2011, Outland had approximately 100 technicians working on Gamesa turbines, and provision of services to Gamesa accounted for the vast majority of Outland's revenue.

*The Tying of Wind Turbine Sales and O&M Services*

25.    At the time that Gamesa sold wind turbines to various owners, and at all relevant times, a market for wind turbines existed in the United States.

26.    At the time that Gamesa sold the wind turbines to various owners, a market for the O&M Service of Gamesa wind turbines existed in the United States.

27.    In 2007 and 2008 (through August 2008), there was a shortage of available wind turbines in the United States.  Wind turbine manufacturers could sell whatever they could manufacture.  While at that time manufacturers were planning to increase their manufacturing capacity, any such increase would be years away.  The demand for wind turbines in the United States exceeded the available supply by multiples.

28.    If a purchaser did not want to agree to the tying of an O&M Service agreement to the sale of wind turbines, other manufacturers did not have the manufacturing capacity to replace the sale.

29.    Upon information and belief, at one point, Gamesa controlled more than 10% of the overall United States market for wind turbine sales. However, during 2007 and 2008, there was a scarcity of available wind turbines for purchase. Demand so exceeded supply that even those manufacturers that had less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market.

30.    Gamesa's competitors did not have the productive capacity to be able to replace its reduction in output with an increase in their own output at no higher cost. Here an increase in output by a competitor was simply not physically possible during the relevant time periods

31.    As a result, the shortage of wind turbines resulted in sufficient market power for Gamesa to illegally tie its sale of wind turbines to the provision of O&M Services.

32.    Because there is generally a lag time of approximately one-two years between execution of a contract for the sale of wind turbines and the commencement of O&M Services, contracts executed by Gamesa in 2007 and 2008 would prevent wind turbine owners from entering into contracts for O&M Services in 2008 through 2010.

33.    At the time Gamesa sold the wind turbines to various owners, Gamesa controlled 100% of the O&M Service market for Gamesa wind turbines.

34.    By tying the sale of Gamesa wind turbines to the provision by Gamesa of O&M Services for those wind turbines, Gamesa was able to establish and continue its control of 100% of the O&M Service market for Gamesa wind turbines. That is, even though Gamesa brought in

**A135**

Outland to perform the actual services on the Gamesa wind turbines that Gamesa had sold to customers, Outland was a subcontractor—Gamesa was the contractor and maintained the actual customer relationship with the turbine owner.

35.    The improper tying arrangement precluded Outland from seeking and/or acquiring that service business in 2008 and 2010 and resulted in wind turbine purchasers paying higher service costs, which were ultimately passed on to consumers.

*The Events Leading to the McCoy Accident*

36.    On September 23, 2010, the following Outland personnel were assigned to the Cayuga Ridge wind farm in order to perform a waffle block design modification procedure (the "Modification Procedure") specified by Gamesa: Alex Rice (Project Manager), Mike Piper (Lead Technician), Matt Davis, Kyle Nieman, Adam Hengesteg, Nathan Black, Cory Hart, Alex Anderson, Andrew Ehrhardt, and Aaron McCoy.

37.    Cayuga Ridge was one of the sites covered in the MSA.

38.    In order to perform the Modification Procedure the turbine needs to be de-energized.

39.    When dealing with potentially hazardous electrical energy, technicians use a lock-out tag-out ("LOTO") procedure to ensure their safety. The procedure is so named because it consists of using a lock—to lock the electrical equipment in the "off" position—and a tag—to inform other employees of who locked the equipment, and when they did so.

40.    Outland trained all of its personnel to use a standard LOTO procedure. Under that standard LOTO procedure, when a technician wants to perform services on a turbine, that turbine must be "turned off" by switching the equivalent of a large circuit breaker to the "off" position. The technician then applies a lock to the switch in such a way that the switch cannot be turned

**A136**

back on as long as that lock is in place. Each technician applies his own lock and maintains control of the key that opens the lock, so that no other person is able to remove the lock and then re-energize the turbine as long as the technician is working on the equipment and exposed to electrical hazards. The technician then applies a tag on which he writes pertinent information about the service being performed (e.g. his name, the date, the time), so that anyone else coming along will understand the reason for the lock on the switch. The tag states that it is only to be removed by the person who placed the tag.

41.     Once the technician has applied the lock, established control of the key and then applied the tag, the technician would climb up to the top of the turbine tower, perform the service, and then descend back to the bottom of the tower to unlock the lock, and thereby allow the re-energization of the turbine.

42.     Again, the approach described above is the standard LOTO procedure. That standard LOTO procedure was the only LOTO procedure approved by Outland health and safety management and protocols at that time.

43.     All Outland technicians were trained and instructed to use only that standard LOTO procedure.

44.     Like all other Outland technicians, Plaintiff McCoy was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

45.     Alex Rice was trained in, and instructed by Outland management to use only, the standard LOTO procedure.

46.     The standard Outland LOTO procedure follows the standard (aka individual) LOTO procedures set forth in 29 C.F.R. 1910.147 (general industry) and 29 C.F.R. 1910.269 (electric power generation, transmission, and distribution).

47.    Other LOTO procedures may be permissible. For example, 29 C.F.R. 1910.147(f)(3) describes a group LOTO procedure.

48.    On or about September 23, 2010, at a meeting of Gamesa, Iberdrola and Outland on-site personnel at the Cayuga Ridge site, Iberdrola and Gamesa instructed Outland's personnel in that meeting that a modified LOTO procedure would be used for the Modification Procedure.

49.    In attendance at that meeting were the following individuals: (a) from Iberdrola: Curtis Radke (site supervisor), Evan Bonnel, Dale Thomas, Andrew Morrissey, and Chris Tolian; (b) from Gamesa: Ross Williamson (site manager); (c) from Outland: Alex Rice, Mike Piper.

50.    Under that modified LOTO procedure, each Outland technician performing the design modification was to leave his key at the base of the wind turbine tower, near the lock, and then climb uptower to perform services. Under this approach, when a given team of two Outland technicians had completed their work and needed the turbine re-energized so that they could check the effectiveness of that work, the Outland team was to remain uptower and call to an Iberdrola technician via radio.

51.    That Iberdrola technician would be stationed down on the ground and would be available to re-energize any of the turbines in which Outland's technicians were working uptower. Upon receiving a call to re-energize a given turbine, the Iberdrola technician would proceed to the given turbine, radio again to Outland's technicians uptower to confirm that they were in a so-called "safe zone," i.e., away from the electrical equipment, take one of the keys left downtower by Outland's technicians, unlock the lock, and then re-energize the equipment.

52.    The benefit to Iberdrola and Gamesa of this modified LOTO procedure was that it would reduce a) the amount of time it would take to perform the design modification, thereby

reducing turbine downtime and increasing production of electricity; and b) the number of climbs

and re-energizations, thereby reducing wear and tear on the turbine and its components.

53.    At no time did anyone who participated in that meeting notify anyone from

Outland's off-site management—not Outland's health and safety management, not Outland's

operations management, not Outland's technical training management, not Outland's human

resources management, and not Outland's legal management—that Outland's on-site personnel

would be using that modified LOTO procedure.

54.    This modified LOTO approach appears to have been inconsistent with some

Gamesa guidance, but consistent with other Gamesa guidance. Although Gamesa's general

instruction for "Locking and Signaling Procedure for Electrical Equipment" states that "[i]t is

absolutely forbidden for the employees to remove whatever personal warning labels or padlocks

which are not theirs," the procedure that Gamesa issued for performance of the transformer

design modification (the work that Outland's technicians were performing at the time of the

accident) refers to the separate roles of "operator" and "technician" indicating the use of a system

operator LOTO procedure with the "operator" controlling the lock at the base of the tower and

the "technician" working uptower. That is, both the instructions of Iberdrola and Gamesa's on-

site managers and the documentation that Gamesa provided Outland in accordance with which

Outland was to perform the procedure called for Outland technicians to surrender control of their

LOTO keys to another party, specifically, Iberdrola.

55.    On October 20, 2010, the accident at Cayuga Ridge occurred involving Plaintiff

Aaron McCoy.

56.    On that day, multiple teams of Outland technicians were working uptower in

different turbines. When one such team called to the downtower Iberdrola technician to re-

energize their turbine, that Iberdrola technician went to another tower and re-energized that other tower.

57.    In that tower, McCoy and his work partner were not expecting re-energization but rather were working near the transformer. Upon re-energization, an arc flash (electrical explosion) emerged out of the electrical equipment uptower in front of which Aaron McCoy was working, thereby burning McCoy.

58.    In taking these actions, the Iberdrola technician purposefully and knowingly removed a lock that was not his lock, using a key that was not his key. The Iberdrola technician was reckless and negligent in his decision to energize a turbine without first confirming that Outland's technicians uptower were in a safe position.

59.    The period from September 27, 2010, to October 20, 2010, was between the regular monthly site visit from Outland health and safety management during which site EHS audits would have been completed.

60.    At the time of the accident, McCoy was performing the Modification Procedure at the direction of Gamesa while using the modified LOTO procedure that Outland was using at the direction of Iberdrola and Gamesa.

61.    As a result of the accident, an investigation was undertaken by the United States Occupational Health and Safety Administration ("OSHA").

62.    Outland's personnel cooperated fully with the OSHA investigation, and answered all questions truthfully, even when those answers hurt Outland's interests.

63.    In contrast, on information and belief, Gamesa's personnel did not participate in all of the interviews that OSHA requested.

64.     Both before and after the October 20, 2010, Cayuga Ridge incident, Outland's industry-leading O&M Services teams had performed at all sites and projects under the MSA – including Cayuga Ridge – in a safe, efficient, effective and high quality manner.

65.     Specifically, Outland has met or exceeded all defined service standards, including for ensuring the availability of the turbines, completing all administrative duties in a timely manner, and completing all maintenances within the contractually-defined schedule.

*Gamesa's Secret Plan to Put Outland Out of Business and Gamesa's Intentional Interference with the Acquisition of Outland, and Gamesa's Actions to Improperly and the Duke Fleet Services Agreement*

66.     In August 2010, Gamesa hired, Rick Hammill and Gary Stansbury to lead the services area of Gamesa.

67.     On information and belief, Hammill or others at Gamesa decided that the existing Gamesa O&M Service business model, where Gamesa would always subcontract the provision of O&M Services, was going to change.

68.     On information and belief, Hammill or other at Gamesa decided that Gamesa would establish its own O&M Service group with technicians that can self-perform to reduce the amount of work (and revenue) given to independent service providers like Outland.

69.     That complete shift in its business model was contrary to all the prior representations and assurances provided to Outland.

70.     Outland reasonably expected based upon Gamesa's promises and statements the prior year's level of business with Gamesa to be maintained and an increase in business from Gamesa in 2011 due to Gamesa's ongoing assurance that it was not going to compete with Outland.  Gamesa requested that Outland purchase certain flame-retardant clothing, and that Outland pay for certain training provided by Gamesa as their preferred partner and in preparation

**A141**

for the expected growth in business with Outland. Gamesa also told Outland that it needed to have additional personnel to handle the work that Gamesa would provide.

71.    In early January 2011, Gary Stansbury of Gamesa stated to Steve Scott that Gamesa was interested in acquiring Outland.

72.    Steve Scott thanked Gary for Gamesa's interest but indicated that Outland intended to remain independent from any one particular manufacturer because otherwise Outland might be prevented from acquiring work for turbines manufactured by others.

73.    Sometime between the end of 2010 and January 2011, however, Gamesa secretly and with malicious intent, devised a strategy to destabilize Outland if Outland rejected Gamesa's acquisition overture.  Gamesa's plan would be to put Outland out of business so that Outland technicians would be available for Gamesa to hire in large numbers, which would allow Gamesa to acquire all or a substantial portion of Outland's business and personnel at no cost and allow Gamesa to achieve its goal of creating its own large O&M Service group, while at the same time eliminating Outland as a competitor of Gamesa's new O&M Service group.

74.    The plan devised by Gamesa provided for Gamesa to keep telling Outland that Outland was going to keep getting more business from Gamesa.

75.    That approach would mean that Outland would continue to train and hire new technicians.

76.    That approach would mean that Outland would continue to acquire assets and protective equipment for its technicians as directed by Gamesa.  One such example, is the approximately $250,000 of flame-retardant clothing that Gamesa's policy required Outland to acquire at Outland's own expense in 2010 and 2011.

77.      The basic approach was to keep Outland believing it would continue to receive more work from Gamesa and then, at the right moment, to pull the rug out from under Outland and watch the business fall, thus allowing Gamesa to pick up the pieces for its own hoped-for O&M Service business.

78.      In January and February 2011, Gamesa continued to implement its secret plan. Unknown to Outland and contrary to the representations made by Gary Stansbury, Gamesa had secretly decided to cease all Purchase Order business with Outland as a first step, and started to look for ways to terminate the MSA as a second step.

79.      On February 17, 2011, Outland and Duke Energy ("Duke") entered into a letter agreement pursuant to which Duke was to purchase a 25% interest in Outland (the "Original Acquisition Agreement").

80.      On February 24, 2011, Outland informed Gary Stansbury that Outland and Duke Energy had entered into the Original Acquisition Agreement for Duke to acquire a substantial minority stake in Outland, with the possibility that Duke or another party eventually acquiring all of Outland.

81.      As part of the acquisition transaction, Duke had agreed with Outland that Outland would be receiving all of the operations and maintenance contracts for the Duke Energy fleet of wind farms (the "Duke Fleet Services Agreement").

82.      Gamesa knew or had reason to know that Duke and Outland would enter into the Duke Fleet Services Agreement based upon its conversations with Steve Scott of Outland and Jason Allen of Duke.

83.      Upon learning of the execution of the Original Acquisition Agreement Gamesa realized that if Duke acquired a stake in, or completely acquired, Outland, that Outland would be

able to withstand any attempt by Gamesa to destabilize Outland. If that occurred, Gamesa's plan to build its own O&M Service business at the expense of Outland would fail.

84.     Gamesa reacted quickly.   On February 26, 2011, Gary Stansbury of Gamesa called Steve Scott of Outland and gave the concept a thumbs down for the stated reason that Gamesa believed Iberdrola would force Outland off their sites because Iberdrola and Duke compete on the development front.

85.     However, in keeping with the façade to try to keep Outland vulnerable to Gamesa's plan, on that same February 26, 2011 call, Gary Stansbury stated to Steve Scott that Gamesa was very happy with the quality of service that Outland continued to deliver, and reiterated that Outland was Gamesa's key vendor. In that connection, Stansbury stated that they were seeking up to 24 additional technicians from Outland because Gamesa was getting ready to replace a competing service provider at some sites.

86.     In continuing the façade in order to preserve the element of surprise needed to execute the plan, as late as March 2011, Gamesa was still telling Outland that Gamesa had a long list of projects they wanted Outland to commission under Purchase Orders in 2011, and that Outland needed to be ready to handle the work, which would require Outland to hire and train more personnel and acquire more equipment.

87.     In response to Gamesa's statements of February 26, Steve Scott contacted Iberdrola directly.   After several missed attempts at direct contact, on March 27, 2011, Kevin Devlin, Vice President of Commercial Operations for Iberdrola stated that he endorsed the concept of Duke acquiring an interest in Outland.   Devlin stated that the competition issue between Duke and Iberdrola was not a concern.

**A144**

88.     As a result of Iberdrola's direct statements to Outland, Gamesa realized that its false statement regarding Iberdrola would not be sufficient to prevent the consummation of either the Original Acquisition Agreement or the Duke Fleet Services Agreement. On April 14, 2011, Gamesa called Duke directly to attempt to scuttle the Duke/Outland transaction. Not only did Gamesa inform Duke that Gamesa's position was that the deal should not happen, Gamesa took affirmative economic steps to try to induce Duke not to do the transaction with Outland. Specifically, Gamesa discussed a turbine supply offer that tied in a five-year extension of the O&M Services on Duke's North Allegheny project, which is located in Pennsylvania. The Duke North Allegheny project was the first Duke project with Gamesa turbines that was scheduled to enter the post-warranty period starting in September 2011.

89.     Duke rejected Gamesa's interference, and attempt at bribing Duke, to terminate or modify Duke's transaction with Outland.

90.     At that time Duke told Gamesa that Duke was not going to engage Gamesa to provide any future services work and that Outland would be getting Duke's services work.

*With No Place to Turn, Gamesa Looks to the OSHA Citations and the McCoy Accident*

91.     On April 8, 2011, OSHA issued six citations to Outland related to the LOTO procedure that was in use at the Cayuga Ridge wind farm at the time of the accident that occurred involving Plaintiff Aaron McCoy.

92.     After Gamesa learned of the citations, Gamesa's Gary Stansbury stated to Steve Scott of Outland that, "To be honest, we're shocked we weren't cited as well."

93.     Neither Gamesa nor Iberdrola were issued citations by OSHA.

94.     Upon information and belief, neither Gamesa nor Iberdrola were issued citations because it was an Outland employee that was injured, and no injury occurred to either a Gamesa employee or an Iberdrola employee.

95.     Also on information and belief, Iberdrola was told informally by OSHA at the 2011 American Wind Energy Association conference in Anaheim, California, on or about May 23, 2011, that if another accident occurred at an Iberdrola site that OSHA would seek criminal sanctions against Iberdrola.

96.     After the rebuke that Gamesa received from Duke on April 14, 2011, Gamesa was desperate and needed to find a way to destabilize Outland quickly, and interfere with the pending acquisition of Outland and the Duke Fleet Services Agreement.

97.     By April 15, 2011, various parties (including Gamesa) in the wind turbine services market believed that Duke was in fact purchasing 100% of Outland.

98.     On May 11, 2011, the terms of the Original Acquisition Agreement was amended to add another party, Sterling Partners which is an institutional investor, and provide for the sale of 100% of the member interests in Outland (the "Restated Acquisition Agreement").

99.     As the result of Gamesa's knowledge of the Original Acquisition Agreement, its knowledge that Outland and Duke would be entering into the Duke Fleet Services Agreement, and its belief that Duke was or was likely acquiring all of Outland, Gamesa knew or had reason to know of the existence of the Restated Acquisition Agreement.

*Gamesa Realizes It is Out of Time and Implements its Plan to Topple Outland and Implicates Iberdrola*

100.     In order to interfere with the Original Acquisition Agreement, the Restated Acquisition Agreement and the Duke Fleet Services Agreement, and Outland's other existing and potential economic relations, on May 12, 2011, Gamesa took further steps to implement its

**A146**

plan to scuttle the acquisition transaction, the Duke Fleet Services Agreement and to eliminate Outland as a going concern by sending Outland a letter in bad faith raising frivolous issues and declaring Outland in default under the MSA.

101.    In that same letter, Gamesa implicated Iberdrola in its scheme by stating that Gamesa's customer, Iberdrola, had demanded that Gamesa remove Outland from all of its wind farms.

102.    The May 12 letter stated that "Outland has failed to perform O&M Services in accordance with the health, safety and environmental requirements of the [MSA] and applicable law. This failure has been noted by OSHA . . ."

103.    At the same time, Gamesa implemented the other part of its plan which called for the cessation of any new Purchase Orders for transactional business with Outland and the breach of the unambiguous promises to provide an increase in work to Outland.

104.    Gamesa had implemented its three-prong approach—renege on its promises of work (leaving 40% of Outland's technicians without work), scuttle the acquisition of Outland and the Duke Fleet Services Agreement (so that it would not be able to financially withstand the Gamesa attack), and move to terminate the remaining contractual work represented by the MSA (which would leave another 40% of Outland's technicians without work).

105.    The impact was immediately felt on Outland.  Within days of Gamesa's letter, both Duke and the institutional investor refused to proceed with the transaction under the originally agreed terms, and reduced the amount they were willing to pay for Outland by approximately $15 million.

106.    In addition,  Duke did not enter into a services agreement with Outland to provide services for its fleet of wind farms.

**A147**

107.     Furthermore, with the full and immediate cessation of Purchase Orders, approximately 40% of Outland's technicians were without work.  In addition, the 18 technicians that were still in training to handle the increase in work promised by Gamesa would have no work once their training was complete.

108.     With respect to Gamesa's attack under the MSA, Outland notified Gamesa that it rejected Gamesa's frivolous and bad faith attempt to declare a default under the MSA.

109.     Gamesa responded by letter dated May 27, 2011, in which Gamesa reiterated that Outland was in default under the MSA stating "Outland was cited by OSHA for failing to comply with various provisions of 29 C.F.R. §1926 et seq."

110.     Outland again notified Gamesa that it rejected Gamesa's frivolous and bad faith attempt to declare a default under the MSA.

111.     In letters dated July 21, 2011, Gamesa admitted that its assertions in its letters of May 12 and May 27 were unjustified, and wholly without basis, under the MSA because the July 21 letters frivolously and in bad faith asserted a completely new basis for default under the MSA, and for the first time, asserting a breach of the dormant FSA.

112.     Outland notified Gamesa that it rejected Gamesa's frivolous and bad faith attempts to declare a default under the MSA and to declare a breach of the FSA in its efforts to destabilize Outland.

113.     Because of Gamesa's actions, the acquisition did not proceed even under the reduced terms with Duke and Sterling, and the Duke Fleet Services Agreement was not consummated.  On November 1, 2012, however, in order to avoid receivership, an action for which had been commenced by Wells Fargo Bank, Outland transferred substantially all the business assets and employees of Outland to Duke.

**A148**

## CLAIMS FOR RELIEF

### COUNT I
### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS

114.    Outland restates and realleges the foregoing paragraphs.

115.    Outland had contractual relations with third parties, including the Original Acquisition Agreement, the Duke Fleet Services Agreement and the Restated Acquisition Agreement.

116.    Gamesa, was aware of, and had reason to know of, those contractual relations.

117.    Gamesa intentionally interfered with those contractual relations by, among other things, knowingly and purposely and taking actions not in good faith designed and intended (i) to destabilize Outland and eliminate it as a competitor, and (ii) to interfere with, and prevent the consummation of, Outland's acquisition agreements, and the Duke Fleet Services Agreement..

118.    Gamesa, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing those contractual relations.

119.    As a direct and proximate result of Gamesa's improper actions, the Duke failed to consummate the acquisition of Outland pursuant to either the Original Acquisition Agreement or the Restated Acquisition Agreement and failed to enter into the Duke Fleet Services Agreement.

120.    As a direct and proximate result of Gamesa's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**A149**

## COUNT II
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC RELATIONS

121.    Outland restates and realleges the foregoing paragraphs.

122.    Outland had prospective contractual relations with third parties, including the Original Acquisition Agreement, the Duke Fleet Services Agreement and the Restated Acquisition Agreement.

123.    Gamesa, was aware of, and had reason to know of, those prospective contractual relations.

124.    Gamesa intentionally interfered with those prospective contractual relations by, among other things, knowingly and purposely and taking actions not in good faith designed and intended (i) to destabilize Outland and eliminate it as a competitor, and (ii) to interfere with, and prevent the consummation of, Outland's acquisition agreements, and the Duke Fleet Services Agreement.

125.    Gamesa, without justification or privilege, engaged in these improper actions with the purpose and intent of interfering with or preventing Outland from entering into or continuing those prospective contractual relations.

126.    As a direct and proximate result of Gamesa's improper actions, the Duke failed to consummate the acquisition of Outland pursuant to either the Original Acquisition Agreement or the Restated Acquisition Agreement and failed to enter into the Duke Fleet Services Agreement.

127.    As a direct and proximate result of Gamesa's intentional interference, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

**A150**

## COUNT III
## PRIMA FACIE TORT

128.    Outland restates and realleges the foregoing paragraphs.

129.    Gamesa intentionally and without justification devised and implemented a plan to put Outland out of business and to harm Outland by doing whatever it could to insure that Outland was not acquired by another company (other than Gamesa).

130.    Gamesa's plan inflicted devastating harm on Outland and its members.

131.    Gamesa's plan resulted in the loss of almost the entire value of Outland as a going concern.   In order to avoid receivership, Outland had to transfer its employees to Duke in November 2012 and transfer its assets to Duke.

132.    None of Gamesa's actions were taken in good faith and none were justified.   In particular, the letter of May 12, 2011, sent by Gamesa was not sent in good faith.

133.    The May 12, 2011, letter was sent for the express purpose to interfere with Outland's economic interests, prevent the acquisition of Outland and the consummation of the Duke Fleet Services Agreement, and start the eventual cascading of Outland into oblivion.

134.    Gamesa's earlier actions of directly contacting Duke in an attempt to scuttle the transaction with Duke, and lying about Iberdrola as being a basis for the May 12 letter provide support to the conclusion of Gamesa's nefarious intentions.

135.    Gamesa's plan was specifically intended to prevent Outland from consummating the Original Acquisition Agreement, the Duke Fleet Services Agreement and the Restated Acquisition Agreement.

136.    Gamesa succeeded with their plan.

**A151**

137.    But for Gamesa's improper and ill-intentioned actions, Outland would have consummated the Original Acquisition Agreement or the Restated Acquisition Agreement, and the Duke Fleet Services Agreement.

138.    Gamesa also utilized its power under the then existing contractor-subcontractor arrangement with Outland to get Outland to make itself more vulnerable by promising Outland work and asking Outland to gear-up for that additional work, knowing all along that Gamesa intended to destroy or injure Outland.

139.    As a direct and proximate result of Gamesa's unjustified actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

### COUNT IV
### PROMISSORY ESTOPPEL

140.    Outland restates and realleges the foregoing paragraphs.

141.    Gamesa told Outland that Outland was its primary subcontractor and that Gamesa would be providing a continuously increasing stream of business to Outland.  In particular, in 2010 continuing into 2011 Gamesa told Outland that it needed to be ready for the work that Gamesa would be providing to it.  Outland incurred extra costs for equipment, and hiring and training employees on the basis of Gamesa's verbal unambiguous promises of that future work, which it would not have but for Gamesa's promises.

142.    Gamesa made unambiguous promises to Outland that it would provide significant amount of future work to Outland.

143.    Particularly in light of the existing general/subcontractor relationship, Outland's reliance was expected and forseeable by Gamesa.  Indeed the reason why Gamesa told outland

**A152**

that it would be providing the additional work to Outland was so that Outland could ramp-up to be prepared for the additional work.

144.    Outland relied on the promises to its detriment by incurring the additional costs for equipment and hiring and training additional employees, in each case that it would not have incurred but for Gamesa's promises.

145.    Without justification, Gamesa did not provide the additional work.

146.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY

147.    Outland restates and realleges the foregoing paragraphs of its Complaint.

148.    Gamesa and Outland were parties to the FSA, the MSA, various purchase orders and to Gamesa's promise to provide future work to Outland.  In each of those arrangements, the relationship between Gamesa and Outland was that of contractor-subcontractor, or principal and agent.

149.    A principal and an agent are in a fiduciary relationship.

150.    Because of the fiduciary relationship, the principal owes the agent a duty of good faith and fair dealing in the incidents of their relationship.

151.    Gamesa had a duty to refrain from actively utilizing some power, control, or opportunity to destroy, injure, or gain preferential advantage over Outland.

152.    Here, Gamesa intentionally and without privilege tried to harm Outland by doing everything it could to interfere with Outland's Acquisition Agreements, the Duke Fleet Services

**A153**

Agreement, and Outland's very existence. Those actions breached Gamesa's duty to refrain from actively utilizing power, control, or opportunity to destroy or injure Outland.

153.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

## COUNT VI
## INDEMNIFICATION

154.    Outland restates and realleges the foregoing paragraphs.

155.    Section 7.4 of the MSA  states that Gamesa will indemnify Outland for losses, fines, damages, claims, penalties or liability for bodily injury or property damage to the other party or any third party to the extent arising out of Gamesa's negligence, gross negligence or intentional misconduct.

156.    Outland has suffered damage, losses, fines as the result of  Gamesa's negligence, gross negligence and intentional misconduct, including, without limitation (i) payments paid or payable to OSHA as a result of the McCoy accident, (ii) the losses suffered from Duke not proceeding with the terms of the Restated Acquisition Agreement or the Original Acquisition Agreement, and Duke not engaging Outland as services provider for its fleet of wind farms and (iii) other damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial, all of which Gamesa is obligated to indemnify Outland for under Section 7.4 of the MSA.

157.    In addition to the indemnification provision contained in Section 7.4 of the MSA, Gamesa has a separate duty to indemnify Outland.

158.     The relationship of Gamesa and Outland was that of contractor-subcontractor or principal and agent.

159.     Outland has suffered losses as the result of Gamesa's actions that fairly should be borne by Gamesa in light of their relationship, such as (1) the losses suffered from Duke not proceeding with the terms of the Restated Acquisition Agreement or the Original Acquisition Agreement, and Duke not engaging Outland as services provider for its fleet of wind farms, (2) the costs that Outland incurred for additional equipment and employees to ramp-up for the promised additional work, and (3) the fines paid to OSHA and the legal fees incurred by Outland related to the OSHA proceeding.   These are all losses in excess of $75,000 that fairly should be borne by Gamesa in light of their relationship.

## COUNT VII
## SECTION 1 OF THE SHERMAN ACT AND CLAYTON ACT, SECTION 3 (TREBLE DAMAGES)

160.     Outland restates and realleges the foregoing paragraphs.

161.     Gamesa has engaged in a premeditated plan to systematically eliminate Outland as a competitor to Gamesa, and taken other actions, to continue an existing unlawful restraint on trade based upon a tying arrangement that violated Section 1 of the Sherman Act and Section 3 of the Clayton Act.

162.     Gamesa's actions constitute unfair trade practices, and a violation of the Sherman Act and Clayton Act.

163.     In 2007 and 2008 (through August 2008), there was a shortage of available wind turbines in the United States.   Wind turbine manufacturers could sell whatever they could manufacture.   While at that time manufacturers were planning to increase their manufacturing

**A155**

capacity, any such increase would be years away.  The demand for wind turbines in the United States exceeded the available supply by multiples.

164.    If a purchaser did not want to agree to the tying of an O&M Service agreement to the sale of wind turbines, other manufacturers did not have the manufacturing capacity to make up the sale.

165.    Demand so exceeded supply that even those manufacturers, such as Gamesa, that had less than a major share of the overall wind turbine sale market in the United States still had sufficient market power to force a purchaser to do something that it would not have done in a competitive market, i.e., purchase O&M Services from Gamesa.

166.    Gamesa's competitors did not have the productive capacity to be able to replace its reduction in output with an increase in their own output at no higher cost.  Here an increase in output by a competitor was simply not physically possible during the relevant time periods

167.    As a result, the shortage of wind turbines resulted in sufficient market power for Gamesa to illegally tie its sale of wind turbines to the provision of O&M Services.

168.    Because there is generally a lag time of approximately one-two years between execution of a contract for the sale of wind turbines and the commencement of O&M Services, contracts executed by Gamesa in 2007 and 2008 would prevent wind turbine owners from entering into contracts for O&M Services in 2008 through 2010.

169.    At the time Gamesa sold the wind turbines to various owners, Gamesa controlled 100% of the O&M Service market for Gamesa wind turbines.

170.    By tying the sale of Gamesa wind turbines to the provision by Gamesa of O&M Services for those wind turbines, Gamesa was able to establish and continue its control of 100% of the O&M Service market for Gamesa wind turbines. That is, even though Gamesa brought in

A156

Outland to perform the actual services on the Gamesa wind turbines that Gamesa had sold to customers, Outland was a subcontractor—Gamesa was the contractor and maintained the actual customer relationship with the turbine owner.

171.    The improper tying arrangement precluded Outland from seeking and/or acquiring that service business in 2008 through 2010 and resulted in wind turbine purchasers paying higher service costs, which were ultimately passed on to consumers. Not an insubstantial dollar volume of commerce in the O&M Service market for Gamesa wind turbines is affected.

172.    Gamesa has no legitimate business justification for imposing the O&M Service tie-in.

173.    As a direct and proximate result of Gamesa's actions, Outland has suffered damages, in excess of $75,000, and incurred attorneys' fees and costs, to be proven with specificity at trial.

174.    Outland demands an award of treble damages in accordance with law.

**WHEREFORE**, the Outland plaintiffs pray that this Court enter judgment in its favor and against Defendant Gamesa as follows:

1.    Awarding Outland its damages, including all exemplary and treble damages, where available at law.

2.    Requiring Gamesa to disgorge all amounts improperly gained by their improper action.

3.    Granting the relief requested in each Count in these claims against Gamesa.

4.    Awarding Outland its attorneys' fees incurred as a result of Defendants' actions, where available at law.

5.      Awarding Outland its costs, disbursements and additional attorneys' fees incurred as may be available at law.

6.      Awarding Outland pre- and post-judgment interest.

7.      Awarding Outland all other relief that the Court deems just, proper and equitable, including where applicable equitable relief, such as disgorgement.


Dated: March 4, 2013                    */s/Thomas Melone*
                                        Thomas Melone, Esq.
                                        222 S 9th St, Suite 1600
                                        Minneapolis, MN 55402
                                         (212) 681-1120

**A158**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AARON MCCOY,               ) | |
|           ) | |
|        Plaintiff,       ) | |
|           ) | |
|     vs.             ) | Case No. 11 CV 00592 |

AARON MCCOY,                    )
                               )
        Plaintiff,             )
                               )
    vs.                        )    Case No. 11 CV 00592
                               )
GAMESA TECHNOLOGY CORPORATION, )
INC., GAMESA WIND US, LLC, IBERDROLA )
RENEWABLES, INCORPORATED, and  )
STREATOR-CAYUGA RIDGE WIND     )
POWER, LLC,                    )
                               )
        Defendants.            )
                               )
_____ )
                               )
IBERDROLA RENEWABLES, INC. and )
GAMESA TECHNOLOGY CORPORATION, )
INC.                           )
                               )
        Third-Party Plaintiffs, )
                               )
    vs.                        )
                               )
OUTLAND RENEWABLE ENERGY, LLC, )
OUTLAND RENEWABLE ENERGY FIELD )
SERVICES, LLC and OUTLAND ENERGY )
SERVICES, LLC,                 )
                               )
        Third-Party Defendants. )
_____ )

**MOTION PURSUANT TO FED. R. CIV. P. 59(e)
TO ALTER AND AMEND JUDGMENT**

Now comes Outland Renewable Energy, LLC n/k/a Renovo Renewable Energy, LLC,

and Outland Energy Services, LLC n/k/a Northwind Holdings LLC ("Outland"), by their

attorney Thomas Melone, and moves this court pursuant to Fed. R. Civ. P. 59(e), to alter or

amend the judgment entered on August 8, 2013, (Docket Nos. 351 and 352) in favor of Gamesa Technology Corporation, Inc., and Gamesa Wind US LLC (the "Gamesa Parties").

On September 22, 2011, Outland filed various counterclaims (the "Counterclaim") against the Gamesa Parties (Docket No. 112). The Counterclaim included violations of the Sherman Act (15 U.S.C. §1) and the Clayton Act (15 U.S.C. §14) pursuant to which the Court has jurisdiction under 28 U.S.C. §1331 (federal question)(the "Federal Claims"). The Counterclaim also included various state law anti-trust claims (the "State Anti-Trust Claims"), and other state law claims (the "Other State Claims")(the State Anti-Trust Claims and the Other State Claims, being collectively referred to as the "State Claims"). The Court exercised jurisdiction over the State Claims without examination of whether the Court had jurisdiction over the State Claims.

Outland as a limited liability company with many members was a citizen of Minnesota, Delaware, New York, Wisconsin, South Dakota, California, Colorado, Oregon, Ohio, Montana and Arizona, and, as a result, no diversity of citizenship exists between Outland and the Gamesa Parties.

On September 26, 2012, in response to a motion by the Gamesa Parties (Docket No. 252), the Court dismissed the Federal Claims and the State Claims based on the pleadings pursuant to Fed. R. of Civ. P. 12(c), except with respect to one count for indemnification (the "November Order"). *See*, Minute entry (Docket No. 274), and Memorandum Opinion (Docket No. 275). On March 4, 2013, Outland filed a motion for leave to amend the Counterclaim (Docket No. 297), which motion was denied on June 12, 2013 (Docket No. 327) (the "June Order").

In this Motion Outland asks the Court to amend and clarify the judgment to make it clear

2

**A160**

that the Court had no jurisdiction over the Other State Claims, and the judgment as to the Other State Claims was entered based upon lack of subject-matter jurisdiction.

In the alternative, Outland requests that the Court alter, amend and vacate the judgment regarding the Other State Claims for the reasons set forth below.

## I.    THE COURT LACKED SUBJECT MATTER JURISDICTION OVER THE OTHER STATE CLAIMS.

A federal court has jurisdiction to hear "all claims sufficiently related to the claim on which its original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Constitution." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1181 (7th Cir. 1993). *See also,* 28 U.S.C. § 1367 (granting supplemental jurisdiction to District Courts "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.")  Claims are sufficiently related if they "'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case.'" *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164-65, 139 L. Ed. 2d 525, 118 S. Ct. 523 (1997) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)).  "A loose factual connection between the claims is generally sufficient." *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1994); *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008). But "it is not enough that the claims be tangentially related." *Hernandez v. Dart*, 635 F. Supp.2d 798, 814 (N.D. Ill. 2009) (dismissing plaintiff's legal malpractice claim that was "independent of" his claims relating  to an underlying arrest that formed the basis for original jurisdiction) (citation omitted).

Sharing a "factual background" is not necessarily sufficient standing alone; rather, the question is whether the claims share operative facts, that is, facts that are relevant to proving an element of both the federal and state claims. *See, Berg v. BCS Financial Corp*., 372 F. Supp.2d 1080, 1093 (N.D. Ill. 2005); *Nguyen v. Cumbo*, 2010 U.S. Dist. LEXIS 124330, 2010 WL 4877555, at \*5 (N.D. Ill. Nov. 23, 2010) (requiring some overlap in the "legal [or] evidentiary burden"). Furthermore, the "facts linking state to federal claims must be 'operative,' i.e., they must be 'relevant to the resolution of' the federal claims." *U.S. v. Clark*, 2010 U.S. Dist. LEXIS 9712, \*1 (N.D. Ill. Feb. 3, 2010). *See, Gen. Auto Serv. Station v. City of Chi*., 2004 U.S. Dist. LEXIS 3800 at \*12 (N.D. Ill. Mar. 9, 2004) (finding shared factual background insufficient to establish supplemental jurisdiction where federal claim would be "wholly unaffected" by dismissal of state-law claim).

Here, because there is no diversity of jurisdiction between Outland and the Gamesa Parties, and the claims are based upon state law, the Court may only exercise jurisdiction over these claims if they meet the requirements for supplemental jurisdiction under 28 U.S.C. § 1367(a).  *See, Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) ("jurisdictional issue [that is] unnoticed by the parties and the district court [is] of course, not waivable.")

A summary list of the claims contained in the original Counterclaim and the proposed amended counterclaim are set forth in the table below.

| List of Claims<br>Original Counterclaim | Type of<br>Claim | Proposed Amended Counterclaim | Type of<br>Claim |
|---|---|---|---|
| COUNT I<br>TORTIOUS INTERFERENCE WITH<br>CONTRACTUAL RELATIONS<br>(OUTLAND'S EXISTENCE) | Other State<br>Claim | COUNT I<br>TORTIOUS INTERFERENCE WITH<br>CONTRACTUAL RELATIONS | Other State<br>Claim |
| COUNT II<br>TORTIOUS INTERFERENCE WITH<br>PROSPECTIVE ECONOMIC RELATIONS<br>(GAMESA'S INTERFERENCE WITH<br>OUTLAND'S PROSPECTIVE CONTRACTS | Other State<br>Claim | COUNT II<br>TORTIOUS INTERFERENCE WITH<br>PROSPECTIVE ECONOMIC<br>RELATIONS | Other State<br>Claim |

**A162**

| WITH OTHERS) | | | |
|---|---|---|---|
| COUNT III<br>TORTIOUS INTERFERENCE WITH<br>CONTRACTUAL RELATIONS<br>(OUTLAND'S ACQUISITION) | Other State<br>Claim | COUNT III<br>PRIMA FACIE TORT | Other State<br>Claim |
| COUNT IV<br>INTENTIONAL INTERFERENCE WITH<br>OUTLAND'S DIRECTIVES, TRAINING<br>AND SAFETY PROTOCOLS | Other State<br>Claim | COUNT IV<br>PROMISSORY ESTOPPEL | Other State<br>Claim |
| COUNT V<br>BREACH OF CONTRACT<br>(TRANSACTIONAL WORK) | Other State<br>Claim | COUNT V<br>BREACH OF FIDUCIARY DUTY | Other State<br>Claim |
| COUNT VI<br>INDEMNIFICATION UNDER MSA | Other State<br>Claim | COUNT VI<br>INDEMNIFICATION | Other State<br>Claim |
| COUNT VII<br>BREACH OF DUTY TO DEAL FAIRLY | Other State<br>Claim | COUNT VII<br>SECTION 1 OF THE SHERMAN<br>ACT AND CLAYTON ACT,<br>SECTION 3 (TREBLE DAMAGES) | Federal<br>Claim |
| COUNT VIII<br>SECTION 2 OF THE SHERMAN ACT AND<br>CLAYTON ACT, SECTION 3 (TREBLE<br>DAMAGES) | Federal<br>Claim | | |
| COUNT IX<br>SECTION 1 OF THE SHERMAN ACT AND<br>CLAYTON ACT, SECTION 3 (TREBLE<br>DAMAGES) | Federal<br>Claim | | |
| COUNT X<br>BREACH OF DUTY OF GOOD FAITH AND<br>FAIR DEALING | Other State<br>Claim | | |
| COUNT XI<br>COMMERCIAL DISPARAGEMENT | Other State<br>Claim | | |
| COUNT XII<br>INJURIOUS FALSEHOOD | Other State<br>Claim | | |
| COUNT XII [SIC]<br>DISPARAGEMENT OF PROPERTY | Other State<br>Claim | | |
| COUNT XIII<br>DEFAMATION | Other State<br>Claim | | |
| COUNT XIV<br>ACCOUNTING FOR BONUSES | Other State<br>Claim | | |
| COUNT XV<br>MINNESOTA ANTITRUST ACT OF 1971<br>(TREBLE DAMAGES) | State Anti-<br>trust claim | | |
| COUNT XVI<br>MINNESOTA ANTITRUST ACT OF 1971<br>(TREBLE DAMAGES) | State Anti-<br>trust claim | | |
| COUNT XVII<br>TEXAS FREE ENTERPRISE AND<br>ANITTRUST ACT TEXAS BUSINESS AND<br>COMMERCE CODE SECTION 15.05(a) | State Anti-<br>trust claim | | |
| COUNT XVIII<br>TEXAS FREE ENTERPRISE AND<br>ANITTRUST ACT<br>TEXAS BUSINESS AND COMMERCE<br>CODE SECTION 15.05(b) | State Anti-<br>trust claim | | |

5

**A163**

| COUNT XIX<br>TEXAS FREE ENTERPRISE AND<br>ANITTRUST ACT<br>TEXAS BUSINESS AND COMMERCE<br>CODE SECTION 15.05(c) | State Anti-<br>trust claim | | |
|---|---|---|---|
| COUNT XX<br>ILLINOIS ANTITRUST ACT 740 ILCS<br>10/3(2) AND 10/3(3) | State Anti-<br>trust claim | | |
| COUNT XXI<br>ILLINOIS ANTITRUST ACT 740 ILCS<br>10/3(4) | State Anti-<br>trust claim | | |
| COUNT XXII<br>DECLARATORY JUDGMENT (28 U.S.C. §<br>2201) AND INJUNCTIVE RELIEF | Mix of<br>claims | | |

The Federal Claims were anti-trust claims. The Federal Claims involved the Gamesa Parties alleged practice of tying the sale of operation and maintenance services to the sale of wind turbines. The only State Claims that satisfy the requisite factual connection for subject matter jurisdiction were the State Anti-trust Claims.

The Other State Claims were based upon state contract law and state tort law. The only aspect of the Federal Claims that are common to the Other State Claims is that they are between the same parties.[1] The operative facts that would be relevant to proving the Federal Claims share no overlap in the "legal [or] evidentiary burden" that would be relevant to proving an element of the Other State Claims.

Here the requisite factual connection between the Federal Claims and the Other State Claims does not exist. As a result, because no diversity exists between Outland and the Gamesa Parties, the Court did not have jurisdiction to decide the Other State Claims. *See, e.g., Ballentine v. Birkett*, 2013 U.S. Dist. LEXIS 95932, *4-7 (2013)(finding no factual overlap between the operative facts necessary to establish Federal tort claims and the state tort violation even though the facts that led to the Federal claim caused plaintiff's employer to act committing the state tort

---

[1] The Court concluded in the November Order that the "lawsuit by Outland's employee for personal injuries [is] only tangentially related to the [Outland] counter-claims," thus the Outland claims do not satisfy the requisite factual connection for subject-matter jurisdiction with the McCoy claims either.

A164

violations: "[t]he operative facts necessary to prove that the state actors committed federal constitutional violations are separate and distinct from the operative facts necessary to prove that her employer committed state tort violations."); *Berg v. BCS Fin. Corp.*, 372 F. Supp. 2d 1080, 1095 (N.D. Ill. 2005) (finding no common nucleus of operative fact between ERISA claim for denial of benefits and state law breach of contract claim where dismissal of the state law claim would in no way effect the ERISA claim even though the claims emerged out of the same factual background and out of the plaintiff's employment generally); *Angsten v. Blameuser*, No. 05 C 4254, 2005 U.S. Dist. LEXIS 28828, 2005 WL 3095513, at *5 (N.D. Ill. Nov. 16, 2005) (declining supplemental jurisdiction over state law claims that shared "a general factual background (that is, the unchecked harassment of the [the plaintiffs] by their neighbor and his friends)," with the plaintiff's § 1983 claims against the chief of police for denial of equal protection of the law because "the operative facts necessary for the tort claims [were] wholly unrelated to the operative facts essential to the elements of the Section 1983 claim").

The central facts of the Federal Claims are not the same facts that are central to the Outland's state law claims, and the Outland's claims do not comprise "but one constitutional 'case.'" *Gibbs*, 383 U.S. at 725. Here, there is no overlap between facts that are relevant to proving an element of the Federal Claims and facts relevant to proving an element of the Other State Claims. *Berg v. BCS Financial Corp.*, 372 F. Supp.2d 1080, 1093 (N.D. Ill. 2005).

Outland asks the Court to alter, amend and clarify the judgment to make it clear that the Court did not have subject-matter jurisdiction to decide the Other State Claims.

## II. IN THE ALTERNATIVE, OUTLAND REQUESTS THE COURT TO ALTER, AMEND AND VACATE THE JUDGMENT REGARDING THE OTHER STATE CLAIMS.

In the alternative, Outland requests that the Court alter, amend and vacate the judgment regarding the Other State Claims for the reasons set forth below.

**A165**

Inducement to breach a contract (not an Outland claim), interference with a contractual relationship (Count I in the proposed Amended Counterclaim), and interference with a prospective economic advantage (Count II in the proposed Amended Counterclaim) are separate theories upon which the tort of interference with economic relations may be based. The first theory protects against intentional acts designed to produce an actual breach and requires that a plaintiff prove:  he had a valid and existing contract with a third party; defendant had knowledge of the contract and intended to induce its breach; the contract was in fact breached by the contracting party; the breach was caused by defendant's unjustified or wrongful conduct; and damages were suffered as a result.

The second theory is slightly broader in that it protects against intentional acts not necessarily resulting in a breach. It requires that a plaintiff prove: (1) he had a valid and existing contract with a third party; (2) defendant had knowledge of this contract; (3) defendant committed intentional and unjustified acts designed to interfere with or disrupt the contract; (4) actual interference with or disruption of the relationship; and (5) resulting damages. *See, Carpenter, Interference with Contract Relations* (1928) 41 Harv. L. Rev. 728, 732-742; *Restatement (Second) of Torts*, § 766, com. k, at pp. 12-13; *Prosser & Keeton, Law of Torts*, § 129, p. 991 (5th Ed. 1984) stating:

> Beyond this it may be said that actual inducement [of breach] is not necessarily required at all and that interference with contract may be quite sufficient for liability, provided always that it causes harm and that the interference was unjustified. Thus no actual repudiation of the contract is necessary for liability, and it is enough that the contract performance is partly or wholly prevented, or made less valuable, or more burdensome by the defendant's unjustified conduct.

*Accord, United Bilt Homes, Inc. v. Sampson,* 310 Ark. 47, 52, 832 S.W. 2d 502, 504 (Ark. 1992)(citing *Prosser*); *Pacific Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118,

A166

270 Cal. Rptr. 1, 791 P.2d 587, 592 (Cal. 1990) ("Plaintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations."); *De Jur-Amsco Corp. v. Janrus Camera, Inc.*, 16 Misc. 2d 772, 155 N.Y.S. 2d 123, 125-26 (N.Y. Sup. Ct. 1956)("there may be prima facie liability for interference with contract relations without inducing breach of contract by, for example, injuring persons under contract so that they are disabled from performing, or by destroying or damaging property which is the subject matter of a contract, or by doing other acts which make performance more burdensome, difficult or impossible or of less or no value to the one entitled to performance."); *Kisano Trade & Invest Ltd. v. DEV Lemster*, 2011 U.S. Dist. LEXIS 133089, *23-24 (W.D. Pa. 2011).

The third theory is still broader in that it protects against intentional acts designed to harm an economic relationship which is likely to produce economic benefit. It requires that a plaintiff prove: (1) he had an economic relationship with a third party containing the probability of a future economic benefit; (2) defendant had knowledge of this relationship; (3) defendant committed intentional and unjustified acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) resulting damages.

As discussed below, the judgment against Outland with respect to the tortious interference claims should be vacated under whatever law is applied.

### A.  THE CLAIM FOR TORTIOUS INTERFERENCE.

Illinois state courts generally follow the choice of law principles of the *Restatement (Second) of Conflict of Laws*.  *See*, *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 686 (2001). The general rule for torts, such as the tortious interference claims, is that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties."

*See, Restatement (Second) of Conflict of Laws* § 145.  Here, Outland is based in Minnesota.  On

the other hand, Gamesa is based in Pennsylvania.  Both jurisdictions, however, follow the

*Restatement (Second) of Torts* with respect to tortious interference with contract and with

prospective economic relations.  *See,  Thompson Coal Co. v. Pike Coal Co*., 488 Pa. 198, 412

A.2d 466 (1979); *Gieseke v. IDCA, Inc*., 2013 Minn. App. LEXIS 2, *12  (Minn. App. 2013).

In the June Order the Court decided the substance of the Other State Claims related to

Outland's claim for tortious interference by asserting that Outland had waived any right to assert

claims under other than Illinois law.  The Court stated:

> Outland's original twenty-two count complaint asserted several Illinois
> statutory and common law claims. It now asserts that Minnesota law should
> govern its non-federal claims.
>
> Courts in Illinois that sit in diversity apply the "most significant contacts
> test" to determine which state's law governs the dispute. *Auto-Owners Ins.
> Co. v. Websolv Computing, Inc*., 580 F.3d 543, 547 (7th Cir. 2009).
> However, a party waives its choice of law argument where it fails to timely
> assert it. *See Camp v. TNT Logistics Corp*., 553 F.3d 502, 505 (7th Cir.
> 2009) (Courts sitting in diversity apply the forum state's law where the
> parties fail to raise the choice of law issue); *Vukadinovich v. McCarthy*, 59
> F.3d 58, 62 (7th Cir. 1995) ("[C]hoice of law, not being jurisdictional, is
> normally . . . waivable.").
>
> Outland asserts for the first time that its claims arise under Minnesota state
> law despite not having raised a choice of law issue at any time prior to the
> instant motion's briefing. In light of Outland's failure to raise the issue
> before now, the Court will assess Outland's claims under Illinois law. *See
> Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, No. 92 C 7768,
> 1999 U.S. Dist. LEXIS 917, at *4 (N.D. Ill. Jan. 15, 1999) (denying the
> defendant's motion to dismiss based on choice of law argument where it
> failed to raise the issue on a prior motion for reconsideration with respect to
> the same claim).

The Court relied on *Camp v. TNT Logistics Corp*., 553 F.3d 502, 505 (7th Cir. 2009) for

the proposition that "a party waives its choice of law argument where it fails to timely assert it."

The *Camp* decision did not address the issue of waiver.  *Camp* was a diversity action (which the

A168

claims between Outland and Gamesa are not.)  More importantly, in that case neither party raised

the issue at any time prior to *summary judgment* in the District Court or in the Court of Appeals.

As a result, the *Camp* decision merely restated the general rule:

> As a federal court sitting in diversity, we apply state substantive law and federal procedural law. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Because none of the parties raised the choice of law issue, we apply the substantive law of Illinois, the forum state. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

In contrast, Outland has raised the choice of law issue at an early stage, and before any

discovery has commenced on the tortious interference claims.

The June Order relies on *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) for

the proposition that "choice of law, not being jurisdictional, is normally . . . waivable.").  As the

Court in *Vukadinovich* explained, neither party raised a choice of law issue (in that case between

Federal law and Indiana state law), and it was academic in any event because with respect to the

specific issue involved there was no relevant Indiana law:

> We have treated the issue as one of federal law, either common law or statutory (42 U.S.C. § 1988), though Rule 69(a) of the Federal Rules of Civil Procedure, which governs collection proceedings in the federal courts, adopts whatever procedures are followed by the state courts in the state in which collection is sought, here Indiana, unless there is an applicable federal statute expressly regulating the execution of judgments. *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993). Neither party has mentioned Indiana law, however, so we have approached the issue as one of federal law. Rule 69(a) is a choice of law provision, and choice of law, not being jurisdictional, is normally, *see, e.g., Advance Concrete Forms, Inc. v. McCann Construction Specialties Co.*, 916 F.2d 412, 414 n. 4 (7th Cir. 1990); *Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742, 750 (7th Cir. 1988), and we think here, waivable, although we cannot find any case in which the issue has been addressed. *The issue is pretty academic, since we cannot find any Indiana cases, statutes, or rules of court bearing on the question* whether a defendant who receives an award of attorney's fees should be entitled as a matter of course to reimbursement of the expense of collecting the fees. (emphasis added.)

Here the facts are remarkably different.  First, the Outland Counterclaim contained claims

under Federal law and state law, including the state law of Minnesota, Illinois and Texas.  The Court dismissed the Counterclaim on the basis that the claims where insufficient.  When Outland then filed leave to amend the claims (which the Court stated in the June Order was no surprise), the Court then concluded that Outland was bound by insufficiently stated claims.  Second, the dismissed tortious interference claim did not refer to the law of a specific state. Third, the issue has been raised at an early stage of the proceeding, where no discovery has taken place.  Fourth, the Court's choice of Illinois law _is_ the deciding factor in the Court's view.

The Court's approach would prevent any amendment to a complaint because the Court would deem anything not raised initially as waived, which is what the Court did with respect to the claims that were included in the proposed amended complaint that were not in the original Counterclaim even though those additional claims were based upon the same facts originally pled.

Here the business claims were severed from the other parts of the case (Docket No. 205), discovery that had occurred was limited to the narrow issues related to the one wind farm (Docket No. 204), discovery had not commenced on the other claims because no schedule was established and Gamesa refused to produce any documents until its motions to dismiss where decided. As a result, this is not a situation, even if viewed as a new theory or a new complaint, where it is late in the game and there may be prejudice to the defendant.  The business claims were at the starting gate. _Compare, Muslin v. Frelinghuysen Livestock Managers, Inc_., 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (stating "waiting until 'a late point in' the litigation waived objecting to choice of law"); _International Admrs., Inc. v. Life Ins. Co_., 753 F.2d 1373, 1378 (7th Cir. 1985) (finding it "manifestly unfair and inappropriate, absent compelling reasons . . . to disapprove" of a court's choice of law when neither party objected); _Casio, Inc. v. S.M. & R. Co_.,

12

**A170**

755 F.2d 528, 530-31 (7th Cir. 1985) (parties functionally stipulated to the law by not objecting);

*Restatement (Second) of Conflicts of Law § 136(2) cmt. h* (when neither party refers to foreign

law "in the pre-trial stages," the court "will usually decide the case" under local law).

Moreover, based upon the interpretation given by the Court to Illinois law, here the

difference "change[s] the outcome." *Int'l Adm'rs*, 753 F.2d at 1376 & n.4; *see also, In re Air*

*Crash Disaster*, 644 F.2d 594, 605 & n.2 (7th Cir. 1981) (a conflict must actually exist for choice

of law to matter).

One of the elements of a claim for tortious interference is that the defendant had

knowledge of the contract.  Here, Outland alleged that the Gamesa Parties knew of the

Acquisition Agreement, and by April 2011 believed that the Acquisition Agreement provided for

the acquisition of 100% of Outland.  Yet the Court ruled that the Gamesa Parties needed to have

knowledge of the Amended Acquisition Agreement even though it had knowledge that an

acquisition was in process pursuant to some agreement.

Whether or not Illinois state courts would take such a highly technical and ultra-

conservative approach to the issue of knowledge of a final version of an agreement is

questionable in light of the general rule stated in *Prosser & Keeton, Law of Torts*, § 129, p. 991

(5th Ed. 1984) that:

> Intentional interference of curse presupposes knowledge of the plaintiff's
> contract or interest, or at least of facts which would lead a reasonable person to
> believe that such interest exists.

What is certain, however, is that under Minnesota law (as well as other states that have

had to face the issue directly) it is not necessary to show actual knowledge, although here

Gamesa did have actual knowledge that there was an agreement for the acquisition of all or part

of Outland.  Rather, it is enough to show that the tortfeasor "had knowledge of facts which if

**A171**

followed by reasonable inquiry, would have led to a complete disclosure of the contractual

relations and rights of the parties." *Kallok v. Medtronic, Inc*., 573 N.W. 2d 356, 362 (Minn.

1998). "[T]he law will impute bad faith when the wrongdoer has knowledge that the contract

existed." *Id.* at 365. When a defendant knows of a contract between the plaintiff and a third

party, the defendant "is on notice as to the terms of the agreement and has a duty to learn

whether his actions will cause the [third party] to breach his agreement.'" *JIT Concepts, Inc. v.*

*Shelby County Healthcare Corp*., 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005) (quoting *Wells*

*Fund I v. The Shoe Show of Rocky Mount, Inc*., 863 S.W.2d 731, 733 (Tenn. Ct. App. 1993)).

"[T]he alleged inducer may not close its eyes and ears and thereafter claim a lack of knowledge

when the [contract] could have been easily obtained." *Id*. (internal quotations omitted). *See also*

*Rain Bird Corp. v. Nat'l Pump Co*., No. 2:02CV018, 2003 U.S. Dist. LEXIS 26792, at *49 (N.D.

Miss. 2003) ("A finding of willful ignorance is sufficient to infer knowledge of the contract.");

*Major Computer, Inc. v. Academy Life Ins. Co*., 929 F.2d 1249, 1252 (8th Cir. 1991) ("'It is

enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry,

would have led to a complete disclosure of the contractual relations and the rights of the

parties.'" (quoting *Swaney v. Crawley*, 154 Minn. 263, 191 N.W. 583, 584 (Minn. 1923)).

*Accord*, *Prudential Real Estate Affiliates, Inc., v. Long & Foster Real Estate, Inc*., 2000 U.S.

App. LEXIS 3394, *14 (4th Cir. 2000)(stating

> defendant cannot "insulate itself from Prudential's tortious interference claim
> by asserting that it did not know about the specific terms of the franchise
> agreement. *See Stannard v. McCool*, 198 Md. 609, 84 A.2d 862, 867 (Md.
> 1951) (To be liable for intentional interference with a contract, "the actor must
> have knowledge of the business expectancy with which he is interfering . . . .
> But it is not necessary that the actor appreciate the legal significance of the
> facts which give rise to the contractual duty. If he knows those facts, he is
> subject to liability even though he is mistaken as to their legal significance
> and believes that there is no contract or that the contract means something
> other than what it is judicially held to mean." (internal quotation marks

**A172**

omitted)); *cf. St. George Antiochian Orthodox Christian Church v. Aggarwal*, 326 Md. 90, 603 A.2d 484, 490 (Md. 1992) ("There is more than one mental state that may constitute 'knowledge.' The first and highest form of 'knowledge' is actual knowledge, that is, an actual awareness or an actual belief that a fact exists. A second form of 'knowledge' is what has often been called 'deliberate ignorance' or 'willful blindness.' The latter form of 'knowledge' exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth." (citation omitted))."

As the above cited cases show, in Minnesota, as well as in other states that have addressed a similar issue, such as Tennessee, Maryland and Mississippi, the Court's narrow reading of Illinois law, and refusal to look to Minnesota law, is the deciding factor in its decision.

Moreover, the Court elevates form over substance when it states:

> With respect to Outland's claim regarding the Acquisition Agreement, Outland cannot plausibly show a breach of that agreement. The Amended Acquisition Agreement altered the Acquisition Agreement; therefore, if Duke were guilty of a breach, it logically would have to be a breach of the Amended Acquisition Agreement. As the Acquisition Agreement could not have been breached due to the amendment, Outland's claim based upon it also must fail.

The Court acknowledges that Outland sufficiently pled that Gamesa knew of the Acquisition Agreement, but concludes that because the Acquisition Agreement was amended there is no reason to believe that Gamesa knew about the amendment. Thus while Gamesa thought it was interfering with the Acquisition Agreement, because it serendipitously interfered with an amended version of the Acquisition Agreement, the Court concludes that Gamesa gets off scot-free.

Outland made a *prima facie* showing that Gamesa had knowledge of Outland's contract with Duke to acquire all or part of its business, but because the contract was amended, the Court feels that the Gamesa Parties had the right to do whatever it wanted so long as it did not have knowledge of the amendment to the agreement. The Court has taken an incorrect narrow view of

**A173**

the scope of the claim for tortious interference with contractual relations because the Court is requiring a breach of the agreement of which the tortfeasor had knowledge. As the above-cited authority shows, that is not a requirement. The Gamesa Parties had knowledge of the acquisition of Outland, the fact that they did not know the precise terms of the agreement does not excuse them from liability.

The Court next concludes that Outland's third claim under count I is deficient "because it asserts a breach by Duke of a 'commitment' to enter into the DFSA." The Court stated that it "is unaware of a cause of action for breach of a commitment."

Black's law dictionary defines "commitment" as "[a]n agreement to do something in the future." *See, also, Crosspoint Seven v. Mfrs. Life Ins. Co*., 148 Fed. Appx. 535 (7th Cir. 2005) (commitment letters were treated as contracts). Whether the commitment rose to the level of a contract is a factual issue.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of tortious interference with contractual relations.

### B. OUTLAND'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

The Court dismissed the tortious interference with prospective economic advantage for three reasons:

1. the Court did not deem the knowledge prong of the *Voyles* test to have been satisfied.

2. the relationship between Outland and Duke must have been terminated to be entitled to relief, and

3. Gamesa was not wholly motivated by ill will towards Outland but sought to advance its interest as a competitor.

The Knowledge prong of the *Voyles* test.

**A174**

In the June Order, the Court did not deem the knowledge prong of the *Voyles* test to have been satisfied. The Court's conclusion is incorrect for two reasons. First, as noted above, the Court improperly did not apply Minnesota law. Second, under Illinois law knowledge of the actual Amended Acquisition Agreement was not necessary.  It was only necessary that the Gamesa Parties had knowledge of the Outland's expectancy of entering into a valid business relationship, which the Gamesa Parties clearly had. *See, Disher v. Fulgoni*, 161 Ill. App. 3d 1, 47 (Ill. App. 1987)("In Illinois, a claim for tortious interference with a prospective economic expectancy must rest upon a plaintiff's reasonable expectations of entering into a valid business relationship, a defendant's knowledge of the expectancy and intentional and malicious interference with the expectancy without just cause, to plaintiff's damage.")

The Requirement of Termination of the Relationship

In the June Order, the Court concluded that the relationship between Outland and Duke must have been terminated to be entitled to relief. The Court's conclusion is incorrect for two reasons. First, as noted above, the Court improperly did not apply Minnesota law. Second, under Illinois law the elements of tortious interference with prospective economic advantage are: "(1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the plaintiff's expectancy; (3) defendant's purposeful interference to defeat the expectancy; and (4) damages." *See, Douglas Theater Corp. v. Chicago Title & Trust Co*., 288 Ill. App. 3d 880, 887 (Ill. App. 1997).  The third and fourth element only requires that the "expectancy" be defeated, which is directly related to what was expected.  Outland clearly alleged what it expected and what eventually occurred was markedly different due to the tortious interference of the Gamesa Parties. *See, Prosser & Keeton, Law of Torts, supra,* § 129, p. 991 (5th Ed. 1984); *United Bilt Homes, Inc. v. Sampson, supra; Pacific Gas & Elec. Co. v. Bear Stearns & Co*.,

**A175**

*supra; De Jur-Amsco Corp. v. Janrus Camera, Inc.*, *supra*; *Kisano Trade & Invest Ltd. v. DEV Lemster*, *supra*.

Comment c to the *Restatement (Second) of Torts* § 766 also makes clear that inducement to breach, and thus a termination of the relationship, is not an absolute requirement for liability under that section. It states:

> The *liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations*. . . .
> The plaintiff's interest in his contractual rights and expectancies must be weighed, however, against the defendant's interest in freedom of action. If the defendant's conduct is predatory the scale on his side may weigh very lightly . . . . The issue is whether in the given circumstances his interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce. In deciding this issue, *the nature of his conduct is an important factor*. (emphasis added).

Other treatises support this interpretation of the law. *See* 2 Fowler V. Harper, Fleming James, Jr. & Oscar F. Gray, *Harper, James and Gray on Torts* §§ 6.7, 6.9, at 366, 379 (3d ed. 2006) ("The contemporary view of the action is that it lies[] more broadly"; "Protection is afforded the interest in contractual relations against harms other than inducement of breach. We may generalize that any intended and unprivileged interference . . . that causes loss to either party to a transaction is actionable by the party suffering the loss."); *id.* § 6.8, at 377 ("The term *inducing breach of contract* is somewhat misleading as a description of the tort in question.") (emphasis in original); *id.* § 6.5, at 356 ("The interest involved in this tort may be described as the interest of the individual in the security and integrity of the contractual relations into which he has entered."); W. Prosser & W. Keeton, *Torts* § 129, at 991 (5th ed. 1984) ("no actual repudiation of the contract is necessary for liability"); *id.* at 979 ("It may be sufficient for liability that the defendant has acted intentionally to interfere with a known contract or prospect, that he has caused harm in so doing, and that he has acted in pursuit of some purpose considered

**A176**

improper."); *id*. at 945 (indicating that a defendant may be liable when it commits a tort against a person with whom the plaintiff has a contract: "If the plaintiff's interests and those of the contracting party are sufficiently close, a tort to the one may be sufficient basis for liability to the other, if harm results."); 1A *Callmann on Unfair Competition, Trademarks & Monopolies* § 9:16 (4th ed. 1981) ("Some cases treat interference as a more comprehensive concept than inducement of breach; and therefore hold that there may be tort liability where a contractual relationship is rendered less valuable or more burdensome by some impairment, even though it is not breached."). "The most numerous of the tortious interference cases are those in which the disruption is caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach his contract with the plaintiff *or causes a third person not to confer a benefit on the plaintiff*." Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U. Chi. L. Rev. 61, 106 (1982) (emphasis added). "In most jurisdictions, the fact of competition alone does not justify interference, and at least a prima facie case of liability attaches if the competitor *intentionally interferes with* a known contract." *Id*. (emphasis added) (citing Prosser, § 129, at 945).

Gamesa's motivation

In the June Order, the Court concluded that Gamesa was not wholly motivated by ill will towards Outland but sought to advance its interest as a competitor and as a result has no liability. The Court's conclusion is incorrect for two reasons. First, as noted above, the Court improperly did not apply Minnesota law. Second, under Illinois law, the *Restatement (Second) of Torts*, Section 766B, comment f, establishes that ill-will is not a prerequisite for liability ("Ill will on the part of the actor toward the person harmed is not an essential condition of liability. . . [a]lthough the actor is acting for the purpose of advancing an interest of his own, that interest

**A177**

may not be of sufficient importance to make his interference one that is not improper and avoid liability." *See, also*, Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U. Chi. L. Rev. 61, 106 (1982) (emphasis added). "In most jurisdictions, the fact of competition alone does not justify interference, and at least a prima facie case of liability attaches if the competitor *intentionally interferes with* a known contract." *Id*. (emphasis added) (citing Prosser, § 129, at 945).

Citing *Imperial Apparel, Ltd. v. Cosmos's Designer Direct, Inc*. 882 N.E. 2d 1011, 1019 (Ill. 2008), the June Order concluded that because Outland and Gamesa were competitors, the Gamesa Parties had a privilege to take the action they did (stating "[u]nder Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will. *General Motors Corp. v. State of Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 15, 862 N.E.2d 209, 308 Ill. Dec. 611 (2007)").

However, the *Imperial Apparel* court also stated: "[t]he privilege to compete does not, however, encompass the use of improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement. *See Cohabaco Cigar Co. v. United States Tobacco Co.*, No. 98-C-1580, 1998 U.S. Dist. LEXIS 17472 (N.D. Ill. October 29, 1998)." The Imperial Apparel court relied on the General Motors case, which in turn, relied on the *Soderland Brothers* case.

In the *General Motors* case, the Illinois Supreme Court stated:

> The terms "lawful competition," "privileged competition," "privilege of competition" and "competitor's privilege" appear in the case law and all refer to the same privilege, which is an affirmative defense to the tort of intentional interference with prospective business advantage. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398-99 (7th Cir. 2003); *International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir.

**A178**

1999); *G.M. Brod & Co. v. U.S. Home Corp*., 759 F.2d 1526, 1534 (11th Cir. 1985).  It "allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *See Soderlund Brothers, Inc. v. Carrier Corp*., 278 Ill. App. 3d 606, 615, 663 N.E.2d 1, 215 Ill. Dec. 251 (1995).

The *Soderland Brothers* case on which both the *General Motors* and *Imperial Apparel* cases find their source, clearly establishes that under Illinois law the privilege is based upon the *Restatement (Second) of Torts §768.  See*, *Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill. App. 3d at 615 (stating

The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will. (*See Candalaus Chicago, Inc. v. Evans Mill Supply Co*. (1977), 51 Ill. App. 3d 38, 366 N.E.2d 319, 9 Ill. Dec. 62; *Restatement (Second) of Torts* § 768(1)(d) & Comment b, at 40 (1979).) That privilege extends to the tort of interference with a prospective business relation or economic advantage but does not apply to the tort of interference with a contractual relation. (*See Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 610, 480 N.E.2d 1176, 1182, 89 Ill. Dec. 433 ("unlike the right to receive the benefits of a contract, the right to engage in a business relationship is not absolute, and must be exercised with regard to the rights of others"); *Belden Corp. v. InterNorth, Inc*. (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101, 45 Ill. Dec. 765 ("the sacrosanct contractual relation takes precedence over the conflicting rights of any presumptive interferor, including his right to compete and his own prospective advantage"); *see generally Restatement (Second) of Torts* § 768, Comment a, at 39 (1979).) Section 768 of the *Restatement (Second) of Torts* sets forth the elements for competition or permissible interference as follows:

"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue in an unlawful restraint of trade and

**A179**

(d) his purpose is at least in part to advance his interest in competing with the other."

(*Restatement (Second) of Torts* § 768, at 39 (1979).)

Acts of competition, which are never privileged, include fraud, deceit, intimidation, or deliberate disparagement. *Belden Corp. v. InterNorth, Inc.; see Galinski v. Kessler. See generally, Prosser, Torts* § 130, at 956 (4th ed. 1971).

Here the Court's decision is incorrect because the factor of in part advancing one's interest is only one factor that must be satisfied in order to use the privilege.  It is not a sole and deciding factor as the Court determined—all four factors must be met.  In addition, the Gamesa Parties and Outland were not competitors in the sense used in §768. Gamesa did not have its own internal O&M service group. Amended Complaint ("Am. Comp.") ¶¶6, 67.

The Gamesa Parties would not be able to avail themselves of the *Restatement (Second) of Torts*, Section 768, privilege.  First, the matter did not involve a matter involved a competition between the Gamesa Parties and Outland.  The matter involved Gamesa interfering with the acquisition of Outland.  *See*, Comment d (stating "[t]he rule stated in this Section applies only in the situation in which the business diverted from the competitor relates to the competition between him and the actor.  It does not apply when the business diverted by the actor does not relate to his competition with his competitor.")  *See also*, Comment e stating

> "The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged. If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition. For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

**A180**

Here, Gamesa did not succeed by virtue of matters relating to the competition.  On the contrary, Gamesa succeeded because it was exerting superior power in affairs unrelated to competition.

Moreover, Gamesa also employed unlawful means.  Acts of fraud and deceit are never privileged.  Here, the Gamesa Parties deceived Outland by leading them to believe that the Gamesa Parties were not going to compete with Outland. Am. Comp. ¶¶7, 69, 70, 73, 74, 77, 85, 86, 100, 104. Furthermore five additional torts that Gamesa committed provide the basis to conclude that their interference was improper: (i) fraudulent misrepresentation   (*Restatement (Second) of Torts, §549*),  (ii) negligent misrepresentation (*Restatement (Second) of Torts, §552*), (iii) tortious interference with contract (*Restatement (Second) of Torts, §766*), (iv) the breach of fiduciary duties of Gamesa as a principal in the principal-agent relationship that existed between Gamesa and Outland (*Restatement (Second) of Torts*, §874), and (v) liability for intended consequences, which is sometimes referred to a prima facie tort (*Restatement (Second) of Torts*, §870) .

Whether the interference was improper, and the certainty of the desired result, are factual questions that cannot be resolved at the pleading stage.  For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of tortious interference with economic advantage.

## C.  THE OUTLAND PLAINTIFFS' CLAIM FOR PRIMA FACIE TORT

The amended counterclaim added the claim of prima facie tort as defined by the *Restatement (Second) of Torts*, §870.  The Court dismissed the count concluding that it would not be recognized under Illinois law.   First, the Court improperly did not apply Minnesota or Pennsylvania law. Second, even under Illinois law the Court did not sufficiently address the

**A181**

United States Supreme Court's, citing the *Restatement (Second) of Torts*, Sec. 870, recognition of the "[g]eneral [p]rinciple" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." *See, Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 657 (2008). While the Court stated that it not see any issue raised by the Seventh Circuit in *Kirksey v. R.J. Reynolds Tobacco Co*., 168 F.3d 1039, 1042 (7th Cir. 1999) with *Barry Gilberg, Ltd v. Craftex Corp*., 665 F. Supp. 585 (N.D. Ill. 1987), the plain language of the Seventh Circuit's comment "*not yet anyway*" could only be read as an expectation that the Illinois Supreme Court would recognize it. And that comment occurred before the United States Supreme Court's recognition of the prima facie tort principle of *Restatement (Second) of Torts*, §870.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of prima facie tort.

### D. PROMISSORY ESTOPPEL AND BREACH OF FIDUCIARY DUTY.

Despite the Gamesa Parties not raising the issue, the Court *sua sponte* decided at this early stage of the proceeding that it would not allow the specific claim because it was not in the original Counterclaim, and allowing it would change "the theory of the case."

The Court stated that it was so ruling because it might be burdensome on Gamesa to engage in additional discovery citing the brief discovery that was conducted on the narrow issue of the work at one wind farm. No other discovery has been conducted on the business claims. Moreover, a claim of promissory estoppel as an alternative to a breach of contract claim that was in the original complaint could not reasonably be considered to (i) require any burdensome additional discovery, or (ii) markedly change the theory of the case. Similarly, the original complaint contained related claims of breach of duty to deal fairly and breach of duty of good

A182

faith.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim of promissory estoppel and breach of fiduciary duty.

### E.  GAMESA'S OBLIGATION TO INDEMNIFY OUTLAND

The Court dismissed this count as it relates to contractual indemnification stating that the "Court's Order of Good Faith Settlement bars Outland's indemnification claim with respect to OSHA costs relating to McCoy's accident."  Earlier in the ruling, however, the Court correctly stated that "the Court's February 5, 2013, Order on Gamesa's Motion for Finding of Good Faith Settlement relating to McCoy's claims expressly disclaimed any effect that the settlement would have on the viability of Outland's counterclaims and Gamesa's crossclaims."

The Court's order of February 5, 2013 (Docket No. 290) clearly excludes Outland's claim:

> 4. Nothing in this Order shall limit, impinge, pertain to or effect the claims and causes of action arising out of or relating to the allegations set forth in the Counterclaims of OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC, entitled "*Counterclaims of Outland Against Gamesa Technology Corporation, Inc. and Gamesa Wind US, LLC" filed on or about September 22, 2011, Document No. 112 in this litigation,* and nothing in this Order shall limit, impinge, pertain to, or effect the claims or causes of action arising out of or relating to the allegations asserted by GAMESA TECHNOLOGY CORPORATION, INC. and GAMESA WIND US, LLC, against OUTLAND RENEWABLE ENERGY, LLC n/k/a RENOVO RENEWABLE ENERGY, LLC, OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC n/k/a OUTLAND ENERGY SERVICES, LLC, and OUTLAND ENERGY SERVICES, LLC f/k/a OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC in the pleading entitled "Gamesa Technology Corporation, Inc.'s and Gamesa Wind US, LLC's Answer, Affirmative and Additional Defenses, and Counterclaim to Outland's Counterclaim" filed on or about February 9, 2012, Document No. 215 in this litigation. (emphasis added.)

**A183**

Outland's indemnification claim was Count VI in Document No. 112. The plain meaning of the order excludes it.

Moreover, the purpose of a good faith finding under the Illinois Joint Tortfeasors Contribution Act is to address various potential tortfeasors contribution related to McCoy's claims, not claims that are wholly unrelated to injuries to payments to which McCoy would be entitled. For that reason, the finding itself only addresses claims arising out of and related to AARON MCCOY's claims. The OSHA penalties did not arise from and were not related to the *claims* of McCoy, which were the only matters covered in paragraphs 2 and 3 of the February 5, 2013, Order.

Outland's claim for indemnification for the OSHA penalties was not released by the good faith settlement.

The Court then declined to allow Outland to add a common law indemnification claim solely because it was not in the original complaint. Clearly, no theory of the case would be changed by the addition of such a claim. The Court cited *Johnson v. Sales Consultants, Inc.*, 61 F.R.D. 369, 371 (N.D. Ill. 1973), but in *Johnson* the plaintiff sought to change the theory of the case from a fraud in the inducement to an anti-trust action. Moreover, additional and wide-ranging additional discovery would need to occur. Here the change is a refinement to an indemnification claim, hardly a change in the theory of the case, and a claim that would not require any additional discovery above and beyond what would occur with respect to the Other State Claims, once discovery commenced.

For the reasons stated above, Outland moves the Court to alter, amend and vacate the judgment as to the claim for indemnification.

**III.    CONCLUSION.**

**A184**

For the reasons stated above, Outland asks the Court to amend and clarify the judgment to make it clear that the Court had no subject matter jurisdiction over the Other State Claims, or, in the alternative, that the Court alter, amend and vacate the judgment regarding the Other State Claims for the reasons set forth above.

Dated: September 4, 2013

_____

Thomas Melone, Esq.
222 S 9th St, Suite 1600
Minneapolis, MN 55402
 (212) 681-1120

**A185**

```
 1                   IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     AARON McCOY,                        ) No. 11 C 592
 4                                       )
                                         )
 5          Plaintiff,                   )
                                         )
 6               v.                      )
                                         )
 7   GAMESA TECHNOLOGY CORPORATION,      )
     INC.; GAMESA WIND US, LLC;          )
 8   IBERDROLA RENEWABLES, INC.;         )
     STREATOR-CAYUGA RIDGE WIND          )
 9   POWER, LLC,                         )
                                         )
10          Defendants.                  )
     ------------------------------- )
11   IBERDROLA RENEWABLES, INC.;         )
     and GAMESA TECHNOLOGY               )
12   CORPORATION, INC.,                  )
                                         )
13          Third-Party Plaintiffs,      )
                                         )
14               v.                      )
                                         )
15   OUTLAND RENEWABLE ENERGY, LLC;      )
     OUTLAND RENEWABLE ENERGY FIELD      )
16   SERVICES, LLC; and OUTLAND          )
     ENERGY SERVICES, LLC,               ) Chicago, Illinois
17                                       ) August 8, 2013
            Third-Party Defendants.  ) 9:30 o'clock a.m.
18

19               TRANSCRIPT OF PROCEEDINGS - MOTION
            BEFORE THE HONORABLE CHARLES P. KOCORAS
20

21   APPEARANCES:

22   For the Defendant          KUTAK ROCK, LLP
     Gamesa:                    BY:  MR. MATTHEW M. ENENBACH
23                              One South Wacker Drive, Suite 2050
                                Chicago, Illinois  60606
24

25
```

```
 1   APPEARANCES:   (Continued):

 2
     For the Third-Party        KEELEY KUENN & REID
 3   Outland Defendants:        BY:  MR. THOMAS EDWARD ROCHE
                                150 North Wacker Drive, Suite 1100
 4                              Chicago, Illinois  60606-1602

 5
     Court Reporter:            MR. ANTHONY W. LISANTI
 6                              United States Courthouse
                                219 South Dearborn St., Suite 1744-A
 7                              Chicago, Illinois 60604
                                (312) 405-1383
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A187**

```
 1              THE CLERK:  11 C 592, McCoy vs. Gamesa Technology.
 2    Motion for entry of final judgment.
 3              MR. ROCHE:  Good morning, your Honor, Tom Roche, local
 4    counsel for Outland.
 5              THE COURT:  Good morning.
 6              MR. ENENBACH:  And Matthew Enenbach for the Gamesa
 7    entities, your Honor.
 8              THE COURT:  For, who?
 9              MR. ENENBACH:  The Gamesa entities.
10              THE COURT:  These were the two parties that have
11    resolved their differences?
12              MR. ENENBACH:  Gamesa obtained a judgment on the
13    pleadings as to Outland's counterclaims.  Outland moved for
14    leave to amend and that was denied, as well.
15              THE COURT:  What is in the Court of Appeals?
16              Is there something in the Court of Appeals?
17              MR. ROCHE:  Nothing.  It was dismissed because we did
18    not have a final appealable order.  It was withdrawn.
19              THE COURT:  So, you are going back there?
20              MR. ROCHE:  I am not sure if we are going back to the
21    Seventh Circuit --
22              THE COURT:  Is there any reason I should not grant
23    this motion?
24              MR. ROCHE:  No.
25              THE COURT:  The motion is granted.
```

**A188**

1          MR. ENENBACH:   Thank you, your Honor.

2          THE COURT:   All right.

3          MR. ROCHE:   Thank you, your Honor.

4

5                    *   *   *   *   *

6   I certify that the foregoing is a correct transcript of the
    original shorthand notes of proceedings in the above-entitled
7   matter.

8
    /s/ Anthony W. Lisanti          September 12, 2013
9   Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A189**